**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CASE NO. 8:22-cr-363-KKM-JSS
March 7, 2024
Tampa, Florida
9:47 a.m. - 5:01 p.m.

ELIAS XAVIER ROSARIO TORRES,
VERONICA ESTEFANIA RODRIGUEZ PINUELA,

Defendants.
_______________________________/

**TRANSCRIPT OF TRIAL - VOLUME 3**
BEFORE THE HONORABLE KATHRYN K. MIZELLE
UNITED STATES DISTRICT JUDGE

Proceedings reported and transcribed by computer-aided transcription.

**APPEARANCES:**

| | |
|---|---|
| For the Government: | JEFFREY CHANG, ESQ.<br>JAMES PRESTON, ESQ.<br>Assistant U.S. Attorneys<br>400 N. Tampa Street, Suite 3200<br>Tampa, Florida 33602<br>813/274-6000 |
| For the Defendant, Elias Xavier Rosario Torres: | RAUDEL VITIER, ESQ.<br>HOWARD JAMES WILLIAMS, ESQ.<br>Federal Public Defenders<br>400 North Tampa Street, Suite 2700<br>Tampa, Florida 33602<br>813/228-2715 |
| For the Defendant, Veronica Estefania Rodriguez Pinuela: | KEN LANGE, ESQ.<br>Law Offices of Ken Lange<br>12550 Biscayne Blvd., Suite 207<br>North Miami Beach, Florida 33181<br>305/892-0030 |
| Interpreters: | Gabriela Loncar<br>Jesse Leonor |
| Court Reporter: | Howard W. Jones, RDR, RMR, FCRR<br>801 N. Florida Avenue, Suite 15A<br>Tampa, Florida 33602<br>813/301-5024 |

* * * * * * * * * *

# I N D E X


| | PAGE |
|---|---|
| TESTIMONY OF MARCY PLAZA | |
| Direct Examination by Mr. Chang: | 23 |
| Cross-Examination by Mr. Vitier: | 41 |
| Redirect Examination by Mr. Chang: | 53 |
| PROFFER TESTIMONY OF HERMOGENES JOSE RODRIGUEZ SALINAS | |
| Direct Examination by Mr. Lange: | 57 |
| Cross-Examination by Mr. Preston: | 88 |
| Cross-Examination by Mr. Vitier: | 89 |
| MOTION FOR MISTRIAL AND SEVERANCE ON BEHALF OF DEFENDANT PINUELA BY MR. LANGE: | 96 |
| RULING OF THE COURT: | 107 |
| TESTIMONY OF REBECCA METSKY | |
| Direct Examination by Mr. Chang: | 110 |
| TESTIMONY OF LUIBETH FORTES-RODRIGUEZ | |
| Direct Examination by Mr. Chang: | 119 |
| TESTIMONY OF JUAN ALVAREZ | |
| Direct Examination by Mr. Chang: | 124 |
| RULE 29 CONFERENCE | 131 |
| RULING OF THE COURT: | 137 |
| MOTION IN LIMINE ON BEHALF OF THE UNITED STATES BY MR. PRESTON: | 148 |
| RULING OF THE COURT: | 155 |
| TESTIMONY OF VERONICA ESTAFANIA RODRIGUEZ PINUELA | |
| Direct Examination by Mr. Lange: | 169 |
| Cross-Examination by Mr. Preston: | 197 |
| Cross-Examination by Mr. Vitier: | 209 |
| CERTIFICATE OF COURT REPORTER: | 233 |


* * * * * * * * * *

**E X H I B I T S**

| GOVERNMENT EXHIBIT NO. | IDENTIFIED | PAGE RECEIVED |
|---|---|---|
| 42 | 122 | 122 |
| 43 | 122 | 122 |

| DEFENDANT TORRES EXHIBIT NO. | IDENTIFIED | PAGE RECEIVED |
|---|---|---|
| 11 | 168 | 168 |

* * * * * * * * * * *

**P R O C E E D I N G S**

(Court called to order and the following proceedings were had outside the presence of the jury.)

THE COURT: There's been a few things that I want to go over with counsel. I saw the government updated the jury instruction.

Any objection to that from defense?

MR. VITIER: Yes, Your Honor. Only because it would be confusing. Most of the Pinkerton instruction is covered as far as the conspiracy in the conspiracy instruction, which is at 0100, it's Document 105 of what's been submitted to the Court, it's page 30 of 53. The elements of the conspiracy are already there.

And then it also -- the Court's going to instruct them that they have to look at the separate crimes and the separate defendants separately. So using the Pinkerton instruction it's gonna convolute those two instructions.

THE COURT: Mr. Lange, do you have an additional argument before I turn back to Mr. Chang?

MR. LANGE: No, I do not, Judge.

THE COURT: So do you join in that objection?

MR. LANGE: Yes.

THE COURT: Mr. Chang or Mr. Preston?

MR. PRESTON: Yes, good morning, Your Honor. The Pinkerton instruction that was proposed is actually an

Eleventh Circuit pattern jury instruction. It's not confusing to the jury. It's an additional -- it's in addition to the conspiracy count. It doesn't cover the conspiracy count.

THE COURT: It's about Counts Two and Three, right?

MR. PRESTON: Correct. And it carries over from the conspiracy. In order for Pinkerton to apply, the jury will already have to have found that the defendants were involved in a conspiracy and the conspiratorial achievements or, in other words, the things that are charged in Counts Two and Three, are attributable to both defendants if those additional elements that the Court will instruct the jury on through this standard instruction are met.

It applies in this case based on some of the arguments we've heard, it applies in this case based on the conduct that's attributed to both defendants, and it's not confusing and it's not covered. The government submits that it is an appropriate instruction, it's been given many times in drug cases in this Circuit and in this court, and I submit to the Court that the objections to that instruction should be overruled at this point in time.

THE COURT: Anything else from defense counsel?

MR. VITIER: No, Your Honor.

MR. LANGE: Nothing further, Judge.

THE COURT: Okay. Given how the case has proceeded so far, I certainly think it's applicable to have the defenses put forth its case, so at this time I'm intending to go give it. I'll finalize the jury instruction when we get to that juncture of the trial after defense case has been put on.

Mr. Lange, can you answer a couple of questions for me? So with regards to Mr. Rodriguez, who I believe -- Mr. Lange?

MR. LANGE: Yes.

THE COURT: With regards to Mr. Rodriguez, who did appear and is before Judge Adams right now getting counsel appointed, I believe, or inquiring as to whether he qualifies for that --

MR. LANGE: That's my understanding.

THE COURT: Did you give him the trial subpoena?

MR. LANGE: No, no, we had -- when the trial subpoena first came to me for him, the public defender and I spoke and I said I'd produce him whenever they needed to produce him, and that's why we didn't proceed with a subpoena, because it was for a different date than today. It was for an earlier date, the subpoena.

THE COURT: So did you ever give him the trial subpoena from Mr. Torres.

MR. LANGE: No, it's all been verbal. He's my

client's uncle, I never thought to give it to him, thought it would be necessary.

THE COURT: Okay. Well, we'll see what -- this is what I anticipate unfolding. He's gonna probably get counsel appointed and then we're gonna have to do a proffer outside of the jury's hearing as to what he would be asked on direct by you and what he would be asked on cross by Mr. Vitier. I suspect he's going to assert the Fifth if he has counsel and, as a result, no one is gonna be allowed to call him, because he can't selectively assert the Fifth, or he's gonna waive it entirely. But my guess is he's going to be advised to assert the Fifth.

MR. LANGE: Yeah, I mean, it's his choice.

THE COURT: Right. Any objection to proceeding in that manner? I think that's almost certainly how this will need to go forward.

MR. VITIER: No objection to proceeding with a proffer, Your Honor.

MR. PRESTON: None from the government either, Your Honor.

MR. LANGE: I mean, I don't know the kind of colloquy that the Magistrate Judge is having with him, so I was assuming that that would be sufficient to either -- either cause him to continue to participate or not continue to participate.

THE COURT: Well, what he can't do is answer your questions on direct and then say I'm not gonna answer any of Mr. Vitier's questions on cross or hostile direct. If he answers any questions about this subject matter, then he's waived his Fifth Amendment right. And I imagine given the counsel that I know he's getting appointed, he's gonna get good advises, which is gonna be not to say anything probably.

MR. LANGE: Right. Well, of course, that puts a chilling effect on my ability to present a complete defense. And that's fine if he wants to do it. I would hope -- I don't know appointed counsel, but I would hope that he would not be encouraging necessarily one way or the other, because we don't have a factual basis yet, which I asked for from the public defender as to why -- a factual proffer as to why he thinks this is an issue. It was raised at 4:00 o'clock or 4:30 yesterday afternoon. That's the first time I really heard this issue be raised.

THE COURT: Which issue are you referring to?

MR. LANGE: The public defender's issue about wanting -- some implication that the defense witness is somehow involved in some conspiracy with my client and could be criminally involved. There was zero indication of that as a public defender issue until I heard it at 4:00 or 4:30 yesterday afternoon. So it's fine, it can be inquired, I

don't mind it. If he wants to take the Fifth, fine. But I think Your Honor at a minimum ought to hear what factual basis he has to believe --

THE COURT: That's why I'd say we do a proffer outside of the jury's hearing to understand -- I want to understand what you would inquire and as to what he would assert if he would assert. But this is not out of the blue, there was a trial subpoena that the defense, Mr. Torres, procured. They were unable to serve it. That's somewhat their problem, but you agree to give it to him.

MR. LANGE: Well, the subpoena was out of date anyway, it was on the wrong date. We had agreed that I would produce him.

THE COURT: Does anyone have a copy of the subpoena?

MR. VITIER: I don't have a copy of the subpoena, but he's correct, it had the original March 4th date before we moved it to the 5th. When I talked to --

THE COURT: But trial subpoenas usually last for the trial beginning on March 4th and continuing through, which is why I was saying yesterday in theory someone under a trial subpoena who has been properly served with a subpoena has an obligation to sit outside the courtroom that whole week.

MR. LANGE: I understand, but we had reached an

understanding since -- that I would produce him when he wanted -- when he wanted him produced, and that's what we're doing. I just think a better practice would be, depending on what happens in the Magistrate Court, to instead of having -- me having to disclose my entire direct examination first, the public defender should be required to present what he believes is -- is a good-faith basis for what he's trying to do. I think there ought to be a proffer, a factual proffer from him first, and then Your Honor deciding whether you want to hear from me and hear my whole direct examination.

THE COURT: I'll figure out who goes first. It doesn't -- here's the bottom line, as I understand it, and I want to know if anyone can show me case law differently. He cannot selectively assert the Fifth. So if you're going to talk to him about the same subject, which I think we are, we're gonna talk about the day, March 8th, 2022, in the car, his role, what he knows. He cannot answer your questions and refuse to answer Mr. Vitier's.

MR. LANGE: I agree with that.

THE COURT: Right. Right, we're all in agreement on that?

MR. VITIER: Agreed.

THE COURT: If he answers your question, he waives the Fifth and he has to answer his questions and --

MR. LANGE: True.

THE COURT: Or what I imagine will happen is he will be counseled not to answer anything and he's going to assert the Fifth on this topic generally. That's what I anticipate happening. I think that it's pretty clear or should have been pretty clear to both defense counsel that that is likely to occur, since he is listed on both of your witness lists. They have a trial subpoena, he's a friendly witness to you, so you didn't need a trial subpoena. This is not shocking, I think, that he might do this.

MR. LANGE: I just don't want -- I just don't want him thinking that that's his only choice here.

THE COURT: That's why he needs counsel, which is why we have remedied that.

MR. LANGE: No, I understand, counsel and I'm sure he'll do a very professional job. It's just that I -- again, I guess what I'm focusing on is however Your Honor wants to do it, I would like you to hear first from -- a proffer from the PD as to why he thinks there's a good-faith factual basis for what he's trying to do.

THE COURT: What do you mean by that? A good-faith factual basis? Like, I think there's a line of questioning -- there's a line of questioning that he can clearly ask about his physical presence just being in the car that day and his knowledge of what occurred before, who

brought the bags, any of that would just be -- obvious from the facts that have already been introduced at trial.

MR. LANGE: Or it could be a pretext to get him to invoke the Fifth if it's not sufficient. In other words, his theory is that somehow the witness is involved in some sort of criminal activity. He ought to have a proffer, not just that he's -- straightforward he's in the car he's watching. He can do that on regular cross-examination. Why would he press the Fifth Amendment issue if there's not a good-faith factual basis of some sort of corruption on the part of the witness? There has to be that first -- otherwise, that's a chilling effect on his ability to testify in the defense case.

THE COURT: I think that's the purview of whomever his counsel would be, to decide what -- this is why he needs counsel appointed.

MR. LANGE: I'm fine with that, I thought that was a good idea. I just don't know, you're sort of making an assumption that, well, the CJA counsel is gonna advise him to take the Fifth. On what basis would he advise him to take the Fifth?

THE COURT: I don't know, but that would be communications between that counsel and Mr. Rodriguez, which I am not going to inquire into, that's why he gets counsel appointed.

MR. LANGE: I still think there needs to be fundamentally some sort of a factual basis from the public defender to establish any sort of factual belief that he's a corrupt -- he's a corrupt defense witness, that he's a corrupt -- that somehow he's involved in some sort of criminal enterprise in this case, rather than just force -- making some allegation without a factual basis to believe this. And then the guy is encouraged to take the Fifth and he takes the Fifth and I no longer have a critical defense witness. I mean, it really intrudes on -- it invades my defense camp, which is fine, that's why I was happy to produce him and let him talk to him, have a discussion first, which he hasn't done, have a -- and then come back and say, well, I have -- this is my good-faith proffer belief as to why it's essential to -- to -- for him -- to do what I -- I'm asking the Court to do.

THE COURT: I don't know what -- to be clear, I have no idea what Mr. Rodriguez is going to testify to. I have no idea what his counsel is going to advise him to do. I am certainly not going to inquire as to what his advice is from counsel what to do. I'm just telling you, because there seems to be a lack of foresight of this issue yesterday, but I anticipate this is how this will play out. So I'm giving defense notice of it given that there was not appropriate steps taken in the pretrial process.

Mr. Rodriguez has been listed as a defense witness for both you and Mr. Torres for a while. There was a trial subpoena, you knew that your co-defendant wanted to call him. It is not unanticipated that they would probably be calling him in a less-than-friendly posture. That's my point.

MR. LANGE: What I was advised from the public defender is that they wanted to speak to him in advance of any decision to put him on as a defense witness and I said, fine, I'll produce him, you can speak to him. This is in advance of any trial testimony. So -- so -- and my belief, I think which was legitimate and honest, was that they could inquire of him and they could decide not to call him after they spoke to him. They haven't spoken to him. I offered to produce him in a pre-court prehearing personal one-on-one, you guys talk to each other and then decide what you want to do.

MR. VITIER: Your Honor, may I respond?

THE COURT: Yes, please.

MR. VITIER: That's never happened. So I have never been given a phone number and I've never -- when I subpoenaed him -- let me back up.

At the pretrial conference we discussed Mr. Rodriguez. I discussed that he's been dodging my subpoenas and that he had been listed on the defense witness list care of Mr. Lange. So in that hearing you asked

Mr. Lange is he gonna accept service of that subpoena? He agreed.

THE COURT: Well, he volunteered I believe to take service of the trial subpoena.

MR. VITIER: That's how I remember it, Your Honor. So the point is, after that we've --

THE COURT: That's not, to be clear, how I would have effectuated service of process, it's just that seemed to be an agreement that you-all came to and --

MR. VITIER: That's --

THE COURT: -- I thought was going to work.

MR. VITIER: That's correct, Your Honor. After that there were emails exchanged where I was told he would be produced to me during this trial week between the 6th, 7th, and 8th. That still hasn't happened. I don't have a phone number for him, I haven't had a meeting with him. That's why late yesterday I was asking can I please talk to the witness.

And to clarify, I never said that I was gonna -- I was going to allege anything of him. When Your Honor asked me yesterday I was sincere enough to say because of the same thinking, because he's in the car, that alone may be incriminating. I'm not gonna ask him incriminating questions, I'll be more than happy to tell you what I'm gonna ask him, which is he was in the car, he was there with

Ms. Pinuela, he seen the pink bags in the car before they picked up Torres, and he picked up Torres and Torres hadn't been in the car for more than 30 minutes and he didn't bring anything with him. Whether or not some other agency feels that that's incriminating because he's in the vehicle, that's completely different, I'm not gonna say you scored the drugs, you touched the -- I'm not gonna ask him any of those things.

THE COURT: Maybe he won't assert the Fifth. I don't know. This is all speculative, because I have no idea what Mr. Rodriguez is -- what Mr. Rodriguez is going to say, because I don't know what your questions are gonna be, I don't know what your questions are gonna be.

So I think we're just jumping the gun a little bit. I think the main thing is he need counsel appointed. That's something that I wish would have been brought to my attention earlier by somebody. But that problem has been remedied. I'm not saying I'm excluding him for Fifth Amendment reasons, I'm just telling you I think that might happen.

MR. LANGE: And I just wanted to say in response to -- we did get a proffer, that's the first proffer I've heard from the public defender as not what he expects the defense witness to say. And from that you can glean -- do you glean any potential criminal activity? No, it's typical

cross-examination material of a defense witness. I mean, what he just said is --

THE COURT: Okay. We'll go over all of this later today, right? That's why I'm saying we're gonna have a proffer outside of the jury's hearing about what the questions scope will be and at that time -- I think it's Mr. Farmer who is getting appointed -- will advise his client based on their confidential privileged information that they've exchanged as to what he may or may not assert. I can't predict that and I'm not gonna inquire into that.

MR. LANGE: Okay.

THE COURT: I don't think there's anything else to do right now. I just wanted to get us all on the same page that this is what's happening.

MR. VITIER: And for clarity sake, Your Honor, yesterday I was just asking whether I can form my questions in leading instead of directing. That was it. That's why I called him an adverse witness, I was just -- since -- that's why I asked is Mr. Lange gonna call him or am I. When Your Honor said I should call him in my case in chief, I just asked may I lead him. That's how we got into this whole conversation.

MR. LANGE: I don't think there was any -- I don't think there was any basis to make him an adverse witness automatically.

THE COURT: Well, I think under Rule 611(c) he is related literally to your client, so there is at least an inference that he is aligned with your client. I don't know what he's gonna say, so again, like I said yesterday, I'm not saying that he can immediately start with leading questions. I want to see how this goes.

MR. LANGE: Right. And as a matter of fact, just to try to bend over backward here on this issue so I can keep a critical defense witness in this case as a testifying witness for the defense, I did take a position yesterday that I thought there wasn't a sufficient basis for an adverse witness cross-examination of the defense witness on direct examination by the public defender.

I'll come right now saying that I'm changing that position and I am happy to not object to him cross-examining on direct examination if he stays as a witness. The critical thing is that he has a right to participate as a witness and not be excluded on some theory that's just a theory or hypothetical. There's no concrete material here saying -- evidence or testimony to say that he's involved in any way in any kind of nefarious or suspicious or -- he's a straightforward witness and --

THE COURT: Well, Mr. Lange, I'm not excluding him right now, I will wait to see what he says at the proffer.

MR. LANGE: Right. But I -- in an effort to

encourage a resolution that allows him to continue as a testifying defense witness for me, I'm happy to change my position and not object to him cross-examining.

THE COURT: How about this, how about this: After his proffer, if it makes more sense for him to be called one time in this case, in your case in chief, and cross by Mr. Vitier, that's fine. The only reason I was telling Mr. Vitier to call him is I don't need him called twice in the same day.

MR. LANGE: I agree with that.

THE COURT: So it was just for streamlining purposes.

MR. LANGE: Fine to do that.

THE COURT: Let's see what his proffer is to see if he can even be a witness who is permitted to testify in this trial first.

MR. LANGE: Right. Which it would seem from the proffer, that little bit of proffer we heard from the PD, that allowing the PD to cross-examine him instead of direct examination him would solve the problem.

THE COURT: I'm not sure what -- does the government have anything they would like to say on this point?

MR. PRESTON: The equation includes a cross-examination by the United States, Your Honor. The

witness was part of a conversation or was instructed as part of a conversation by the defendant, Pinuela, you don't know anything, don't say anything. Just that carries a potential implication that that witness may have been involved in this conspiracy, receiving that instruction. Being cross-examined on that particular issue alone by either Mr. Vitier or myself potentially gives rise to the defendant's good-faith -- I mean, the witness's good-faith invocation of the Fifth Amendment privilege.

I agree with everything the Court has said in regard to we have to wait and see. I don't think this needs to be discussed any further until we've heard additional information.

THE COURT: I agree.

MR. PRESTON: I will advise the Court that at a later point in time before the Defendant Pinuela testifies that I do have a motion in limine to present and it -- it's not ripe at this point in time, but I think we should get the jury in here and get going.

THE COURT: I agree.

Okay. In light of that, we'll call the jury in and return to the government's case in chief.

Yes, go ahead and swear in the interpreters, please.

(Interpreters sworn by the Deputy Clerk.)

INTERPRETER LONCAR: I do. Gabriela Loncar, L-o-n-c-a-r.

INTERPRETER LEONOR: I do. Jesse Leonor, L-e-o-n-o-r.

MR. PRESTON: May I be excused for a moment, Your Honor? Mr. Chang will take the next witness.

THE COURT: Yes.

MR. PRESTON: Thank you.

THE COURT: Mr. Vitier, did your expert test positive again this morning?

MR. VITIER: Yes, Your Honor.

(The jury was returned to the courtroom, after which the following proceedings were had in open court.)

THE COURT: Good morning. Ladies and gentlemen, we will turn back to the government's case in chief.

Is the government ready to call its next witness?

MR. CHANG: Yes, Your Honor. The United States will call Marcy Plaza.

THE COURT: Ms. Plaza, before you take the stand, I'll have the Courtroom Deputy swear you in first.

(Witness sworn by the Deputy Clerk.)

THE DEPUTY CLERK: State your name and spell your first and last name for record.

THE WITNESS: My name is Marcy Plaza. First name is spelled M-a-r-c-y. Last name is P-l-a-z-a.

THE DEPUTY CLERK: Thank you. You may be seated.

MR. CHANG: May I inquire?

THE COURT: Yes.

**DIRECT EXAMINATION**

**BY MR. CHANG:**

Q. Ms. Plaza, I would like to just start with your background, how you got into this. Where do you work currently?

A. Currently I work at the FBI laboratory, which is from Quantico, Virginia.

Q. And what is your position with the FBI lab?

A. I am a forensic DNA examiner in the DNA casework unit.

Q. How long have you been doing that in that role?

A. I have been at the FBI for eight years.

Q. What other experience do you have working with DNA prior to the FBI?

A. Prior to working at the laboratory I was employed at Bode Technology, which is a private DNA laboratory also located in Virginia. I was there for eight years and I performed a similar role to the one that I perform now at the FBI laboratory.

Q. What kind of educational background do you have to have -- or do you have to get into this line of work?

A. I have a bachelor's degree in biology from Slippery Rock University, which is located in Pennsylvania about an

hour north of Pittsburgh. I also have a master's degree from Nova Southeastern University. That is located here in Florida down near Fort Lauderdale.

Q. What is your master's degree in?

A. Oh, I'm sorry. My master's degree is actually in marine biology.

Q. Now, after you started with the FBI, did you have to go through any additional specialized training?

A. Yes. Prior to being released to perform casework on my own as an examiner, I went through an approximately 20-month training program at the FBI laboratory.

There were several different examinations that were part of that training, there were both written and oral examinations in order to demonstrate my knowledge of forensic serology, DNA analysis, statistics, those types of things that are related to DNA work. And then there were also moot court examinations where I demonstrated my ability to testify in court.

Before I was released to perform DNA casework on my own, I had to take and pass a competency test exam, which I did.

Q. And this training with the FBI, was that done under already qualified examiners?

A. Yes. Part of the training program was doing casework under a qualified supervise -- while I was being supervised

by a qualified examiner, excuse me.
Q. Now, to this date, are you still taking continuing education courses?
A. Yes. I am required to do a certain number of continuing education hours every year as part of my job requirement.
Q. Is that just to help you stay updated on any -- any, you know, changes to the science?
A. Yes.
Q. Have you testified previously as an expert regarding DNA analysis?
A. Yes. Prior to today I have testified 26 times in court.
Q. Overall -- I know you have experience, but overall, how many years of experience do you have in this field?
A. So between the work that I did at Bode Technology and the work that I'm doing now, approximately 16 years.
Q. Before we get into the facts of this case, I would just like to talk about DNA as a general concept.
What is DNA?
A. DNA is short for deoxyribonucleic acid. It is the genetic material that controls not only what each one of us looks like, but also all of the chemical processes that take place in each one of our bodies day to day.
Q. Where is DNA found specifically in the human body?

A. Within the human body, DNA is found within the cells. And the cells are the buildings blocks of your body. So you have multiple different cell types within your body that perform different functions and look different from each other based on what they do.

So, for example, you have brain cells, muscle cells, skin cells, blood cells, all those look different from each other and do different things, but the DNA that's contained within them is the same from cell type to cell type.

Q. So, you know, if DNA comes from a different place, such as your skin versus your mouth, is that the same DNA that you can examine?

A. Yes.

Q. Is DNA unique from one person to another?

A. So with the exception of identical twins, DNA is different from person to person. Now, if you were to take a look at my DNA and compare it to your DNA, you would find that the bulk of it, roughly 99 percent, is exactly the same. And the reason for this is because we have a lot of similarities between us. We're all humans, we have the same chemical processes taking place in our bodies every day. We have two eyes, a nose, a mouth. All those things that are the same between us are controlled by the book of our DNA.

But there is a small portion of your DNA, roughly one percent or less, that is different from everyone else

and that accounts for all of the differences that you see between people.

So when I'm performing my DNA analysis, I'm concentrating on certain areas within that one percent or less that differs from person to person. These are called short tandem repeats or STRs for short.

Q. Let's talk about touch DNA. What is touch -- what's commonly referred to as touch DNA?

A. So touch DNA is DNA that may be left behind by someone when they come in contact with a surface. So you have skin cells that are coming off of your hands and everywhere every day. So you if think about in the winter when your skin is really dry, you can almost see those cells being sloughed ed off. So when somebody comes in contact with something, it's possible for them to leave some DNA behind.

Q. Is it more likely to find touch DNA on a rough surface as opposed to something smooth?

A. So you can find DNA on both textured or rough surfaces and smooth surfaces. The skin cells tend to kind of stick a little bit better to the textured surfaces just because it has something for them to adhere to, but it is possible to find DNA on smooth surfaces as well.

Q. How would a technician, like a forensic tech, go about collecting DNA that has been left behind?

A. So in our laboratory, if we were looking for DNA, they

would usually either do a swabbing of the evidence item, so that's basically taking a sterile Q-Tip and rubbing it along the surface of the item to pick up any of those cells that may have been left behind.

Another option is to take a cutting of that item. So, for instance, if you had a T-shirt and you had a potential blood stain on there, you could take a cutting directly from that staining.

Q. In this case, had the swabs already been taken before being sent to your laboratory for analysis?

A. Yes.

Q. Now, once DNA has been collected off of the firearm, how are you then able to compare it with a sample of a known person?

A. So there is a bit of a process that takes place, but, yes. So once swabs are brought to the laboratory, we will take a cutting of that swab, so we'll cut off that cotton tipped part of the swab and take that forward for DNA analysis.

At the end of that DNA analysis process, there is a DNA profile that we obtain that we can then compare to any known DNA profiles that may have been submitted in the case.

Q. And we'll get into that process a little more further down in your testimony, but I want to touch base on what transference is.

Are you able to tell how the DNA was left behind on an object from your analysis?
A. No, that is a limitation of my testing.
Q. What is transfer -- DNA transfers?
A. So DNA transfer is, an example would be, if you and I were to shake hands and I left some of my DNA on your hand, that would be a primary transfer of my DNA to your hand. If you then went and handled an object after that handshake with me, it's possible that some of that DNA left behind on my hand could be transferred to that object, even though I never came in contact with it, you were the one who came in contact with it. So that's an example of transfer.
Q. Okay. Are you able to tell whether touch DNA was left behind by direct contact or primary transfer or secondary transfer?
A. No, I'm unable to tell that.
Q. So we'll talk about what some of the possible outcomes are when you compare DNA with a person. When you compare a DNA sample of touch DNA taken from an object, versus that of a known person, what are the possible outcomes that you can form an opinion to?
A. So when I make those visual comparisons between an evidence DNA profile and a DNA profile from a known person, there are two different outcomes that I can come to.
So when I compare the evidence profile to the known

profile, if they are different, I'm able to say that that person I'm comparing is excluded as a possible contributor to that evidence profile. So because they're different, I can say with certainty that that person could not have contributed DNA to that evidence profile.

If I make that comparison and the DNA types are the same or similar, then I can say that that person is possibly included as a potential contributor to that evidence profile.

Q. So first off, were either defendants in this case excluded based on your testing from the DNA taken from the firearm?

A. No, they were not.

Q. Now, you said there are different -- are there different levels of support for inclusion, where you determine that there is a possible inclusion?

A. Yes. So once I make that visual comparison and determine that someone could be included as a possible contributor to that evidence DNA profile, my next step is to calculate a statistic in order to provide some weight to that potential match that's been made.

So that statistic that I calculate is called the likelihood ratio. And it's a comparison of the probability of that evidence DNA profile under two different explanations.

So generally, it will compare the probability of that evidence profile if the person of interest is a contributor to that profile versus the probability of that DNA profile if it's an unknown unrelated individual and it's not that person of interest.

So when I calculate that likelihood ratio, it will generally provide support for one of those explanations over the other. And there are differing levels of support that go along with that.

Q. When you compare one hypothesis to another, is that just a scientific method that's done for DNA testing?

A. That is the statistical calculation that we use in order to provide that weight for a potential match.

Q. Okay. What are the different levels of support?

A. Sure. So in addition to reporting the actual likelihood ratio value that I get, which will be a number, I will also include a qualitative statement in the report, which kind of gives a little bit more context to what that number means.

So if the likelihood ratio value is between two to just under 100, that's going to provide limited support for including that person of interest to that evidence profile.

If the number is from 100 to just under 10,000, that will provide moderate support for including that person of interest.

If the number is from 10,000 to just under one million, that's going to provide strong support for including that person.

And then if the likelihood ratio value is at one million or any number higher than that, that's going to provide very strong support for including that person as a contributor to that DNA mixture.

Q. And when you say over 1. -- was it 1.5 million for very strong support?

A. It's any number at one million or higher.

Q. Okay. So when you say that, is it -- so when you compare that with the hypothesis that that person is not included as a contributor, it's over one million times more likely that's when you get to that category?

A. Not quite, it's more -- it's -- I like to think of a likelihood ratio as a scale. So as I said, you've bot those two didn't explanations on either side of the scale. On one you have the probability of that DNA profile if your person of interest is a contributor versus the probability of that DNA profile if it's not that person of interest, they just happen to match to that DNA profile, and it's actually an unknown unrelated person.

So that scale and the likelihood ratio value is going to tilt that scale in support of one of those explanations over the other. If I get a low number, it's going to tilt

the scale ever so slightly. If I get a really, really high number, you can imagine it tilting that scale to a much more higher degree.
Q. And is very strong support for inclusion the highest possible outcome that you can opine on?
A. Yes, that is the highest level of support that we have.
Q. Okay. So you talked a little bit about the process for testing the DNA. After the samples get brought to your lab for analysis, how is that testing performed?
A. Sure. So the first thing that we do, and in this case I had swabs that were submitted, we will collect from those swabs. So that involves cutting off the cotton part of that swab and putting it into a test tube.

The next step is called extraction, and this is where a series of chemicals are added to that cotton swab in order to break open those cells that have been collected and gain access to the DNA that's inside.

The next step is to perform what's called quantitation. Quantitation is simply a test that is performed to give an estimate of how much DNA we were able to get from that item of evidence.

And that estimate is then important for the fourth step, which is amplification. This step is where we are making millions of identical copies of those short tandem repeat or those STR locations that are located on the DNA

and are the points of interest that I'm interested in taking a look at for analysis.

The fifth and final step of the process is called separation. And this is where those millions of identical copies are then separated out by size, which puts it in a format that makes it easy for me to be able to do data analysis and make my interpretations and conclusions.

Q. During this process are there control samples that are used to make sure everything is functioning properly?

A. Yes, there are.

Q. Okay. So once the testing process is done, you said that you come up with an analysis. Is that based on your training and experience to interpret those results?

A. Yes.

Q. Are you able to determine at that time whether there is a mixture of DNA on a sample?

A. Yes. So when I'm doing my data analysis, I will look at the evidence profiles first. And I will take a look at those and part of that analysis is determining how many people are contributing DNA to the profile. So I could have a single source profile, meaning that the DNA is only coming from one person, or I could see that there is a DNA mixture, meaning that the DNA is coming from more than one person. So part of that analysis will be to determine how many people are contributing DNA to that mixture.

Q. And at that stage, are you also able to determine if a known person may be included from that mixture?

A. Yes. So after I've taken a look at all of the evidence and determined if I'm dealing with single source profiles or mixtures and determine the number of contributors, my next step will be to look at those known DNA profiles and then make those visual comparisons to see if those persons of interest could possibly be DNA contributors to the evidence profiles.

MR. CHANG: May I approach the witness, Your Honor, with an exhibit?

THE COURT: Yes.

MR. CHANG: So I have provided the witness with Exhibits 37 through 41.

BY MR. CHANG:

Q. Starting with 37 -- 37, 38, and 39, where were each of these swabs taken from?

A. So starting with Exhibit Number 37, this is a swab from the front sight and muzzle of a Glock weapon.

Exhibit 38 is a swab from the rear site of the Glock.

And Exhibit 39 is a swab from the trigger and grip area of the Glock.

Q. Okay. And were you able to -- were these the swabs that you analyzed against known samples?

A. Yes.

Q. And how do you know that?

A. So the way that I know that is that on the evidence packaging there is a sticker that says, FBI laboratory, and has the lab number that was assigned to this particular case. It also has the item number that was assigned to each one of these pieces of evidence at the laboratory.

So I recognize it based off that sticker, as well as the yellow evidence tape, which I know to be our evidence tape at the lab. And I can see the initials from the biologist who collected from this particular item of evidence.

Q. Now moving on to Exhibits 40 and 41, can you tell the jury what each of those exhibits are?

A. Exhibit 40 is a known DNA sample from Mr. Torres.

And Exhibit 41 is a known DNA sample from Ms. Pinuela.

Q. And were you able to compare in this case Exhibits -- the swabs taken from the gun, 37, 38, and 39, to those known samples in 40 and 41?

A. Yes.

Q. And did you do that separately? Did you compare them against each defendant separately?

A. Yes, I did.

Q. Okay. And for the same reason that you mentioned, you knew 37, 38, and 39 were what they are, is that how you also recognize 40 and 41?

A. Yes, it is.
Q. So were Exhibits 37 and 38, the swabs taken from the slide of the gun, were those compared together?
A. So when we processed the swabs that were taken from the front sight and the muzzle and then the swab that was taken from the rear site, we ended up combining those two swabs -- we ended up combining those two swabs for analysis.
MR. CHANG: One second, I'm sorry.
THE WITNESS: No problem.
THE COURT: Just one moment.
(Brief pause in proceedings.)
THE COURT: All right. You may continue.
BY MR. CHANG:
Q. I'll ask the question again. Were Exhibits 37 and 38, were they -- were they combined?
A. Yes, they were combined. So again, these were swabs that were taken from the front sight and muzzle of the weapon and then there was a swab that was taken from the rear site.
The reason that we combined these is that if we had been provided the weapon at the laboratory ourselves and we would have swabbed it there, we would have swabbed those areas together in our laboratory. And the reason is because those are smaller areas of the weapon, there may not be a lot of DNA left behind there, so by combining those and kind

of taking DNA that may be left behind on those areas together we are maximizing our chances of getting a DNA profile that's going to be suitable for comparisons.

Q. Okay. So in this case, what was the result when you compared the DNA sample taken from the grip and trigger of the gun versus the defendant, Rosario Torres?

THE WITNESS: Your Honor, I have my case file that I would like to refer to the report just to refresh my memory if you don't mind.

BY MR. CHANG:

Q. Would it help to refresh your recollection?

A. It would, yes.

(Provided to witness.)

THE WITNESS: Thank you.

So for the swabs that were taken from the grip and trigger of the Glock 23, there was a male DNA profile that was obtained from that swabbing. There was a DNA mixture and it was interpreted as having come from three individuals.

When I made the visual comparison between Mr. Torres's known DNA profile to the evidence profile from that grip and trigger, he was included as a possible contributor to that DNA mixture.

So my next step was to calculate that statistic to provide some weight to that potential match. When I did

that, I determined that the DNA results from that item are 1.7 million times more likely if Mr. Torres and two unknown unrelated individuals are contributors to that mixture than if three unknown unrelated individuals are contributors to that mixture.

So that likelihood ratio value of 1.7 million provides very strong support for including Mr. Torres to that profile.

BY MR. CHANG:

Q. Is that the highest level of support that you can opine to again?

A. Yes, it is.

Q. Let's talk about the comparison for the combined swabs from the slide compared against Mr. Torres's DNA.

A. Sure. So for that particular set of swabs there was male DNA that was obtained. Again, it was a DNA mixture and this time it was interpreted as having come from two individuals. When I compared Mr. Torres's DNA to that evidence DNA profile, I determined that he was included as a possible contributor to that profile.

When I calculated the statistic, I determined that the DNA results from the swabs from the sights and muzzle are 390,000 times more likely if Mr. Torres and an unknown unrelated individual are contributors to that mixture than if two unknown unrelated individuals are contributors to

that mixture.

That number of 390,000 provides strong support for including Mr. Torres as a contributor to that profile.

Q. Now moving on to Ms. Pinuela in this case, what was the result when you compared the -- the swabs taken from the -- the combined swabs from the sights versus Ms. Pinuela's DNA sample?

A. When I made that comparison, again, this was a male DNA profile and it was determined to be a mixture of two individuals. Ms. Pinuela was included as a possible contributor to that DNA mixture. When I ran the statistic, I determined that the DNA profile from that item is 500 times more likely if Ms. Pinuela and an unknown unrelated individual are contributors to that profile than if two unknown unrelated individuals are contributors to the profile.

That number of 500 provides moderate support for including Ms. Pinuela to that DNA mixture.

Q. Did you get a different result from the grip and the trigger?

A. Yes. So that was, again, a male profile, a three-person mixture. When I compared Ms. Pinuela's DNA profile to that, it was determined that she was included as a possible contributor. The statistic that was then calculated determined that the DNA results from the grip and

trigger are 1.5 million times more likely if they originated from Ms. Pinuela and two unknown unrelated individuals than if it had originated from three unknown unrelated individuals.

And that number of 1.5 million provides very strong support for including Ms. Pinuela.

Q. Were either defendants excluded from any of the profiles?

A. No, they were not.

MR. CHANG: A moment, Your Honor?

THE COURT: Yes.

MR. CHANG: Thank you, Ms. Plaza.

I have no further questions, Your Honor.

THE COURT: Does Mr. Torres have any cross of this witness?

MR. VITIER: Yes, Your Honor. Thank you.

**CROSS-EXAMINATION**

**BY MR. VITIER:**

Q. Good morning, Ms. Plaza.

A. Good morning.

Q. You received items in this case to process, correct, swabs?

A. That's correct.

Q. And you received what was taken only from a firearm in this case?

A. Other than the two known samples from the persons of interest, yes, I received swabs from a firearm.
Q. And you testified that DNA can be taken from smooth and rough surfaces?
A. So in our laboratory, we will focus on those textured areas for a couple of reasons. First, what I alluded to earlier, that the skin cells tend to stick to those textured areas a little bit better than they do to the smooth areas. But also, because a lot of times those items that have those smooth areas are going to be sent downstream to our latent prints unit where they'll be looking for fingerprints. And the smooth areas are more conducive to fingerprints than they are to DNA. So in order to preserve that evidence for fingerprints, we will only concentrate on the textured areas.
Q. Okay. So the point -- but if they had sent you swabs from the smooth area, you could have compared those?
A. Yes.
Q. And you also mentioned that there is other types of materials, for example, cloth. It's possible to extract DNA from a cloth?
A. Yes.
Q. You also discussed primary transfer and secondary transfer?
A. Yes.

Q. And you were saying that primary transfer is, for example, if I touched something directly and I leave --

Can you explain primary transfer again?

A. Sure. Yeah, so you were on the right track. If you were going ahead and touch something, it's possible that you could leave your DNA behind and that's a primary transfer event.

Q. But there's also a way where if you and I held hands and I touched another item, that would be a secondary transfer?

A. That is possible, yes.

Q. And it's in the mixture it's not unlikely?

A. I'm not sure that I wouldn't say that it's not unlikely. It is possible. Unfortunately, with my testing I'm unable to tell how the DNA was deposited on an item or when it was deposited, so I can't really speculate on that.

Q. So if you see a mixture of two persons, your primary thought is that they both touched the item together or that it's a mixture of two people?

A. So I don't really take into account or think about how that was put onto that item. The only thing that I can say is that I found DNA on this item, it was a mixture of two people, and then make any comparison to any known individuals.

Q. So in other words, once you receive the mixture, you

don't know how it got there?
A. That is true.
Q. Now, in this particular case, you only received buccal swabs for two individuals?
A. That's correct.
Q. And you also received swabs from -- we said item three was the front sight and the muzzle?
A. That's correct.
Q. Item five was -- was it two swabs for the rear of the -- rear sights of the handgun?
A. Yes.
Q. And then two swabs for the trigger and grip of the handgun?
A. That's correct.
Q. And before you combine them, I understand that you had testified that had the gun gone to your lab, you would have done it a certain way. But had you wanted to run item three by itself, you could have?
A. That is true.
Q. And you could have run item five by itself?
A. Yes, I could have.
Q. And if, for example, I touch the front side of the gun but not the back side of the gun, you would have been able to determine that?
A. If I had processed those separately. I don't know if I

would have gotten a different result or if I would have gotten the same result. I can't really speculate on that. They were combined, again, in order to try to maximize the chances of getting a usable DNA profile.
Q. What I'm asking you is hypothetically, I touched the gun only in the front, they swab that part. You would expect that my DNA would be there?
A. It's possible that I could detect your DNA.
Q. But if I don't touch the back and they swab that?
A. Again, I don't know what I would have gotten if I would have kept them separate. If they had been kept separate, I would have expected to get two different DNA -- or two DNA profiles separately and I could have made comparisons to that.
Q. Okay. And when you talked about the amount of genetic material, it's hard for you to speculate how much is on there until you've run it; is that correct?
A. That's correct.
Q. And in this particular case, you put item three and five together and then ran it?
A. That's correct.
Q. And then, same thing for item four, that one was run separately.
A. Yes, that was its own swab -- set of swabs and those were processed separately from three and five.

Q. So item three and five were combined and then from then on you named it item three?
A. That's correct.
Q. Now, when you received the -- you received a digital case file in this case, right? You received the request from someone to run this?
A. Yes, along with the evidence that comes in, there is a laboratory examination request that provides a little bit of the case scenario that we need in order to determine what items are going to be tested and what we're going to test for.
Q. And in that request you got a narrative of some of the facts of this case?
A. That is correct.
Q. Do you have that with you today?
A. I do.
Q. Okay. And in that request, how many people did it say were in the vehicle? How many occupants?
A. I believe it said that there were two.
Q. That there were two occupants in the vehicle?
A. Yes.
Q. That's the information you have before you -- before you ran the known samples?
A. That's correct.
Q. Also, for item four, the one that you're testifying

were known -- was a mixture of at least three people?
A. I determined it to be a -- when I did my interpretation to be a mixture of three individuals, yes.
Q. But originally you had in your notes two people?
A. So whenever I do the data analysis, we have what's called an interpretation sheet where I make notes as to what my interpretation is. I believe that I made that interpretation sheet at an earlier date, kind of do that when I'm first taking a look at the evidence, and then whenever I took a look at it at a later date to take a little bit more time with the case and actually issue my report, I did end up taking a closer look at it and determining that I believed it was three individuals.
Q. Okay. So originally it was two people?
A. When I originally took a look at the data, I thought there may be two individuals. But on closer inspection I decided to report it as a mixture of three individuals.
Q. Okay. So originally two and then changed to three?
A. So this profile in particular, again, it's a mixture and I'm looking at 21 different locations on the DNA.
For this particular sample, I believe that I had information that only 16 out of those 21 locations where I was dealing with a partial DNA profile. I didn't have information on all 21.
The other thing with this mixture is that it was low

level, meaning that the information that I had, there wasn't a lot of it, so there was a lot of information that I could kind of see that was below or was -- you know, was kind of showing up, and by looking at that, that's when I determined that I thought may be that might be three people there rather than two.

Q. Okay. And when you looked at those -- thank you for that explanation.

When you looked at where the STR, the one percent that you like to focus on --

A. Uh-huh.

Q. -- you noticed there were alleles in certain areas that didn't belong to either Mr. Torres or Ms. Pinuela?

A. So when I -- when I make the determination as to number of contributors, I'll remind you that I take a look at the evidence by itself first. I don't -- and when I'm determining number of contributors, I don't take into account the knowns. I don't take a look at those until later.

So when I looked at this profile, I was looking at it and just it looked like based on the number of piques that I had, the alleles that defense referred to, they show up as peaks on a graph, they're the DNA information at each one of those locations. I noticed that it's possible that there may be three people contributing. And also based on the

balance of those peaks. So it's both the height of the peak, as well as the balance between them that kind of made me think that there might be three people contributing there.

Q. So you're saying that you never compared the alleles to the actual defendants in this case?

A. Not when I was determining number of contributors. I did compare them after I had already made that determination that I was going to call it three individuals.

Q. Understood. In the beginning you didn't, but once you've already determined that there's three people based on the peaks and their heights and the balance, at some point, you compared that to the known sample of Mr. Torres?

A. Yes, that's correct.

Q. And you were able to determine that there were alleles in that mixture that could not be attributed to him?

A. I don't remember if there were any alleles that could not be attributed to him. When I did make the comparison, I did see his DNA types represented at those locations that I was looking at, enough to the point that I wasn't able to say he's possibly a contributor here.

Q. I understand that, but are you saying -- is your testimony today that you didn't notice any alleles that were attributed to a third person that was not from Mr. Torres, that could not have come from his DNA profile?

A. Not that I recall.
Q. Okay. Now, when you receive the DNA mixture, there's no way you know how long that mixture has been on the item before it was collected; is that correct?
A. That's correct. Again, that's a limitation of the testing.
Q. And there's also limitation as to how long the DNA has been on that item?
A. That's correct.
Q. So in what we were talking about, the secondary transfer, if I were to shake your hand and then grab an item, a textured item at that, and I put that item in my briefcase, there's no telling how long that DNA mixture would stay on there?
A. Correct, there's no telling how long that would stay on there. There's also no telling if there would actually be a DNA transfer to the point that you would be able to detect it. A DNA transfer is a really difficult thing to kind of evaluate due to all the environmental factors and the different things that can affect it.
Q. Right. So in my example, if me and you hold hand and I touch a textured object and I put it in my briefcase where there is no environmental factors, like no rain, no wind, any of that stuff, there's no telling how long that DNA mixture could stay there?

A. That's correct.
Q. And hypothetically, somebody could come along, put another item in my briefcase, and if it doesn't affect the mixture, that mixture would stay on that textured item?
A. That's correct.
Q. So if that item, that textured item, that has our mixture on it gets tested a week later, you would still be able to pull a profile from it if it was collected correctly?
A. It's possible, yes.
MR. VITIER: One moment, Your Honor.
THE COURT: Yes.
BY MR. VITIER:
Q. One last question. Had buccal swabs for a third person been sent to your lab, would you have been able to compare that known sample to the sample that you extracted off the firearm?
A. Yes.
MR. VITIER: Thank you.
No further questions, Your Honor.
THE COURT: Mr. Lange, do you have any questions?
MR. LANGE: No. No questions, Judge. Thank you.
THE COURT: Redirect, Mr. Chang?
MR. CHANG: Briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. CHANG:

Q. So we talked about already how you tested the swabs on a slide separately. Does whether you tested that separately or together affect your analysis of the grip as it relates to the 1.5 million likelihood ratio for Ms. Pinuela and 1.7 likelihood ratio for Mr. Torres?

A. No, it does not.

MR. CHANG: I have nothing further, Your Honor.

THE COURT: Thank you, ma'am. You may be excused from the witness podium at this time.

THE WITNESS: Thank you.

THE COURT: Ladies and gentlemen, I realize we started a little later, but I need to do something, so we're gonna take another midmorning break. I apologize for that.

(The jury exited the courtroom, after which the following proceedings were had outside the presence of the jury.)

THE COURT: Judge Adams has informed me she's appointed counsel for Mr. Rodriguez, he is outside the courtroom. His counsel is here in the courtroom. What I would recommend is what I said earlier, we'll bring him in, I'll swear him in, have him take the stand. And in light of what the government's anticipated cross will be, and that cross will be -- whether it's in response to Mr. Lange's direct or in response to Mr. Vitier's direct, I almost

wonder if it makes sense for the government to go first.

Or we can have Mr. Lange go first and see if it's in the scope of the direct, but given that the subject matter almost certainly is going to involve March 8th, 2022, and knowledge of what was or was not in the car and who was or was not in the car, for the reasons that the government already anticipated and I agree with, it seems likely to me there is a Fifth Amendment serious concern from any cross that the government would give regardless of the co-defendants' crosses or directs.

MR. PRESTON: Certainly.

THE COURT: We can do it out of order. Mr. Lange, you can go, but then I think it makes -- here's what I'm getting at: There was a -- Mr. Lange made a comment about this being a necessary defense witness. I anticipate that he might make a motion for severance on that. But if the government is going to cross on a matter which would revoke his Fifth regardless of whether we had a separate trial, then there's no prejudice. So that's why I'm -- I want to know what will be elicited, whether it's solo trial for Ms. Pinuela and a solo trial for Mr. Torres, and it sounds to me like the government's cross is going to look very much the same regardless of who. But I can let Mr. Lange go first. He might invoke from the beginning, I don't know.

So, Mr. Lange, you'll go first, then the

government will go second, and then Mr. Vitier, assuming he hasn't invoked.

MR. LANGE: We're doing that right now as a preview?

THE COURT: Yes. No, it's right now.

MR. LANGE: Okay. He needs a Spanish interpreter first of all, so --

THE COURT: We have two in the courtroom.

MR. LANGE: Okay. I didn't know logistically for my client and the witness.

THE COURT: One of them is helping your client and the other one can assist Mr. Rodriguez.

MR. LANGE: All right.

INTERPRETER LONCAR: Your Honor?

THE COURT: Yes.

INTERPRETER LONCAR: We'll be taking turns on the witness stand as well, but we'll keep the headset so Ms. Pinuela can hear us as well.

THE COURT: That's fine. And for the record, they've already both been sworn in as interpreters.

Thank you.

MR. LANGE: Judge, just to be clear, you want me to go through my direct as I would if it were in front of the jury?

THE COURT: Yes, exactly. This is a proffer of

what you would ask him if you were to call him on the stand, because I need to know whether he will invoke the Fifth Amendment.

MR. LANGE: I could proffer that without actually doing an exact question and answer, I could proffer my questions. Would that be acceptable rather than go through the whole question and answer thing?

THE COURT: I suspect that he's not going to answer your question, but let's see.

MR. LANGE: Okay. So we don't want to start with maybe a proffer, you want to start with actual questions and answer?

THE COURT: What I want you to do is ask the witness the questions you would ask him if the jury was sitting here.

MR. LANGE: Right, that -- I was just suggesting another possible way to do it would be for me to proffer all of what I would ask and then -- and then inquire of him if he has problem with any of that, I suppose, rather than go through every question. But however Your Honor wants.

THE COURT: Mr. Farmer, do you have anything that I should consider with regards to this?

MR. FARMER: I think a proffer might be more efficient.

THE COURT: Okay. That's fine. I don't -- if you

want to get up and tell me with him listening here is the scope of my direct, that's fine.

MR. LANGE: That's what I was going to suggest.

THE COURT: Okay. But you will be tied to that if he --

MR. LANGE: Yeah. No, no.

THE COURT: Okay. That's fine.

MR. LANGE: I know I'll be tied to it, Judge. So you want me to begin?

THE COURT: Well, no. He's not here yet.

MR. LANGE: Oh, I'm sorry, I didn't see where he was. Where is he?

THE COURT: He's outside the courtroom.

MR. LANGE: Oh, okay.

COURT SECLURITY OFFICER: I'll go and get him, Your Honor.

THE COURT: Okay. Thank you, sir.

Mr. Vitier, did you see my endorsed order yesterday with regards to the notary?

MR. VITIER: Yes, Your Honor, and that's what I was trying to give Ms. Gretchen's attention, Ms. O'Brien's. I'm gonna release Mr. Bacot, I'm not calling him. I'm striking him. As I mentioned yesterday, I wanted to see the cross first.

THE COURT: That's fine.

MR. VITIER: Thank you.

THE COURT: Mr. Rodriguez, if you could come stand by the witness podium over here. Raise your right hand. She's gonna swear you in before you take the witness stand.

(Witness sworn by the Deputy Clerk.)

THE WITNESS: Yes.

THE DEPUTY CLERK: Please state your name and spell your first and last name for the record.

INTERPRETER LEONOR: With the last names?

THE DEPUTY CLERK: Yes, please.

THE WITNESS: Hermogenes Jose Rodriguez Salinas.

THE DEPUTY CLERK: You may be seated.

THE COURT: Okay. Mr. Lange, if you would come to the lectern and proffer the scope of the direct examination to which you would ask this witness if you were to call him in front of the jury.

**PROFFER DIRECT TESTIMONY**

**BY MR. LANGE:**

Q. Mr. Rodriguez, good morning.

A. Good morning.

Q. Just to be clear, I represent someone who I believe is your niece, Ms. Rodriguez Pinuela. Do you know that?

A. Yes.

Q. And you see her here in the courtroom, correct?

A. Yes.

Q. All right. What I'm going to do -- and you're aware that I've listed you as defense witness in the jury trial that can testify on Ms. Pinuela's behalf, right?
A. Uh-huh.
Q. You are aware of that?
A. Yes.
Q. Okay. What I'm going to do here is to detail what I would intend to ask you as a witness in questions --
A. Okay.
Q. -- in front of the jury, just as if there was a jury here.
A. Okay.
Q. And this would be in a question-and-answer form. In other words, it would be I would ask a question and you would answer the question as best you could to each question if it were a jury. But what I'm going to try to do here is I want to listen very carefully to what I'm gonna say, because I'm not gonna right here put it in the form of a question and answer. I'm not gonna do that. I'm gonna -- I gonna -- I'm gonna lay out the facts of what I believe you would testify to if you were in front of a jury?
THE COURT: Mr. Lange, I need you to ask him the subject matter, not what you anticipate his testimony will be.
MR. LANGE: I'm gonna -- that's what I'm gonna

ask.

THE COURT: You just said you were going to lay out the facts of what you think his testimony would be. So I need you to be over the subject matter of the questions you would ask, not what you anticipate his testimony to be.

MR. VITIER: Well, but the questions are -- the questions and the subject matter are the same. The questions about --

THE COURT: The questions are, but his answers might not be. You just said -- okay. Just go ahead. My point is you need to tell the Court and Mr. Rodriguez what are the subjects you're going to inquire of him.

MR. VITIER: Okay. No, I -- yeah, I was -- I was gonna get to that Judge, but thank you.

BY MR. VITIER:

Q. So what I'm going to be questioning you in front of a jury about, Mr. Rodriguez, is about March 8th of 2022, the day all this business happened, the day that everything happened and that your niece was arrested.

Do you remember that date?

A. Yes.

Q. Okay. So my questions are gonna begin with how you came to be a person in town that day, March 8th, of 2022, how you came to be in Tampa, because it's my understanding you had been living out of Tampa, somewhere else.

A. Yes. May I speak? I come from Spain and after living in Spain for 21 years, I came to visit my niece, because I hadn't seen for about eight, nine years. So I came over on vacation.
Q. And did you come directly from Spain to Tampa or was it via some other city?
A. No, I left Madrid. And then from Madrid, I stopped in Miami. Then from Miami to Atlanta. Then I stayed in Atlanta for a time, because I was going to start a business with a female friend of mine. And then having been settled in Atlanta, after that is when I came over to visit my niece.
Q. Okay. And who else -- who else was living in the house here in Tampa when you came to visit your niece?
A. My -- my sister-in-law and the children. Well, my sister-in-law lived with her children and the family.
Q. Okay. Veronica was -- Veronica and her little daughter, the two-year-old Lua, they were also at the house?
A. Yes.
Q. All right. And your sister-in-law you're referring to is -- is Ms. Pinuela's mother, true?
A. Yes.
Q. Okay. How many days before March 8th did you appear in Tampa to stay at that house?
A. If I'm not mistaken, I arrived one day prior.

Q. Okay. I'm gonna ask you about the events of March 8th. Were you at the house on March 8th? Were you at the house on March 8th?
A. I invoke the Fifth Amendment.
MR. VITIER: Is Your Honor gonna inquire -- anticipating what Your Honor anticipated, is Your Honor gonna inquire as to whether being at the house on March 8th qualifies as a potentially incriminating statement? Because anybody can say they invoke the Fifth if there's no basis for right then, it may not be legitimate.

So that's the problem we're gonna have all the way -- that question, in and of itself, I don't see as -- I don't see as even potentially incriminating. So it wouldn't be -- it would be something he could legitimately invoke the Fifth for, because I'm not privy to the discussions CJA counsel had with him prior to this about when or when not to invoke the Fifth, I'm just saying too listening to that one question, getting a Fifth Amendment objection, I don't think there's any factual basis to support a Fifth Amendment objection.

So, you know, I -- I'm gonna continue -- you know, I'll continue to make the proffer and we'll have the proffer and his answers. Or not. I can just proffer and he can not say anything. Or Your Honor could inquire and that's -- it's touchy business, I understand, but there has to be --

you know, there's nothing in and of itself in my question were you at the house on March 8th that is at all obviously incriminating or even not obviously incriminating.

So I don't know how Your Honor wants to proceed with this. I would object -- assuming these are all gonna be I invoke the fifth on every one of these questions all the way down line, then I think there's a need to determine whether there's a legitimate basis for the invocation?

THE COURT: Based on the facts that have come into evidence or been alleged and discussed in this trial, here is what I know: No one disputes the car was pulled over on this date in question. Mr. Rodriguez was in the car, there's video camera of that with both of the defendants. There is a dispute perhaps between the defendants as to when and to whom put the bags in the car.

So if you're inquiring as to his earlier whereabouts on the date in question, and it seems to me that what he knows and doesn't know about where they originated, when they came into the car, who put them in the car, all of that goes back to some of the statements your own client made, which were, you know nothing, say nothing.

MR. LANGE: That was a very brief comment, that was not a quote, it was -- it was attributable -- it was a very brief comment.

THE COURT: It's in the transcript. What do you

mean it's not a quote?

MR. LANGE: It's --

THE COURT: Whether it's brief or not brief, the fact that that statement has been introduced in this trial to me is a sufficient factual predicate for Mr. Rodriguez to not answer questions about the subject of March 8th.

MR. LANGE: From that statement that my client supposedly makes to him about don't say anything --

THE COURT: You don't know nothing, don't say anything.

MR. LANGE: He didn't respond. There was no response from him, as I recall, unless the public defender has that.

THE COURT: You may ask more questions and see how this transpires, but given that -- you're not asking about whether he played Bingo at the house on March 8th, right?

MR. LANGE: I think --

THE COURT: I think what he's invoking - and I am not going to inquire into their privileged conversations - is related to the scope of what he knew on March 8th that ended up in a traffic stop where he was a passenger in a vehicle that had the drugs and the firearm recovered from them.

MR. LANGE: Okay. Let me --

THE COURT: And given the disputes that have --

how this case has come out with defense -- co-defendant, there is a predicate that they were there before Mr. Torres -- at least that suggestion has been laid, that they were there before Mr. Torres joined the vehicle.

MR. LANGE: Okay. Let me just make --

THE COURT: I don't see how that wouldn't be a basis for -- I don't think at this point I can say it's a facially invalid invocation based off of those facts that have already come into this trial.

MR. LANGE: Okay. Let me do this --

THE COURT: I'll let you respond, but then I do want to hear from the other counsel into this point, because it implicates them as well.

MR. LANGE: I understand. But let me -- let me just make a suggestion. Rather than go into this question and answer, which I -- let me just tell you in a proffer form --

THE COURT: That's what you were supposed to be doing from the beginning.

MR. LANGE: Well, then we got into questions and answer and I think it would be easier if he's listening to everything and -- and I lay it all out and -- and then we hear from him about a Fifth Amendment invocation, because I have to establish -- if you want me to establish what I'm gonna say, Your Honor has to analyze whether, assuming he

would -- what I'm saying he's gonna say is what he would say, whether that is -- is incriminating to him in any way, potentially incriminating.

Because if you exclude him, the bottom line here is if you decide for whatever reason to exclude him, you're taking away an absolutely essential defense witness, which you know from my outline in the opening statement in terms of what I was promising the jury I was gonna deliver, it includes -- it includes his observations of what happened during the day they went shopping during the day, he was there, he wanted to go shopping with my client, and the baby girl, they went shopping all day. There was no -- there was nothing to do with any narcotics or bags, they shopped all day. They came back to the house, the co-defendant had arranged to have --

THE COURT: Mr. Lange, you may continue with your proffer as to the subject matter of what you would inquire of him, but I cannot force him, given what I know now, to answer your questions, which is what you want me to do.

MR. LANGE: I just don't -- I just think cross --

THE COURT: Am I understanding that correctly? You want me to make him respond so I can evaluate whether there's a basis for asserting the Fifth?

MR. LANGE: Here's what I think, Judge, I think that -- no disrespect to my colleagues, the public

defender --

THE COURT: Disrespect, I think --

MR. LANGE: I think listing him as a defense witness after I listed -- him as a defense witness for them after I listed him as a defense witness knowing everybody knew the discovery, everybody knew what he was going to say, was just an attempt to get him excluded the way we're in the process of excluding him now. I believe it was intentional and I think -- I don't want to call it witness tampering, but it's a species or form of witness tampering the public defender's engaging in. They could easily -- they could easily cross-examine him. And I already said I would be happy -- should be direct examination, but I would be happy to have him cross-examine him.

THE COURT: Did you hear what I said before we called him in?

MR. LANGE: I hear everything you say, Judge.

THE COURT: Your direct about the events of March 8th are going to permit, regardless if Mr. Torres is even a co-defendant in this trial, the government the opportunity to inquire as to the events of March 8th. And their cross is going to -- this is why I suggested perhaps they go first, but that's fine if you want to go first. My guess is he will invoke, because it's within the same subject matter as the questions you're eliciting on direct.

And as a result, he's not an essential witness that you could have ever have called if he was going to invoke --

MR. LANGE: The public defender has --

THE COURT: I'm not talking about the public defender, I'm talking about the federal government.

MR. LANGE: No, but if the public --

THE COURT: I'm talking about the federal government, so respond to that point.

MR. LANGE: According to my theory, the public defender created this conflict.

THE COURT: I'm talking about the federal government, who's on the other side of this case with you.

MR. LANGE: I understand. They're going to be able to cross-examine him, just like I'm suggesting I would have no objection to the public defender cross-examining him.

THE COURT: Right. And if he's going -- you think that there's no basis for him to invoke the Fifth Amendment when he's asked --

MR. LANGE: Not legitimate to invoke the Fifth. No, I don't. I've spoken to him at length through a Spanish interpreter, you know, and -- and he -- there's never been -- because there might be a moment during the whole day where something was said, they can cross-examine him on that. He's not gonna invoke the Fifth on that. He was

never gonna invoke the Fifth. You think I would have gone through all this and listed him and talking to him continuously before this if I thought he was gonna invoke the Fifth? No. He was a cooperative, a hundred percent cooperative witness up until the CJA counsel got -- was appointed and whatever happened in the Mag Court, whatever all that was about, you know. And now, all of a sudden he's invoking the Fifth starting with were you at the house on March 8th.

I mean, this is totally different than any -- I would never have obviously listed him if he wanted not to cooperate or be part of the case. He knew the whole case, he knew the whole narrative, we went over all the facts. They were -- you know, you can agree or disagree on certain aspects of his -- of his defense -- of the defense testimony and that's what good cross-examination will be by both the public defender and the government.

THE COURT: This is why it should have been brought to my attention much earlier and had him appointed counsel a long time ago, not yesterday.

MR. VITIER: Your Honor, may I respond?

THE COURT: Yes.

MR. VITIER: If Your Honor sees that I've filed the subpoena under seal for Mr. Rodriguez well before he was ever listed as a witness by Mr. Lange.

And just out of courtroom decorum, it would be easier if he just refers to me as counsel, rather than me saying the private attorney down from Miami, one word, counsel.

THE COURT: Okay.

MR. VITIER: But the point is I listed him before, I need his testimony, because it exonerates my client. I need his testimony, he's essential to me. I'm not trying to create a conflict. Yesterday, since I'm an officer of the Court, you asked me do I think he needs counsel and I said after talking to the government and after what came in through the transcripts we thought, as officers of the Court, he might need counsel. I wasn't trying to create it, I want his testimony. I need his testimony.

THE COURT: Okay. Can I hear from the government before I hear again from Mr. Lange?

MR. LANGE: I'm sorry?

THE COURT: From the government. Is what I anticipate true, about what your cross would entail?

MR. PRESTON: I certainly would be cross-examining this defendant about his participation, his knowledge in regards to the events of March 8th of 2022.

THE COURT: Okay.

MR. PRESTON: Including how long the backpack was in the car, what it meant to him when he was told not to

talk to the police, things of that nature. I can't go any further with that, because I don't know what he's gonna say on direct examination completely, but certainly those type of questions supported the court's concern that the Fifth Amendment could potentially be invoked in this case.

This isn't a subterfuge to eliminate a witness from anybody. And it was the Court's inquiry to Mr. Vitier yesterday afternoon that prompted today's hearing. It had nothing to do with anybody trying to eliminate a witness for Mr. Lange.

MR. LANGE: First of all, my comment --

THE COURT: Given what the government just proffered they would ask on cross, Mr. Rodriguez, would you answer those questions?

THE WITNESS: I would not answer those questions.

THE COURT: They are clearly within the scope of the direct, which is what you're going to inquire of him about the events of March 8th.

MR. LANGE: Okay. Could I just make clear one comment that the government --

THE COURT: Answer -- no, we're gonna focus on my question. If it's clearly within the scope of the direct that you would have elicited, how can I possibly allow him to testify? He cannot selectively waive the Fifth. So he can't answer your questions on direct and then assert the

Fifth on cross by the government. Forget Mr. Torres and Mr. Vitier right now. How is it possible, then, for you to have called him as a witness? Unless you just want him to waive and then me under court contempt make him respond.

MR. LANGE: No, obviously, you can't force him. But what I'm suggesting to Your Honor is that in all my prior communications, knowing the discovery, even if there were going to be points of cross-examination that might be valid for the government or the defense, the co-defendant, everything he was gonna say was very straightforward and non-incriminating. So all of a sudden it becomes incriminating to every single question, including was he at this house on March 8th.

And my comment was never directed at the -- at the government. They're not trying to suppress this witness and exclude the witness, it's the co-defendant that's trying to tamper with the witness and exclude the witness.

THE COURT: You're not getting the import of what I'm saying. Forget what Mr. Torres would ask on cross. The government has a right to cross whomever you call and he will invoke the Fifth in response to the government's cross and, as a result, because it's on the same subject matter that you're inquiring on direct -- although, if you would like to finish your proffer, I would like you to do that. I don't see how I can possibly allow you to call someone who I

know will invoke the Fifth. And there is a factual basis just on what I know has come into this trial for him to do so without inquiring in an inappropriate manner as to his interactions with counsel.

MR. LANGE: Okay. You want me to finish my proffer?

THE COURT: Yes. And what we were doing, or what I thought you were gonna do, was tell me -- I would ask you about this, I would ask you about this, I would ask you about that. Do that. Don't ask him every question, tell me what your proffer of your scope of your direct would be.

MR. LANGE: Okay.

THE COURT: So you asked were you there on March 8th and he said I would invoke the Fifth. Next question.

BY MR. LANGE:

Q. What I'm going to ask you -- what I'm going to ask you next, Mr. Rodriguez, is how you spent the day on March 8th?

A. I prefer to remain silent.

Q. And then what I would ask you is, did you spend part of March 8th with your niece and her little daughter, the two-year-old Lua?

A. I wish to remain silent.

Q. And did you go -- did you go out with Ms. Pinuela and Lua shopping that day on March 5th -- March 8th?

A. I wish to remain silent.
Q. And did you -- did you spend a number of hours during that day shopping with Ms. Pinuela, her little daughter, and another girl by the name of Anna and her little daughter?
A. Can you please repeat it?
Q. Did you -- did you spend the rest of the day, a good portion of the day, shopping with -- with my client, her little daughter, a girl named Anna, and her little daughter, out shopping?
A. Perfectly.
Q. No. Are you refusing to answer or would you answer those type of questions?
A. I would respond yes.
Q. So you would answer them?
A. Just that question. Yes, I spent the whole day with niece and her -- and the daughter.
Q. Okay. And did in fact, during that shopping day, did you buy things for yourself and did your niece buy things for herself and her little girl?
A. Yes, we did in fact go out that day to buy things for the little girl and I also bought some product for my hair.
Q. Okay. And did you see during that shopping time, during that day, did you see your niece with any kind of a pink or black bag?
A. I wish to remain silent.

Q. After you went shopping with your niece and her little daughter, do you remember -- by the way, do you remember her friend, Anna, who drove you guys to the shopping and her little daughter? Do you remember the two of them being their shopping also?
A. Yes, that's true. The friend came to pick us up at my family's house and, yes, it's true we did buy things for the -- for Anna, this girl Anna's daughter. I didn't know Anna and the daughter.
Q. Okay. After you finished shopping, did you go back to the house, your sister-in-law's house?
A. I wish to remain silent.
Q. Okay. Did there come a time in the evening that you -- you left with Anna and your niece to go meet the co-defendant for dinner?
A. I wish to remain silent.
Q. Okay. Did there come a time, then, that you -- you, your niece, and Anna showed up at a house, an apartment house, and the co-defendant came down from outside the apartment house with a friend of his to go to dinner?
A. I wish to remain silent.
Q. All right. When you -- when you saw the co-defendant come out with his friend from that apartment house, did you -- did you notice that the co-defendant appeared to be tucking something, you don't know what it was, but something

under his arm, kind of clutching it in his armpit area under his arm, an object, or objects?
A. I wish to remain silent.
Q. Did there come a time, then, when the co-defendant got into the black SUV and you started to drive off on your way to dinner at the Bahama Breeze restaurant, you, your niece, and the co-defendant?
A. I wish to remain silent.
Q. Did there come a time once you left that apartment house that the co-defendant received a call from someone, you don't know who, but -- but that caused the co-defendant to tell your niece, who was driving, to meet -- to pull the car over into a convenience store gas station area?
A. I wish to remain silent.
Q. And do you remember the co-defendant was on the phone, that he had gotten a call from this guy while you were -- while you were driving just leaving the apartment house, you don't know what was said, but as a result of that conversation, you guys pulled into the gas station community -- convenience store area?
A. I wish to remain silent.
Q. Did there come a time that you in fact did pull into the convenience store area parking area and you saw a silver Mercedes pull up with a man and woman in it?
A. I wish to remain silent.

Q. Okay. And did you, at that point in the parking lot, see the driver of that silver Mercedes, a man, get out of the vehicle and have a private conversation with the co-defendant, who got out of his vehicle, they were having a private conversation in that parking lot? You didn't hear what was said, but they were definitely having a private conversation; yes or no?
A. I wish to remain silent.
Q. All right. Now, you were -- while they were having that private conversation, you and your niece were not hearing, were not listening to any of that conversation, true, you were not part of that conversation?
A. I wish to remain silent.
Q. In fact, you and your niece went over to the silver Mercedes and stood outside it and your niece talked to the woman that was in the front passenger seat of that, someone that she knew, I think a nail -- a nail technician and just had a general conversation while the other two guys were having their private conversation off to the side?
A. I wish to remain silent.
Q. Okay. Once you were -- once the co-defendant got in the car at the apartment house and he drove and stopped in the convenience store parking lot, you saw the two bags, the pink and the black bag, on the floorboard right between the co-defendant's legs, true?

A. I wish to remain silent.

Q. All right. You did not see your niece at any time touch the pink and the black bags that were on the floorboard between the co-defendant's legs? You didn't see her touch those bags or bring those bags into the car, into the black SUV, true?

A. I wish to remain silent.

Q. All right. And you didn't see at any time your niece bring the bags from home and bring them and put them into the front floorboard area, front passenger floorboard area, where the co-defendant was sitting? You didn't see her put any bags like that on the floorboard before he got in the car?

A. I wish to remain silent.

Q. Now, after the co-defendant had his private conversation with this guy, you got -- you got back into the black SUV with your niece and you guys drove off with the co-defendant, also heading for the Bahama Breeze restaurant, true?

A. I wish to remain silent.

Q. All right. At some point after the police -- strike that.

Once you got to the Bahama Breeze parking lot, you remember the police descending on your car, blocking your car, and then coming up to search the car, to question the

people in the car and then finally to search the car?
A. Can you repeat the question?
Q. Yeah. When you got to the Bahama Breeze parking lot and the police stopped you, stopped the car, you remember the police coming and questioning people in your car and then getting you all out of the car?
A. Yes, when they came and blocked our car, they had him get out of the car first and my niece and I stayed in the car.
Q. Okay.
A. May I continue? May I continue?
Q. Yes?
A. They did not tell us to get out of the car, they didn't tell my niece and I to get out of the car.
Q. Okay. Did you -- and did you see that on the -- on the way to the Bahama Breeze restaurant the co-defendant began smoking a marijuana joint, marijuana cigarette?
A. I wish to remain silent.
Q. Okay. The first person to be removed from the car -- the first person the police removed from the car was the co-defendant, true?
A. Yes.
Q. Okay. Could you then see the pink and the black bags by his -- that would have been by his feet, between his legs, clearly once he was removed from the vehicle?

A. I wish to remain silent.

Q. Okay. But you saw -- you saw after -- after the co-defendant was removed from the vehicle, you saw a police officer come and remove those two bags from where he was sitting, yeah, to take them out of the car, the pink and the black bag?

A. I wish to remain silent.

Q. All right. Do you recall hearing the co-defendant, when you were outside the car and he was outside the car, do you recall him shouting out and saying out loud that you have nothing to do with any -- any activity -- no, you had nothing to do with any drugs or guns and that she had nothing to do with any drugs or guns, that it was all his responsibility, it was all his, everything in the car that was illegal was his? Do you recall that?

A. I wish to remain silent.

Q. At some point -- well, let me ask you this: If -- if there -- if there was cocaine and -- and other drugs, fentanyl, cocaine, and a pistol found in those pink and black bags, did you have anything to do with it? Did you know about it ahead of time or did you have anything to do with the fact that the fentanyl and the cocaine and the gun were in the bags, any knowledge or did you do anything about it -- or with it?

A. I wish to remain silent.

Q. All right. And you remember speaking in Spanish to a female police officer, Officer Sousa, afterward trying to explain to her how you spent the day and what happened? Basically kind of what I'm asking you she asked you, true?
A. I wish to remain silent.
Q. And you answered her questions honestly and fully, true?
A. I wish to remain silent.
Q. And you never invoked your Fifth Amendment right to silence with Officer Sousa, true?
A. I wish to remain silent.
Q. Are you currently working full time for the Hard Rock as an employee?
A. Yeah, that's -- yes.
Q. Doing housekeeping full time, yes?
A. Yes, during the night housekeeping and during the day I work at the daycare taking care of children.
Q. Now, Mr. Rodriguez, you recall that you have had several telephone conversations through an interpreter with my secretary before this case started going over all the facts as I would ask you in this case, what you did and what you saw, right?
A. Yes.
Q. And during those lengthy telephone conversations between you and I and the interpreter, my secretary, you

never once indicated, did you, that you wanted to take the Fifth or not testify, you never said anything about it to me in these several lengthy phone conversations?

A. Can you repeat the question?

Q. Yeah. In all our lengthy telephone conversations through an interpreter that you and I have had to find out exactly what you would say in this case, you never invoked the Fifth like you're doing now, I refuse to testify? You never once told me you didn't want to testify or would refuse to testify, true?

A. Yes.

Q. All right. In fact, you were a hundred percent cooperative in telling me the entire story, basically what I just went through with some more details, obviously, but the basic story that I just went through you went through with me and were very cooperative and happy to come testify to those facts, true?

A. Can you repeat?

Q. Yes. You were -- you told me you were happy to come and testify after we talked in detail about all of the facts of your involvement in the case, you were happy to come testify in the courtroom and testify to the jury truthfully about everything you saw and did that day, true?

MR. PRESTON: Objection, completely irrelevant.

MR. LANGE: I'm not sure how that's irrelevant,

but all right.

THE COURT: One second. How is it relevant if he wants to assert the Fifth now when he's under oath in court? How is it relevant what he told you?

MR. LANGE: I'm sorry, it's relevant because he -- he -- through all our lengthy discussions reviewing his testimony, anticipated testimony, he never once indicated in any fashion that he didn't want to cooperate, that he didn't want to participate, that he was gonna invoke the Fifth, he was a hundred percent cooperative and -- and fully vested in all the details of testifying in trial. I would -- I would never have put him on the defense witness list and said I was using him unless he was that and he was that. And that was the question, wasn't he a hundred percent always cooperative, fully ready to testify to all the facts of what happened in the case, and he never once indicated to me that he did not want to testify or he couldn't testify. That's the question.

THE COURT: Well, I understand the question. But my point is --

MR. LANGE: How is that not relevant to what we're talking about?

THE COURT: He now has counsel, which he didn't have when you were talking to him. And he's now under oath.

MR. LANGE: Right. But I'm just asking him the

question, during that time when he --

THE COURT: Overruled. You can ask the question.

MR. LANGE: All right.

BY MR. LANGE:

Q. During that time when we had our lengthy phone conversations about exactly what you would testify to and -- and whether you were willing to come testify to all of it in court in front of a jury, you were always fully cooperative with me in saying you wanted to help and testify to all that, true?

A. Yes.

Q. Did you ever once in any of our conversations indicate that you did not want to testify, that you wanted to stay silent, did I ever coerce you or threaten you or force you to come testify? You did this all on your own, true?

A. Yes. Yes.

Q. Can you tell us now, Mr. Rodriguez, why, after all these months -- and we're talking about talking, you and I, over a period of months. After all these months suddenly on the third day of our jury trial you are refusing to answer almost all of the questions because -- you want to stay silent because it might incriminate you?

MR. PRESTON: Objection, relevancy, and it intruded on the attorney-client privilege.

BY MR. LANGE:

Q. Can you tell me why that is?

THE COURT: Wait, wait, you need to -- that second point, address the second point of the objection.

MR. LANGE: I'm sorry, Judge?

THE COURT: Address the second point of the objection that the government just lodged.

MR. LANGE: And what was their second point again as opposed to the first?

THE COURT: It intrudes on the privilege of attorney-client communications. You're directly asking him to opine as to why he's invoking the Fifth. That is what you're doing.

MR. LANGE: I -- well, okay.

THE COURT: Aren't you? Isn't that the question?

MR. LANGE: I'm asking -- I'm asking since he never -- he never gave me the slightest inclination he's gonna invoke it, why is he invoking it now? That's the question.

THE COURT: I understand your question. Answer why it doesn't infringe on the privilege between an attorney and their client?

MR. LANGE: I'm just asking him why he didn't tell -- say anything about it at the time, during all our numerous conversations. I know he's -- what he's doing now, he's invoking it now. That's not the issue. The issue is

during all our private conversations, cooperative conversations, full conversations preparing for all his testimony, he was a hundred percent cooperative. Why, if he was inclined to invoke the Fifth and his silence, did he ever not mention that to me in any of our conversations in any way.

THE COURT: I suspect, because he didn't have counsel.

MR. LANGE: Oh, well, counsel made him do it? That -- you're not --

THE COURT: No. No. I suspect because he wasn't fully advised of his rights. And talking to you informally is not the same thing as giving testimony under oath in court.

MR. LANGE: I understand. We had a very thorough conversation, Judge.

THE COURT: Okay. Well, I'm gonna sustain the objection, because you've not answered in any meaningful response to the government's objection.

MR. LANGE: All right. Well, in any event, based upon all that, I've basically finished my proffer as to what I would say if he were to testify. And reminding Your Honor that in my opening statement he played a critical role in parts of the opening statement in terms of supporting my client's narrative of what happened during the day,

shopping, no drugs, no bag -- no pink and black bags. You know, he supported this -- he supported the narrative in a critical way, there's no other supporting witness for me. That's why I listed her -- him. So if --

THE COURT: You're trying to insinuate that it's somehow my fault for appointing counsel to the witness --

MR. LANGE: No, it's not your fault.

THE COURT: -- when you should have brought it up to the Court before? It is not -- it is not my job to police the opening statements as to what you will or will not be able to put on in your case in chief.

MR. LANGE: Okay. My -- I mentioned it before. My belief is that this is concocted by the public defender's office and it had been concocted by the public defender's office all along to eliminate this witness and -- knowing that he would -- that because of counsel -- knowing that counsel would likely be appointed and they would likely recommend he take the Fifth and he has taken the fifth. You know, and I believe that that is a species of witness tampering, intentional on the part of the public defender. That's my belief since the way it came up and the way it developed and what I'm seeing now.

THE COURT: That's quite the allegation given the very obvious facts of this particular case.

MR. LANGE: Well, that is -- that is my belief and

my contention --

THE COURT: Okay. You're --

MR. LANGE: -- for whatever it's worth.

THE COURT: I don't know what -- is that a motion? What is that?

MR. LANGE: No, that brings us to the next point, which is I would like an opportunity in the hall to consult with my client, because I'm -- because based upon how this has developed you've crippled -- not you, but I'm gonna be crippled in -- in the presentation of my total defense.

THE COURT: You first may confer with your client. Of course you can confer with your client.

At this time, I would like to first hear from the government if there's any additional scope of cross that the government would elicit that they haven't already told me about. Because the invocation matters about the relevant scope of cross. That's why I'm asking. And I'm trying to get to the end result, which is there's going to be a motion to sever, I assume, from Mr. Lange.

MR. PRESTON: I don't see that there's a legal basis for going there, Your Honor.

THE COURT: No, I don't either if the relevant scope of cross by the government matches the scope of the waiver he's invoked, and in that case, regardless of whether it's Mr. Torres by himself, Ms. Pinuela by herself, versus

both of them, if he's properly invoked, the government has the right to the relevant cross-examination, then he can't be called as a witness regardless and that means there's no basis for a severance.

MR. PRESTON: Well, given the wholesale invocation during Mr. Lange's proffer of direct testimony in this case, I would submit that we're at an impasse in that regard. But I will ask the witness a couple questions just to complete this process.

**CROSS-EXAMINATION**

**BY MR. PRESTON:**

Q. Sir, do you recall being at a convenience store on March 8th, 2022, in the company of both of these defendants?

A. I wish to remain silent.

Q. There's a video of a particular encounter at a convenience store that depicts you standing outside two vehicles that were parked at that location. Do you have any memory of being there?

A. I wish to remain silent.

Q. Sir, while your niece, Ms. Pinuela, was having a conversation inside the vehicle, she was halfway in the front door of the passenger -- of the driver's side of the vehicle while Mr. Torres was conversing with a gentleman behind that other vehicle, what was your role in being there?

A. I wish to remain silent.
Q. Were you serving as a lookout?
A. I wish to remain silent.
Q. What did you understand your niece to be saying to you when the police encountered you at the Bahama Breeze parking lot when she told you, you don't -- you don't know anything, don't say anything, or something to that effect?
A. I wish to remain silent.

MR. PRESTON: The impasse continues, Your Honor. Thank you.

THE COURT: Mr. Torres's counsel, do you wish to proffer what you would ask on cross or in a hostile direct format?

MR. VITIER: Yes, Your Honor, briefly.

**CROSS-EXAMINATION**

**BY MR. VITIER:**

Q. On March 8th, 2022, you were interviewed by Ms. Sousa, correct?
A. Would you repeat.
Q. I'm sorry. On March 8th, 2022, the Spanish female, Officer Sousa, interviewed you, asked you questions?
A. I wish to remain silent.
Q. You told her that you had been in the vehicle all day with your niece?
A. I wish to remain silent.

Q. She took you to get a driver's license and ran several errands that day with you?
A. I wish to remain silent.
Q. She took you back home and told you she was gonna pick you up later for dinner?
A. I wish to remain silent.
Q. You told Ms. Sousa that your niece picked you up around 5:00 or 6:00 p.m.?
A. I wish to remain silent.
Q. And you were alone in the car, it was just you and your niece in the car?
A. I wish to remain silent.
Q. She asked you, Ms. Sousa did, how long was Torres in the car before you guys got stopped?
A. I wish to remain silent.
Q. And you had told her that it had only been 30 minutes before you guys got stopped?
A. I wish to remain silent.
Q. She asked you if Xavier, or Elias, had anything in his hands when he got in the car?
A. I wish to remain silent.
Q. And your answer was he had no possessions with him or you couldn't see anything in his hands?
A. I wish to remain silent.
Q. Then the cop -- I'm sorry, the officer asked you what

Ms. Pinuela brought in the car?
A. I wish to remain silent.
Q. And you said Ms. Pinuela didn't bring anything in the car, it was already there?
A. I wish to remain silent.
Q. She asked you what was already there? And you said the beige or pink backpack?
A. I wish to remain silent.
Q. The officer corrected herself and said, oh, the pink backpack, that's Pinuela's? Your answer was yes?
A. I wish to remain silent.
Q. She specifically asked you if Mr. Torres brought the black backpack in the car and you said no, you didn't see that?
A. I wish to remain silent.
Q. While you were at the scene, they asked you several questions after your Miranda rights?
A. I wish to remain silent.
Q. Part of your testimony was that although it was just you and your niece in the car, you sat in the back of the vehicle the entire time?
A. I wish to remain silent.
Q. When Ms. Sousa asked you about the gas station incident, you told her you stayed in the vehicle during the entire encounter?

A. I wish to remain silent.
Q. When they were done with the investigation, you were allowed to leave the scene?
A. Yes, rightly so. When it was all over, they released me and they told me I had nothing to do with it, that this was just a protocol that they had to follow because I had been handcuffed. And I told them it's the first time I had been handcuffed. And they said, no, this is just part of the protocol we follow. I had nothing to do with it. Then at that time, after she tells me that, it's him that we were looking for.
MR. VITIER: I almost asked this in Spanish, sorry. Shit, I did it again. I'm sorry, forgive me.
BY MR. VITIER:
Q. Before they let you go, they asked you if you had a cellphone in that vehicle?
A. I wish to remain silent.
Q. You identified a blue telephone that was in that car?
A. I wish to remain silent.
Q. That cellphone was returned to you on the scene?
A. Yes.
Q. And before it was returned to you, officers never asked you for your consent to look in that phone?
A. Yes.
Q. So to your knowledge, that phone was never searched?

A. I believe not.
Q. And associated with this case, to this day you've never been fingerprinted in this case?
A. No.
Q. Nor has DNA swabs been taken from your cheeks to compare you to anything?
A. No.
MR. VITIER: I don't have any further questions, Your Honor.

THE COURT: In light of the invocation by Mr. Rodriguez, I don't see a basis for either defense to be able to call him, other than if you want to talk about how he got to Tampa before March 8th. I think that he answered those questions. He answered that he was a housekeeper at Hard Rock. He answered that kind of the police's actions when they first pulled the car over and then after the investigation concluded. Those are the scope of the non-waived -- or he did not invoke with regards to those particular questions, but I imagine the line of questioning about his current occupation is not particularly relevant to anything in this case.

So in light of what he did invoke to, everything about his knowledge pertaining to the events of the day that concern the location of the bag or the house or comings and goings before the police pulled them over at Bahama Breeze,

I don't see a basis, Mr. Lange or Mr. Vitier, for you to call him and ask him questions on that given that we know he would invoke. Do you disagree?

I'm talking to defense counsel at the moment. Either of you disagree?

MR. VITIER: I don't disagree, Your Honor.

MR. LANGE: No, I think given the position that we're put in, Your Honor has no choice. I still would like time to talk to my client, because I have some motions that I need to make and I don't want to make them until I --

THE COURT: I understand you need to talk to you client. But what I'm trying to do is, in light of the proffer by Mr. Rodriguez -- or sorry, by counsel and his invocation, is it acceptable for me to release him from his trial subpoena at this time?

MR. LANGE: Based upon the circumstances as it developed between late yesterday and this morning, I don't think there's any choice.

THE COURT: I agree, I'm just making sure for the purposes of the appellate record if there's any objection from defense counsel, because he's only -- he's under a trial subpoena from Mr. Torres and you presumably wanted to call him, but you don't have a trial subpoena, correct?

So I'm asking you, because he's not on the government's witness list, they're not intending to call

him. Do you understand my question? Is there any objection? Sounds like there's no objection.

MR. LANGE: Given the way it's developed from late yesterday to today, I have no objection, no.

THE COURT: Okay. And, Mr. Vitier, you already said that.

MR. VITIER: Yes, Your Honor.

THE COURT: Okay. In light of that, Mr. Rodriguez, you are released from your trial subpoena obligations, you may be excused from the witness stand at this time.

Thank you, Mr. Farmer.

MR. FARMER: Thank you. Your Honor, may he stay in the courtroom if he wishes?

THE COURT: If he's not gonna be called by any witness, then, yes. He's a member of the public who is not under the exclusion rule.

MR. FARMER: Thank you, Your Honor.

THE COURT: I think now is probably an appropriate time to take a break for lunch.

MR. LANGE: Yeah, I would like that time.

THE COURT: I understand. I know you want to talk to your client.

Is there anything from the government's perspective?

MR. PRESTON: No, Your Honor. Thank you.

THE COURT: I'm gonna remove the camera nonsense in the front here, then, if we're not gonna call that expert.

MR. VITIER: Yes, Your Honor.

THE COURT: Is there anything else that I need to take up before we adjourn for lunch? I will inform the jury that we'll return at 1:00 p.m.

MR. LANGE: Nothing further from Ms. Pinuela right now.

MR. PRESTON: Nothing from the United States.

THE COURT: Let me just tell the jurors that we're gonna be in recess until 1:00 p.m.

Okay. We're in recess for about an hour.

(A noon recess was taken, after which the following proceedings continued outside the presence of the jury.)

THE COURT: Are there motions to be taken up before the jury is called back in?

MR. LANGE: Yes, thank you, Judge. Just following up on our morning matter with Mr. Rodriguez, I've talked in detail over the lunch break to -- with my client about the next step, if there is a next step with regarding a motion. Let me just briefly just begin by stating that when the public defender filed their motion for severance, I joined

the government in opposing the motion for severance. I thought from a factual point of view, a legal point of view, a strategic point of view, I wanted this trial to be a joint trial with the co-defendant. And my observations so far in the case with the co-defendant I feel is positive for my client.

However, due to the circumstances that sort of popped up, arose from late yesterday until this morning, including, obviously, all of what happened with Mr. Rodriguez, I feel compelled, and my client agrees, to request a mistrial and a severance from the co-defendant.

THE COURT: What's the basis of a mistrial?

MR. LANGE: To allow a severance from the -- if you want to just say a severance from the co-defendant, that's fine, but -- however you want to phrase it, but --

THE COURT: And how will that prejudice, which I assume the prejudice you're basing the motion for severance upon is that you want to call Mr. Rodriguez?

MR. VITIER: Of course, I've already said I was gonna call Mr. Rodriguez.

THE COURT: Okay. Then answer my question from this morning. The government is going to get the same ability to cross him in your solo trial, which means that he will invoke based off of the proffers from both yourself and Mr. Preston, which means you cannot call him, because he

will invoke his Fifth Amendment. So how would severing this trial remedy that prejudice?

MR. LANGE: No, I understand that, I can't call him because of the -- because of the circumstances as they concluded this morning. The thing is it totally changes my position --

THE COURT: If I were to grant your motion to serve, how would the prejudice be any different in a solo trial?

MR. LANGE: I wouldn't call Mr. -- I wouldn't have to -- I wouldn't be calling Mr. Rodriguez and I wouldn't be telling the jury in opening statement I'm calling Mr. Rodriguez as a key supporting witness, which I've already done. So they're gonna look at that as a huge lie on the part of the defense lawyer when we get to closing arguments and there's no Mr. Rodriguez. So we get to the defense case and there's no Mr. Rodriguez after my promises. We're horribly prejudiced by this circumstance. So I --

THE COURT: I think that's a making of your own.

MR. LANGE: I'm sorry? It's not -- I --

THE COURT: I think what you said in opening is a making of your own prejudice.

MR. LANGE: Well, no, because I relied a cooperative critical defense witness that I extensively interviewed, had zero reason to believe he would do what he

did this morning and it's caused me irreparable prejudice. I never would have put him on a witness list. I don't put people on a witness list until I've extensively questioned them. I've done all that. There was no -- I had zero reason to believe he would -- he would conduct himself the way --

THE COURT: If your argument is that the statements you made in opening as to what you anticipated the evidence would show rise to the level of a mistrial, I don't see a basis, then, for a severance.

MR. LANGE: How about a mistrial?

THE COURT: Well, which motion are you making?

MR. LANGE: The one -- I'll make either one Your Honor finds agreeable.

THE COURT: No, it's -- that's not how this works, I don't tell you which motion to make, you tell me what motion you're making and I rule on it. So are you making a motion for mistrial or a motion for severance or both?

MR. LANGE: Both. I'm making a motion for both.

THE COURT: Okay. I deny it with regards to the severance, because the only prejudice that you're implicating is one that you created in your opening. And an opening, as I've told the jury from the very beginning, is not evidence. Now, it is what you anticipate the evidence will be. I'm sorry you didn't anticipate it correctly, but

if I were to sever this, I don't see how it would in any way remedy that harm.

Now, if you want to go to the mistrial, you're saying that your opening statements rose to the level of such prejudice to your client that you need a mistrial?

MR. LANGE: Yes. Yes. That's correct.

THE COURT: Okay. Let me hear from the government.

MR. PRESTON: Your Honor, this is far -- the first time in my experience that I've seen an attorney overpromise during opening statements. Overpromising is not a grounds for a mistrial. A miscalculation on the part of Mr. Lange is not a grounds for a mistrial. The United States submits that the defendant's motion for mistrial should be denied. He's presented no legal basis to support it and factually it's unsupported as well.

THE COURT: Do you want to respond to the motion -- Mr. Preston, sorry. I think there's a dual motion for severance. I know I just denied it, but I don't see how severing this trial would remedy whatever prejudice he caused in opening.

MR. PRESTON: I accept the Court's ruling in that regards as well, Your Honor. I have nothing to argue in that regard. Quite while I'm ahead, I guess.

THE COURT: I guess --

MR. PRESTON: No support for it, again.

THE COURT: If I would -- if I were to grant some sort of severance I wouldn't disband this trial, I would just proceed with Mr. Torres. I assume that's what he's saying?

MR. PRESTON: I don't know. Jeopardy has already attached.

THE COURT: Right.

MR. PRESTON: The Court has already denied a motion for severance. The law frowns on a severance of jointly charged defendants and I submit to the Court that, again, a misstep by counsel --

THE COURT: In opening.

MR. CHANG: -- overpromising of counsel, doesn't rise to the level of granting any of the relief requested here this afternoon.

THE COURT: Understood.

Does Mr. Torres wish to be heard?

MR. VITIER: Your Honor, as to Mr. Lange's motion to sever or do you want us to renew our motion to sever?

THE COURT: You have no additional --

MR. VITIER: I'm just clarifying, Your Honor. If it's about Mr. --

THE COURT: Let's respond to the current motion. I've read the motion to sever that Mr. Torres filed. There

was no basis to sever on that. There is no prejudice to you in not being able to call a witness that was always hostile to you that you should have anticipated would assert the Fifth. I mean, that's why you needed a trial subpoena, right, because you couldn't find him? So I don't see any basis to revisit your motion to sever.

Could you respond to Mr. Lange's motion for mistrial and/or severance just so I have everybody's --

MR. VITIER: No problem.

THE COURT: -- position on the record.

MR. VITIER: That was the first -- like that was the first we had ever heard of it. I would have filed a motion in limine had I known that was gonna be in opening and we could have discussed that beforehand. I didn't know that was gonna be the basis of the opening. I agree that it's no reason to declare a mistrial at this point. I agree there's no legal basis to do it.

THE COURT: Okay.

MR. LANGE: Judge, just can I just have one final thought? I think --

THE COURT: Come to the lectern please.

MR. LANGE: The public defender's case can go on without prejudice. The prejudice falls on my client and that's where the prejudice --

THE COURT: Do you have any legal authority for

the position that your overpromising in opening statement rises to the level of a mistrial?

MR. LANGE: Well, I think it's outrageous that the government would consider this some little overpromise. I've already explained to the fullness that I've done in preparing Mr. Rodriguez for his defense testimony and never getting an inkling that any of this was going to occur. This is shocking. This is beyond belief. And there's no prejudice certainly to the government, they're gonna be able to --

THE COURT: I'm not asking about that, I'm saying do you have any case law to support your motion for mistrial?

MR. LANGE: I do not between late yesterday and today. I don't. I don't have anything. Maybe fundamental fairness, how about that? So the public defender can continue their case unabated, there's no prejudice to them. They wanted a severance anyway. So they get it without getting it officially. And the prejudice lies with my client a hundred percent.

And it's not this overpromising, I think it's -- I think it's outrageous the government would minimize the prejudice that my client's gonna suffer as a result of having what happened to her uncle, what happened in that case, and us losing our only defense witness, who is

critical. I mean, it's just beyond belief, it could not have been predicted before late yesterday.

THE COURT: He was in the car that got pulled over with the drugs and the firearm. How could that not have been predicted?

MR. LANGE: Well, of course the incident could have been predicted, but his -- his being removed from this case because of what he did by taking the Fifth couldn't have been predicted. That could not have been predicted. Me losing my key defense witness could never have been predicted.

This is not some simple, well, the lawyer made a mistake and overpromised. That's not what this is. This is not an overpromising by a lawyer. This is a set of circumstances that arose late yesterday to this morning and it's horribly prejudicial. This is not some minor witness, this is a major defense witness, my only major defense witness to support my client. It's critical. It's critical. She's facing 30 years mandatory because of this -- because of the gun, because of the machine gun.

I mean, this is horribly prejudicial to her. To lose her one -- one and only, an important critical defense witness the way he was lost and to try to blame it on me, that I was somehow negligent in not, what, preparing him properly, understanding that he told me multiple times the

whole story and multiple times that he wanted to be totally cooperative and helpful and tell his version of the story? That's gonna be on me? And then my client gets prejudiced because of that? Critically? I mean, I think that's just unfair fundamentally, Judge. That's my case law right now, between late yesterday and today. It's fundamentally unfair to my client because of that.

THE COURT: Okay. I hear your position. The standard for mistrial is only to be granted upon manifest necessity. It ought to be used with the greatest caution under urgent circumstances and for very plain and obvious causes.

Are there any alternatives to a mistrial, Mr. Lange?

MR. LANGE: I'm sorry, Judge?

THE COURT: Are there any alternatives to a mistrial? Would you like a curative instruction about your opening statement or to remind counsel -- or to remind jury that your comments in opening are not evidence? And I'm telling them to base their decision solely upon the evidence, not upon counsel's comment.

MR. LANGE: The curative instruction in this case would be useless. It would be useless. I told them that. And I've already then went ahead and -- and created a factual proffer, good faith, that I believed -- I was

telling would track the evidence they would hear, including an important piece from the uncle. So a curative instruction would have zero --

THE COURT: That's -- I understand. I'm just asking, because it's my burden under the law to ask for any alternatives and I'm asking. And you're saying you don't even want me to touch what you argue is prejudice?

MR. LANGE: I'm not asking for a curative instruction, because I think under these facts it would be useless.

THE COURT: Okay. That's what I'm asking. Thank you.

Okay. The argument, as I understand it from Mr. Lange, is that he made prejudicial statements in his opening when he forecast what he expected the evidence to show. Because Mr. Rodriguez has lawfully asserted his Fifth Amendment privilege and as a result cannot be called by defense, he cannot be a defense witness.

The question, then, is whether there's a reasonable probability that but for the remarks that defense counsel made in his own opening, the outcome of the trial would have been different.

I am to make this determination in the context of the entire trial and in the light of any curative instruction. I've asked for alternatives. I was told that

no curative instruction would be, not just not helpful, but rebuffed by Mr. Lange. At this juncture I do not see a basis for a mistrial.

As I told the jury in preliminary instructions and as I will tell them again at closing, comments made by counsel are not evidence, they are to make their determinations based on evidence that has come into this case.

There has been no case law put forward that would suggest to me that an overextension of what the evidence may or may not show rises to the level of such prejudicial comments that but for opening statements the outcome of the trial would have been different. That would be an oddity I expect in the law given the instructions that the jurors are to follow in arriving at their verdict.

I also think that in light of the evidence thus far -- we don't even have a verdict yet. So there's that. But in light of the evidence thus far, there has been significant evidence to support the government's case in chief. I imagine we'll hear Rule 29 motions later today, but at this point I would be inclined to deny them, because I think the government has more than met its burden for both of the defendants.

If there's any other relief that, Mr. Lange, you seek me to implement, here is your invitation to suggest it.

MR. LANGE: You're asking me if there's anything else other than what we've already talked about?

THE COURT: Other than declaring a mistrial, are there any other curative measures you would ask me to take?

MR. LANGE: No, other than the severance and the mistrial request, no.

THE COURT: Okay. Is there any other aspect of this motion that any party would like me to rule upon?

MR. PRESTON: No, Your Honor.

THE COURT: Mr. Vitier, are you considering telling me something or just --

MR. VITIER: Yes, Your Honor. I'm considering whether we should ask for a curative instruction, because the opening has already happened. So they brought up all this domestic violence and all this 403 stuff and I believe the government and I, if Ms. Pinuela's gonna testify as to what happened in that opening, I want to be heard on the motion in limine, because, again, it's the first time I've ever heard this elaborate story about a year before that's irrelevant to the March 8th, 2022, car being pulled over.

So if that's gonna be -- I mean, we're gonna have -- I anticipate we're gonna argue about that before we get there. I might be ahead of myself, but --

MR. LANGE: That makes the prejudice even deeper, Judge. Now it's a motion in limine coming up to negate

whatever I said in opening statement. The prejudice is expanding as we speak to my client.

THE COURT: Well, there was no contemporaneous objection during opening as to any of those statements by Mr. Lange. You can raise a motion before I turn to Ms. Pinuela's case and I'll consider it at that time. It wasn't the opening I expected, but I also am not privy to discovery the way counsel is. So there was no objection, like I said, no contemporaneous objection, there was nothing for me to rule on with regards to a 403 objection, if that's the basis for the earlier interactions with Mr. Torres and Ms. Pinuela.

I assumed, but perhaps I shouldn't assume, that that they were not being offered for a propensity, but a lack of mistake type of argument. But I don't know what they were being offered for or previewed for, so I'll wait for you to make a formal motion.

Anything else before we call the jury in?

MR. VITIER: No, Your Honor.

MR. CHANG: Nothing from us, Your Honor.

MR. LANGE: No, nothing, Judge.

THE COURT: Please bring the jury in.

(The jury was returned to the courtroom, after which the following proceedings were had in open court.)

THE COURT: Is the United States ready to proceed

with its case?

MR. CHANG: Yes, Your Honor.

THE COURT: Call your next witness, please.

MR. CHANG: The United States calls Rebecca Metsky.

THE COURT: Ma'am, if you could come and stand in front of the witness podium, I'll have the Courtroom Deputy swear you in before you provide your testimony.

(Witness sworn by the Deputy Clerk.)

THE WITNESS: I do.

THE DEPUTY CLERK: Please state your name and spell your first and last name for the record.

THE WITNESS: Rebecca Metsky, R-e-b-e-c-c-a M-e-t-s-k-y.

THE DEPUTY CLERK: Thank you. You may be seated.

THE COURT: And you may inquire when you're ready, Mr. Chang.

MR. CHANG: Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. CHANG:**

Q. Ms. Metsky, just I would like to start with talking about your background a little bit. Where do you work?

A. I'm employed by the Florida Department of Law Enforcement as a crime laboratory analyst in the Seized Drug Section.

Q. Okay. And how long have you been a crime lab analyst?
A. Approximately six years.
Q. Okay. What kind of educational background do you have for your position?
A. I have a bachelor's degree in forensic science from University of Tampa, as well as a year-long training program I completed through the Florida Department of Law Enforcement.
Q. So what did that training program include?
A. So the training program is two phases. The first phase is an academic phase in which I am doing readings, tests, and as well as physical examination of standards.
The second phase is a supervised casework phase, so I'm working cases under the supervision of a trained --
Q. Were there any competency exams as a part of your training?
A. Yes.
Q. And did you pass, obviously?
A. Yes.
Q. Are you also retested throughout your career?
A. I'm sorry?
Q. Are you also retested throughout your career?
A. Yes, on an annual basis we're given a proficiency test.
Q. Have you previously testified regarding drug analyses?
A. Yes, I have.

Q. How many times?
A. Over 20 times.
Q. Let's talk about this case at hand today. Did you personally conduct testing on four items in this case?
A. Yes, I did.
MR. CHANG: And, Your Honor, may I approach the witness with exhibits?
THE COURT: Yes.
MR. CHANG: So I've handed the witness Exhibits 11, 12, 21, and 23.
BY MR. CHANG:
Q. Could you please review each of those exhibits starting with Exhibit 11.
A. (Complies.)
Q. Are these the four items that you tested?
A. Yes.
Q. And how do you know that?
A. How do I do the testing.
Q. How do you know that they are the exhibits you tested?
A. I recognize them from the evidence packaging. It has a yellow FDLE bar code on it, as well as my initials and handwriting on the evidence tape seals.
Q. Is that true for each of the four exhibits?
A. Yes.
Q. Now, as these items come into your possession, what do

you do first?
A. So I will begin by comparing the physical evidence I received to the paperwork I received to make sure all of the case numbers and item numbers match up.
I will then take a physical description of what I see and then proceed with my analysis, which includes taking the weight of it, a chemical color test, and two instrument testified.
Q. Now, let's start with the weights of the substance. Is that done before any testing?
A. Yes.
Q. And why is -- why is that done first -- let me rephrase that question.
Does testing consume a portion of the sample, is that why you weigh them first?
A. It consumes a small portion, but I just take the weight so I know what the weight is before I begin.
Q. What do you use to weigh them?
A. I use a balance.
Q. And what is a balance?
A. So a balance is similar to what you would see in a grocery store. It has a metal top on it. When you put an item on top of it, you'll get a weight readout on screen.
Q. How do you make sure that balance is accurate?
A. They are performance checked weekly using standardized

weights.
Q. Was the balance accurate during this examination?
A. Yes.
Q. Now, are the weights calculated of just the substance itself without any packaging?
A. Yes, every weight that I report will be a weight of just the substance and not the packaging.
Q. Now, you mentioned a few tests that you did in this case. What was -- you said a color test. Was a color test the first thing you did?
A. Yes.
Q. And can you describe to the jury just what the color test does?
A. The chemical color test is the presumptive test. I take a little bit of the sample and I'll put it into a liquid and observe a color reaction. That will give me indications of what may or may not be present in the sample.
Q. Okay. And does that give you an idea of what substance to test it for essentially?
A. It gives me an idea of what could potentially be present.
Q. And what was the next test that you did after that?
A. From there I did a gas chromatography, as well as a gas chromatography/mass spectrometry test.
Q. Let's start with the gas chromatography test. Can you

please describe to the jury the gas chromatography process?
A. So that is an instrument, it's gonna be a long thin tube inside of an oven. That tube has a special coating on the inside and gas is gonna be flowing through that tube. A sample is introduced to the tube and it's gonna interact with both the gas and the coating and move at different rates, depending on what the substance is.
The time it takes that substance to go through the tube is timed and that time is compared to the time it takes a known standard to go through the same tube under the same conditions.
Q. Is this machine also that you run it through, the instrument, is that also performance checked like the scale?
A. Yes.
Q. Now, did the items that each -- did you put each of these exhibits through that test?
A. Yes, I did.
Q. And were the results what you expected?
A. Going into it I didn't have an expectation of what the results are. When I do my analysis, I'm screening for every potential controlled substance, as well as the absence of a controlled substance.
Q. The next test you said was gas chromatography and mass spectrometry. Can you please describe that process to the jury?

A. So that is an instrument. It will begin with a gas chromatography, which is what I had described, that tube inside an oven. From there it's gonna enter the mass spectrometer. From there the substance is hit with a force that's gonna break it into pieces. The way it breaks is gonna -- it's gonna break the same way every time, and that is unique to a specific substance.

So the pieces of that substance that's broken are gonna be collected and measured and what's similar to a bar graph is gonna be formed of how many of each size piece was present. That bar graph is then compared to a bar graph of a known standard to make an identification.

Q. Now, for each of those four exhibits in this case, did you run each exhibit through that same process of those three tests that we described?

A. Yes, I did.

Q. Okay. Looking at Exhibit 11, what were you able to determine Exhibit 11 to be?

A. My results for Exhibit 11 was that it contained cocaine.

Q. And what was the weight of that cocaine?

A. May I refer to my notes?

Q. Yes, please. Would that help refresh your recollection?

A. Yes. The weight was 452.03, plus or minus .79 grams.

Q. And looking at Exhibit 12, could you identify what that substance was?
A. In this substance, I identified cocaine.
Q. And what was the weight of Exhibit 12?
A. 500.34, plus or minus .15 grams.
Q. And regardless -- when you say plus or minus, can you explain what that means?
A. So that is a statistical calculation that is put on every weight that I take. It takes into account environmental factors that could have a slight variation on the weight, so things like temperature or humidity.
Q. Even with that factored in, is Exhibit 12 over 500 grams?
A. Yes.
Q. Is Exhibit 12 the more solid piece of cocaine that we're talking about? Could you show it to the jury?
A. Uh-huh. This one is 12. This is Exhibit 12.
Q. Thank you. Moving to Exhibit 21, what was that substance?
A. In this substance, I identified fentanyl.
Q. Okay. And how much -- what was weight on the fentanyl?
A. The weight was 16.74, plus or minus .15 grams.
Q. And finally, Exhibit 23, what substance is that?
A. I identified cocaine in this substance.
Q. Did you weigh that last substance?

A. I did not take a weight of just the substance for this one.

MR. CHANG: One moment, Your Honor?

THE COURT: Yes.

BY MR. CHANG:

Q. For clarification, how many grams are in a kilogram?

A. A thousand.

Q. And how many grams are in an ounce?

A. That I do not know off top of my head.

Q. A thousand grams in a kilogram, though?

A. Yes.

MR. CHANG: Nothing further, Your Honor.

THE COURT: Cross for this witness?

MR. WILLIAMS: No cross, Your Honor.

MR. LANGE: No questions, Your Honor. Thank you.

THE COURT: Thank you, ma'am. You may be excused from the witness podium at this time.

Is the government ready to call its next witness?

MR. CHANG: Yes, Your Honor. The government will call Luibeth Fortes-Rodriguez.

THE COURT: Ma'am, if you could come to the front of the witness podium, I would ask you to come up here. When you get there, raise your right hand, I'll have the Courtroom Deputy swear you in.

(Witness sworn by the Deputy Clerk.)

THE WITNESS: Yes.

THE DEPUTY CLERK: Please state your name and spell your first and last name for the record.

THE WITNESS: Luibeth Fortes-Rodriguez. You want the first name? L-u-i-b-e-t-h, F-o-r-t-e-s, Rodriguez, R-o-d-r-i-g-u-e-z.

THE DEPUTY CLERK: Thank you. You may be seated.

THE COURT: You may inquire when you're ready, Mr. Chang.

MR. CHANG: Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. CHANG:**

Q. Ms. Fortes-Rodriguez, where do you currently work?

A. Hillsborough County Sheriff's Office.

Q. And what is your position with the Sheriff's office?

A. I am a community service aide.

Q. Okay. What are -- do part of your responsibilities include reviewing phone calls made by inmates at the Hillsborough County jail?

A. Yes.

Q. Do you pull calls for investigations?

A. Yes.

Q. As well as trial?

A. Yes.

Q. And is that done on a regular basis?

A. Yes.
Q. Do you also serve as a custodian of record for the Hillsborough County Sheriff's Office?
A. Yes.
Q. Let's talk about the jail call system. Are there -- are there records maintained for inmate phone calls that are made from the Hillsborough County jail?
A. Yes.
Q. Are they automatically recorded at the time that they are made?
A. Yes.
Q. And is it the regular course of business for the jail to record these calls?
A. What was that? I'm sorry.
Q. Is it in the regular course of business for Hillsborough County jail to record these calls?
A. Yes.
Q. How are the calls maintained?
A. In the -- GlobalTel Link server is where they're stored.
Q. Okay. Does GlobalTel Link contract with the Sheriff's office to maintain the jail calls?
A. Yes.
Q. And as a custodian of the Hillsborough County Sheriff's Office, do you maintain access to the GTL system?

A. Yes.
Q. How is each inmate identified -- how is each inmate identified as far as the calls are made?
A. With a PIN number.
Q. I'm sorry?
A. With a PIN number.
Q. Is each -- is that PIN number unique to each inmate?
A. Yes. Yes.
Q. So using that PIN number, you're able to identify what calls are made from that PIN number?
A. Yes.
Q. In this case, what is Elias Rosario Torres's PIN number?
A. I do not have that with me, sorry.
Q. If I show you a record, would that help refresh your recollection?
A. Yes.
Q. What is -- let me know when you've taken a look and if it's refreshed your recollection.
A. You did.
Q. What is Mr. Rosario Torres's PIN number?
A. 2022-06-1672.
Q. Okay. Were you able to review calls made from that PIN number?
A. Yes.

MR. CHANG: And may I approach the witness with exhibits, Your Honor?

THE COURT: Yes.

BY MR. CHANG:

Q. I have shown the witness what's been premarked as Government's Exhibit 42 and 43.

BY MR. CHANG:

Q. Do you recognize those calls?

A. Yes.

Q. And how do you recognize them?

A. My initial on the disk.

Q. Are they a fair and accurate depiction of the jail calls made from Mr. Torres's PIN number?

A. Yes.

Q. Were both calls made on March 9th of 2022?

A. Yes.

MR. CHANG: At this time the United States would move into evidence Government's Exhibit 42 and 43.

THE COURT: Any objection from defense?

MR. WILLIAMS: No objection.

MR. LANGE: No objection, Judge.

THE COURT: Forty-two and 43 are admitted. If you wish to publish, you may do so.

(Government's Exhibit Nos. 42 and 43 admitted into evidence.)

MR. CHANG: Thank you, Your Honor.
Madam clerk. Thank you.
I'm publishing Exhibit 42.
(Exhibit 42 published.)
MR. CHANG: Now publishing Exhibit 43.
(Exhibit 43 published.)
MR. CHANG: I have no further questions of this witness, Your Honor.
THE COURT: Okay. Any questions on behalf of Mr. Torres, cross?
MR. VITIER: No, Your Honor, no cross.
THE COURT: How about Mr. Lange?
MR. LANGE: No questions, Judge.
THE COURT: Then, ma'am, you may be excused from the witness podium. That's fine. Thank you.
Does the United States have any additional witnesses to call in its case in chief?
MR. CHANG: Yes, Your Honor, one more witness. The United States would call Juan Alvarez.
THE COURT: Mr. Alvarez, come to the witness podium up here. I'll ask the Courtroom Deputy to swear you in before you provide your testimony.
(Witness sworn by the Deputy Clerk.)
THE WITNESS: Yes, ma'am.
THE DEPUTY CLERK: Please state your name and

spell your first and last name for the record.

THE WITNESS: Juan Alvarez, J-u-a-n A-l-v-a-r-e-z.

THE DEPUTY CLERK: Thank you. You may be seated.

THE COURT: You may inquire.

MR. CHANG: Thank you, Your Honor.

And, Madam Clerk, I will be publishing some exhibits shortly.

**DIRECT EXAMINATION**

**BY MR. CHANG:**

Q. Detective Alvarez, I would like to talk to you a little bit about your background. Where do you work?

A. I'm currently employed with the City of Tampa Police Department.

Q. And how long have you been with the Tampa Police Department?

A. Twenty years.

Q. What is your current position?

A. Currently I am assigned to the narcotics Division, which is called HIDTA, which stands for high intensity drug trafficking area. I'm also assigned to a task force with the FBI and that one is called Safe Streets.

Q. What are your current responsibilities as a narcotics investigator?

A. For the last -- since I've been in HIDTA doing narcotics since 2008, we are deemed with drug trafficking

organizations in the Tampa Bay area.

Q. How much of your career overall has been focused on narcotics investigations?

A. Since 2008.

Q. Where did you start out?

A. So when we get hired as a police officer in our department and most departments you first go to patrol. And I attended patrol for four years and then moved to a specialize unit that started with narcotics, a plain-clothes unit.

Q. Is that street-level narcotics that you're working in?

A. Yes, sir.

Q. And what did that involve at that time?

A. So street-level narcotics is more simplelized as far as small hand-to-hand transaction, street-level narcotics. I did conduct undercover activities during that time frame as well.

Q. Did you personally conduct street-level narcotics undercover transactions?

A. Yes, sir.

Q. And how often was that?

A. Those were quite extense, because they were very simple. It was basically going into problem areas that we had, driving up to those areas, walking up to those areas, meeting people and doing hand-to-hand transactions. So on a

weekly basis, I easily did about three to four a week.
Q. Okay. Now, after your time in the street-level narcotics, where did you go from there?
A. In 2012 I went to CID, which is Criminal Intelligence Division, which I'm currently assigned to.
Q. Okay. And in your current position what kind of -- what kind of drugs amounts are you dealing with in this position?
A. Currently we deal with kilograms, large amounts.
Q. Are you continuing to facilitate narcotic transactions?
A. Yes, sir.
Q. And how many investigations would you say a year?
A. At a large scale, probably do about three to four.
Q. Overall, how many narcotics investigations have you done throughout your career?
A. Easily probably over a thousand since 2008.
Q. Let's talk about are you currently -- in your current position, are you still involved in purchases of kilogram amounts of cocaine?
A. Yes, sir.
Q. Based on that experience, what is the current value of a kilogram of cocaine?
A. Currently a kilogram of cocaine, which is 1,000 grams, is in the low 20,000s, anywhere from 20,000, 21,000, 22,000 per kilogram.

Q. Does that value fluctuate over time?
A. Absolutely.
Q. Now, were you personally involved in purchases of kilogram amounts between 2021 and 2022?
A. Yes, sir.
Q. And what was the value of a kilogram of cocaine at that time?
A. Post CoVid, the price of kilogram went up quite a bit. Right around 2021 we were seeing one kilograms price low 30s. It has trickled down since then. 2021, 2022, it was in the mid 20s, 20,000. Now, in 2024, we're seeing it more at the 20,000-dollar level.
Q. So would it be fair to say that back then it was between 25 and 30,000, somewhere in there?
A. Easily, yes, sir.
Q. What about fentanyl, have you made undercover purchases of fentanyl as well?
A. Yes, sir.
Q. And what would you say, based on your experience, how much is a gram of fentanyl around that time?
A. A gram of fentanyl probably goes about a hundred dollars per gram.
MR. CHANG: May I approach the witness with -- actually let me publish Exhibit 11, please.
If I could also approach the witness with an

exhibit, Your Honor?

THE COURT: Yes.

MR. LANGE: I have provided the witness with Exhibit 11 and Exhibit 12.

BY MR. LANGE:

Q. What is the way that these exhibits are packaged, what does that indicate to you, specifically, Exhibit 11 first?

A. So 11, what we're looking at right now, this package is a kilogram that's been broken up to different weight amounts that are traditionally used by drug traffickers. This one there is a half a kilograms here. It's about 500 grams.

Q. And what about Exhibit 12?

A. For the other one, this exhibit has three almost identical bag contents and those are approximately 125 grams per bag, 125 grams of powder cocaine.

Q. Now, these quantities, when you say 125 grams and a half a kilogram, are these weights that are commonly sold in the narcotics trade?

A. Yes, they are. These are terminology used, a 125, meaning 125 grams, a half -- break a half a kilo, meaning a half of 1,000 grams, this is terminology used by drug traffickers.

Q. Are either of those exhibits personal use amounts?

A. No, sir.

MR. LANGE: Publish our Exhibit 18, please.

BY MR. LANGE:

Q. Looking at Exhibit 18, what are these items used for in the narcotics trade?

A. During a drug transaction, these items, which are just simple digital scales, are utilized to confirm to the purchaser or the seller that what they're buying or selling is the true amount of the narcotic they're advertising. Clearly, you would take -- or I would take during a drug transaction one of these bags and prove to the purchaser or the seller that, hey, this is a 125 grams. So it's utilized to confirm the amount you're purchasing is a true weight.

MR. LANGE: Showing the witness Exhibit 23.

BY MR. LANGE:

Q. All right. Exhibit 21 --

MR. LANGE: Showing the witness Exhibit 21 for the record.

BY MR. LANGE:

Q. How many doses -- how many street level doses is that 16 grams of fentanyl?

A. There is quite a bit of doses. A typical user who is addicted to fentanyl would inject into their body one-tenth of a gram per injection out of fear of overdosing. So this being 16 grams, if there is gonna be ten shots per every gram, we're looking at 160 shots into the human body or more.

Q. I want to shift the topic a little bit to firearms. Now, when you arrest someone for an offense involving selling narcotics, how often do you come across a firearm approximately?
A. Very often. Firearms are a part of drug traffickers for the form of protection.
Q. Have you personally investigated cases where this has occurred?
A. Yes, sir.
Q. And what's the purpose of them carrying a firearm?
A. During the process of doing illegal activity, either selling or buying the narcotics, the subject would utilize and bring a firearm for that reason, for protection, out of fear that they are being robbed.
For example, if they're coming to purchase narcotics and they're bringing let's say $22,000 in cash to buy a kilogram, they are in fear that they're actually not there to buy the kilogram, they're gonna get robbed themselves. So drug traffickers utilize and bring guns for their own protection.
MR. CHANG: One moment, Your Honor.
THE COURT: Yes.
(Brief pause in proceeding.)
MR. CHANG: Thank you, Your Honor.
I have no further questions, Detective.

MR. WILLIAMS: No questions from the defense, Your Honor.

MR. LANGE: No questions, Your Honor.

THE COURT: Okay. Then you may be excused, sir, from the witness podium.

Does the government any additional evidence to put on in their case chief?

MR. CHANG: I don't believe so, Your Honor. Let me just have one moment to make sure.

Your Honor, at this time the United States of America will rest its case.

THE COURT: Ladies and gentlemen, we are gonna take a brief recess, an afternoon recess. We will resume here at 2:35.

(The jury exited the courtroom, after which the following proceedings were had outside the presence of the jury.)

THE COURT: Are there any motions to be heard outside of the jury's presence?

MR. WILLIAMS: Yes, Your Honor. Your Honor, at this time, defense would be making a motion for a Rule 29 for judgment of acquittal at this time. In viewing the evidence in the light most favorable --

THE COURT: Mr. Williams, do you mind coming to the lectern for me. Thank you.

MR. WILLIAMS: I don't mind, Your Honor. Thank you.

I apologize. Is the Court able to hear me better?

THE COURT: Yes, I can. Thank you.

MR. WILLIAMS: You're welcome.

And we would move for a judgment of acquittal at this time. Looking at the light -- the evidence in the light most favorable to the nonmoving party, as to the counts of conspiracy, we would argue that at this time the government has not met their burden as to the count of conspiracy. While we cannot debate whether or not there has been some testimony, our position is that the testimony has not risen to the level in which this case should proceed to a jury regarding my client's, Mr. Torres's, involvement in the conspiracy.

What we have at best is my client attempting to negate charges that would be further sent to the co-defendant, Ms. Pinuela, who actually owned the vehicle. So as it relates to the charge of conspiracy, we would argue that the government has not met their burden at this time.

As to second count of possession of a firearm in furtherance of a crime of violence -- or drug trafficking, excuse me, we would also allege that -- for the same argument that I made as to the first count, that the government has not met their burden as well as it relates to

this count.

We would argue that the testimony in this case, certainly while my client has attempted to take responsibility, the facts of this case have outlined that the guns were found in the vehicle owned by the co-defendant and found in a bag owned by the co-defendant. And my client merely, while just merely requesting to take some things, didn't give any specificity as to what items he was referring to.

There certainly was marijuana found in the car that was -- that could have certainly been attributed to my client. In the testimony that was been put forth thus far, it was pretty clear from the officers that there was no specificity as to what my client was attempting to take responsibility for in his effort. And so due to the fact that this vehicle was owned by the co-defendant, it was found -- much of the items were found in the bag owned by co-defendant, it is our position that the government has not met their burden as it relates to this.

Possession of a firearm or ammunition by a convicted felon, we would again make that same argument. Based on the testimony that's been elicited by the officers in this case, while my client can certainly admit and we stipulated to him being a convicted felon, it is our position that the government has not met their burden as it

relates to this count. Again, the firearm with ammunition was found in the center console of a vehicle owned by Ms. Pinuela, in which Ms. Pinuela was again adamantly fighting for the responsibility of the purse initially and the firearms -- the ammunition was found in the console of the vehicle that was owned by her.

And so there have been no statements to my client specifically related from the officers other than him saying, come on, you know what it is, and I'll take that. But again, there were several other things in there that could have been referenced to that specifically.

So it's defense's position at this time that the government has not met their burden and that the Court should grant a rule of a judgment of acquittal in favor of defense, Mr. Torres.

THE COURT: Okay. Thank you.

So is there a Rule 29 motion for Ms. Pinuela?

MR. LANGE: Yes, Judge. We would start by renewing all of our previously made motions in the case assuming Your Honor's rulings to be the same.

We would move for a motion for judgment of acquittal as to Count One, the conspiracy count. There's no -- there's no legitimate factual evidence that has been established in the government's case in chief to make out a criminal partnership, a criminal agreement between two

people.

You have -- you have the drugs in the case, the trafficking amount of cocaine and the trafficking amount of fentanyl and the firearm contained in those -- those two bags, but there's no evidence at all from Ms. Pinuela's statements or from the co-defendant's statements. To the contrary, the co-defendant's statements exonerate Ms. Pinuela completely of any responsibility or involve -- criminal involvement in any of the counts, Counts One, Two, or Three.

But speaking specifically as to Count One, that's all you have is really in terms of tangible evidence on the conspiracy count is -- is the evidence that Ms. Pinuela in response to Sergeant Jenne attempting to pull the pink and the black backpacks out from the area of Mr. Torres's feet where he had been sitting and staring at them, that she -- that she made a movement while sitting in the driver's seat of the car with -- with female Officer Sousa right next to her at the driver's window and other officers around the vehicle.

She had made some sort of a movement, presumably still in her seat belt, because she had been answering questions from Officer Sousa about the basic information regarding her being the driver of the vehicle and identifying information, identifying stuff. And for her to

reach out and say these are -- you know, stop, these are my bags or this is my bag, this is my stuff, this is my home, it's completely ambiguous and not really evidence that should rise to the level of getting the government past the judgment of acquittal on the conspiracy count.

And I would make the same argument really, obviously, not the criminal partnership part of the argument, but the rest of the argument I made in Count One as to Count Two, the possession with intent to distribute. And also as to Count -- the same argument, obviously, without the conspiracy partnership, lack of evidence as to Count -- as to Count Three.

There's no -- there's no direct -- direct evidence, there's no circumstantial evidence that would rise to the level of valid circumstantial evidence to -- to create sufficient evidence to get past a judgment of acquittal, even at this stage, that she intentionally participated in any conspiracy with the co-defendant to traffic these -- these drugs, the trafficking amount of cocaine, trafficking amount of fentanyl, with -- by use or possession of a machine gun. And that would apply really to all three counts.

So as to all that, I would ask Your Honor for a judgment of acquittal.

THE COURT: Okay. Would the government like to be

heard in response?

MR. CHANG: Very briefly, Your Honor.

When viewing the evidence in light most favorable to the United States, the government has established a prima facie case on all four counts.

If the Court has any specific questions regarding any element or count, I would be happy to walk through them, but at this time our position is that it goes to a jury.

THE COURT: No, I don't have any questions.

MR. CHANG: Thank you, Your Honor.

THE COURT: Okay. I'm gonna deny the Rule 29 motions from both Mr. Torres and Ms. Pinuela. It's my obligation to view the evidence in the light most favorable to the non-movant, here the United States. The evidence is sufficient to proceed if a reasonable trier of fact choosing among the reasonable interpretations of the evidence could find guilt beyond a reasonable doubt.

I have to draw all reasonable inferences and credibility choices in favor of the government. In light of those legal obligations, I think the government has adequately put forward a case to proceed to the jury.

With regards to Count One, the conspiracy charge, the two counts that -- the two elements that must be met are that the individuals in some way agreed to accomplish a shared and unlawful plan the object of which was to possess

with intent to distribute a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl; and, element two, that the defendant's knew the unlawful purposes of the plan and willfully joined in it.

As is true in almost every conspiracy case, if there's not a written agreement, this is proved circumstantially, the government has put on circumstantial evidence that a reasonable trier of fact could credit and believe that the two defendants agreed together to accomplish this shared goal. They knew the unlawful purpose of the plan and willfully joined in it.

This is evidence through the circumstantial evidence. They both arrived in the same vehicle at the gas station, got out and spoke to individuals. They both were being transported in the same vehicle with the two bags plainly visible to both of them. They both made incriminating statements upon apprehension. So I think that that is sufficiently proffered for the case to proceed.

With regards to the Count Two, for possession with intent to distribute for the same reasons -- or similar reasons, I find that there is sufficient evidence to proceed to a jury. The bags being -- there's sufficient evidence for a jury to conclude that they both were aware of the contents of the bags and together were endeavoring to do

this enterprise.

With regards to Count Three, possession of a firearm in furtherance of a violent crime, here the drug trafficking offense, there's also the DNA evidence to consider in light of the other evidence I've already spoken of, the location of the firearm, where it was found, in the pink bag.

With regards to Count Four for Mr. Torres, again you have the DNA, you have the location at his feet, passenger side of the vehicle, and the stipulated facts satisfy the other elements. So there's sufficient evidence, again, viewing in the light most favorable to the government for this to proceed to a jury.

Any additional motions to take up or issues I did not resolve that you would like me to address with regards to the motions?

MR. WILLIAMS: None for Mr. Torres, Your Honor.

MR. LANGE: Nothing from Ms. Pinuela, Judge.

MR. CHANG: Nothing from the government, Your Honor.

THE COURT: Okay. Then we'll take a ten-minute break and resume in ten minutes.

I'll turn to Mr. Torres first. I don't know how long your case in chief will last. Can you given me idea?

MR. VITIER: Your Honor, at this time the only

witness I would have to call is Ms. Sousa, but I'm keeping her as an impeachment witness depending on what -- I wouldn't be calling her, but I don't know what Ms. Pinuela is gonna say.

THE COURT: So you don't have a case in chief to put on?

MR. VITIER: I do not.

THE COURT: Mr. Lange?

MR. LANGE: Yes, we're prepared to proceed with Ms. Pinuela, Judge.

THE COURT: Is she the first witness you're calling?

MR. LANGE: First and only.

THE COURT: So what I'm trying to get a sense of is then we should do a charge conference later this afternoon it sounds like.

Does the government have a rebuttal case if that's the defense?

MR. PRESTON: I don't anticipate one, Your Honor. I don't want to give you a hundred percent on that.

THE COURT: Okay. This is more for counsels' awareness. We're gonna do a charge conference as soon as I dismiss the jury this afternoon. I'm not gonna make them sit around and wait on us any more today. So just be prepared to do that.

And I anticipate all the parties will rest before close of business?

MR. VITIER: Your Honor, before I rest, do you want me to move my business records into evidence?

THE COURT: No, do that once the jury is here.

MR. VITIER: That's what I mean, I'm just gonna --

THE COURT: Yeah, I'm gonna turn to you first, as we said. Order of operation, Mr. Torres goes first. So if you have any evidence you want to put on, put it on, then you can rest. Then I'll turn to Mr. Lange for Ms. Pinuela.

MR. CHANG: Your Honor, I do have -- I didn't object to the form as per the Court's order as to how this record's coming. But I do have an objection as far as relevance and prejudice under Federal Rules of Evidence 403 and 401.

THE COURT: Okay. Why don't we expound upon that more. I understand you don't object to the authentication issue of Ms. Pinuela's drug test when she was in jail.

MR. CHANG: Yes, Your Honor. I just think they're confusing issues, that's why I'm moving under 403. Even though there may be a relevance argument as far as it proves that, you know, there's oxycodone in the bag and then oxycodone in her system, there's nothing to indicate that's the same oxycodone, the prejudice that it may confuse the jury without any explanation.

THE COURT: What about the -- didn't she test positive for cocaine?

MR. CHANG: And cocaine as well.

THE COURT: So unless -- I'm more sympathetic to the relevance argument with regards to marijuana and oxy, because those are not the issued drugs charged.

Cocaine, what's the argument for its relevance and then a 403 objection?

MR. VITIER: Your Honor, I don't know how it would be prejudicial to the government or confusing to the jury. The whole point is whose bag is it, it's a pink bag, that's the whole thing. Her pills aren't in there. The only way to prove that she tested positive to those pills is to have the drug test come in. I mean, it's completely relevant as to whose bag is it and I don't know how it would be prejudicial to the government who is charging Ms. Pinuela with joint possession of the bag.

THE COURT: Maybe we should take them one drug at a time.

MR. VITIER: Okay.

THE COURT: Let's deal with the oxy first. Okay. So given Mr. Vitier's response, Mr. Chang?

MR. CHANG: I'm gonna withdraw the objection at this time. We'll agree that comes in.

THE COURT: To her whole drug testing?

MR. CHANG: Yes, Your Honor.

THE COURT: All right. Then, Mr. Lange, do you have an objection?

MR. LANGE: To the what, to the --

THE COURT: Okay. We're talking about Mr. Torres's proffer of evidence with regards to your client's drug testing. That's his only evidence he's gonna put on, I assume. Right?

MR. LANGE: The drug test in the jail after she was arrested?

THE COURT: Right. And I had ordered all the parties to let me know if there was any authentication issue ahead of trial. Mr. Chang responded and said no authentication. I'm not sure you responded. So those issues, that's past. Do you have any objection otherwise?

MR. LANGE: I do have an objection to the sense that they haven't linked any personal possession drugs to the trafficking drugs that are charged in the indictment. I mean, if they could say, well, this gram of coke that was in her wallet is from the same batch as the -- as the cocaine found in the black or pink bag, then I could see a lot of relevance. But to just say she had --

THE COURT: I think their argument is about more the oxy, if I'm understanding it correctly.

MR. LANGE: The oxy would be even more irrelevant,

because the oxy is not part of the drugs that are charged in the trafficking --

THE COURT: Where was the oxy bottle found?

MR. LANGE: I'm sorry?

THE COURT: Where was the oxycodone bottle found, the bottle?

MR. LANGE: It was in the -- it was in the vehicle somewhere.

THE COURT: Where?

MR. LANGE: I'm not sure. I'm not sure if it was in the center console, maybe in her purse, I don't know. Under the seat. In any event, it doesn't make -- it's not relevant to -- unless they can connect the oxy to the actual cocaine that's being trafficked in those bags or the actual fentanyl that's being trafficked in those bags, it's prejudicial, it's irrelevant. You're talking about totally different drugs, personal possession quantity drugs.

THE COURT: Mr. Vitier, where are you -- tie the connection for Mr. Lange again.

MR. VITIER: Okay. In the bag there's a pack of cigarettes, a bottle of oxycodone, cocaine, and a firearm. This entire case is about who had access to that pink bag, who had the bag with them, and the drug results prove that the cocaine and the oxycodone that came from that pink bag were in her system less than not even 24 hours after being

arrested. I think it was the same exact time she got arrested she still had the oxycodone in her system. So it ties her access to the bag.

THE COURT: The pink bag?

MR. VITIER: Yes, Your Honor.

THE COURT: Mr. Lange, respond to that.

MR. LANGE: Let him present an analysis that connects chemically the oxy or the -- or the -- or the other -- you know, anything else to the actual drugs that are being trafficked. I mean, he has to make more of a connection. Just, well, in 24 hours she had some oxy that might be similar to something that was in the bag or some cocaine.

THE COURT: You don't dispute the factual predicate, though, that there's been testimony that oxy was found in the pink bag.

MR. LANGE: It was found where it was found. My point it's not relevant -- it's prejudicial and not relevant, because it's not connected to the actual trafficking amounts that are in those bags that are the subject of this indictment. It's not relevant. If they want to do something -- make other charges regarding that, those other -- those other drugs, fine. But that's not part of what they're -- or make them part of the indictment, that would be fine. But they're not charged in the indictment.

We have trafficking quantity of cocaine, a trafficking quantity of oxy, and they have no chemical analysis to connect those -- those other drugs to the trafficking quantity drugs. So that's all they're doing, is trying to -- try to smear somebody's bad character because it happened -- they happened to be involved with other personal -- personal amount drugs that are not proven to be connected to the subjects of the indictment --

THE COURT: I think that --

MR. LANGE: -- the trafficking quantities. Let them come in with a chemical analysis to show it's from the same batch. Fine, he can do that. If he can do that, then it's very relevant, otherwise it's irrelevant and prejudicial.

THE COURT: Okay. I think I have your argument.

Who are you getting in through, Mr. Vitier?

MR. VITIER: It's a -- since it's a business record, that's why I asked when you wanted me to move into -- I'm not gonna use a witness, I have an affidavit. It's business record exception.

THE COURT: Okay. So you're just gonna move it in?

MR. VITIER: Yes, just like the stipulation signed by the parties. I just don't need it read.

THE COURT: I'm sorry, you don't need it read?

MR. VITIER: Right, I don't.
THE COURT: You're just gonna move it in and then argue about it at closing?
MR. VITIER: Right. And just to close the matter, when I talked to Sousa on cross, Mr. Lange could have crossed the officer on whether or not, you know, anybody tied the oxy to it and it could be handled in closing argument.
THE COURT: I think I have the parties' arguments.
MR. VITIER: Okay. Does the government wish to be heard any further on this?
MR. CHANG: No, Your Honor, I have no authentication objection.
THE COURT: Or any other?
MR. CHANG: Or any other objections.
THE COURT: Okay. We will be in recess for five minutes.
(A brief recess was taken, after which the following proceedings continued in open court.)
THE COURT: Any other motion to take up? I think there was a motion the government mentioned they might make and given that we won't need another break.
MR. LANGE: Nothing from Ms. Pinuela.
THE COURT: And, sorry, to close the loop, I am -- if there -- to the extent there was an objection lodged by

Ms. Pinuela, I'm overruling it with regards to the drug results.

Yes, Mr. Preston.

MR. PRESTON: Yes, Your Honor. During opening statements a number of comments were made by Mr. Lange during his opening statement concerning domestic abuse. It's the government's position that if the defendant's contention or defense in this case is further argued during opening statements that the defendant had no knowledge or control over the drugs or the firearms, which are the subject of the allegations in this case, then any allegations, this tail, this story of domestic abuse, any of those allegations are irrelevant to that defense.

She is not arguing, based on what we heard from Mr. Lange, that Defendant Torres coerced Ms. Pinuela into distributing drugs or that he made her carry his firearm. Per the opening, she was oblivious to the contraband. So I submit to the Court that any argument or any questioning of this witness in regard to domestic abuse is irrelevant and should not be permitted in this case. I move in limine that the defense be instructed to avoid communication -- avoid questioning --

THE COURT: Any testimony on domestic abuse that proceeded March 8th.

MR. PRESTON: Yes, that preceded March 8th.

Correct, Your Honor.

THE COURT: Mr. Lange?

MR. LANGE: Yes, I object to the motion in limine, Judge. The whole background here with Mr. Torres is critical to the jury's understanding of how her -- for example, how her DNA got on the Glock. She explains the abuse, physical abuse she was getting from Torres, constant abuse, him pulling the gun out, the Glock out that he always carried on her, threatening to shoot her, threatening her baby daughter.

And at times she would pick up that gun off a table that he would leave there and he would -- she would then point it at him. So that would explain -- on these occasions that she did that, that would explain why her DNA was on the gun. Okay. So that's critical background information.

The business about him, again, being sort of physically and personally abusive to her, but getting -- coercing her into using small amounts of drugs and getting hooked on small amounts of drugs as a means of control, in controlling her, is very relevant, because we have small amounts of drugs popping up in her wallet, we have small amounts of drugs popping up in drug testing, and that would explain how she was in a noncriminal way using drugs, personal small quantities of drugs, as a result of his

intimidation.

THE COURT: What does that have to do with the charged offenses, the personal use? She's not being prosecuted for the personal use of cocaine or oxy or any of those.

MR. LANGE: Then it shouldn't be admitted. None of those personal use drugs should be allowed, but they're all being admitted.

THE COURT: You never moved to exclude them.

MR. LANGE: They're admitted into evidence.

THE COURT: You never moved to exclude them. How -- okay. So I'm gonna turn back to the government in one second, because you make one point that I want to hear the government on, which is you've provided an explanation for how her DNA might be on the firearm. But it is my understanding that the defense put on by Ms. Pinuela this whole case has been that she had no knowledge of the drugs or the firearm in the bags in the car on the date in question.

MR. LANGE: Exactly.

THE COURT: Right. So whether Mr. Torres had been abusive to her or coerced her into taking personal drugs or otherwise was just a bad boyfriend, I don't see how that is relevant if your defense is she had no knowledge of the drugs that night. The drugs for which she's being charged.

MR. LANGE: She had no knowledge of the cocaine and the fentanyl in the bag.

THE COURT: Right.

MR. LANGE: Bags.

THE COURT: Okay.

MR. LANGE: Exactly. She had no knowledge of it.

THE COURT: Then what does -- so what does -- you've never raised a duress defense. I don't hear you making one now. You've never argued that she somehow was coerced into being aware of this, but not participating to a full Pinkerton level. You've never made any of those allegations.

MR. LANGE: That was my whole opening statement, that she was -- he was coercer to her.

THE COURT: Coercive to her do to what?

MR. LANGE: Coerced her into taking drugs.

THE COURT: Personal use drugs, but not distributing the large amounts.

MR. LANGE: Right.

THE COURT: Okay. So what does the personal use of drugs have to do with anything?

MR. LANGE: Because they've admitted various personal use drugs, which I object -- which I object to.

THE COURT: You've never objected until this moment.

MR. LANGE: Well, how about right now? I object to the irrelevant use of personal drugs. Unless I'm allowed to talk about why she would have been coerced by Torres into taking small amounts of drugs so he could control her.

THE COURT: As far as I can tell, the only person left to testify is your client, so --

MR. LANGE: She's the only one left, that's right, Judge. Hopefully, her testimony is as valid as anybody else in -- you know, so I don't understand why she's the only one testifying. She can testify about her experiences with Torres, whether it was coercion over drugs, whether it was threatening her with the Glock, whether --

THE COURT: I think you make a decent relevance argument as to why her DNA was on the firearm. I do not see the relevance to any sort of boyfriend-girlfriend coercion in terms of personal use drugs.

MR. LANGE: Well, the other part of this --

THE COURT: What does that go to?

MR. LANGE: Okay. Why it's relevant is control --

THE COURT: Personal use. The personal use.

MR. LANGE: That he be a ridiculous conspirator with her, because he never talked business with women, he thought of women, she'll testify, as I said in opening statement, he thought of women as good for one thing only and not business. He always did business with his male

friends. He would never have conspired with his -- with a female in any kind of drug transaction. This was all men's business. That was -- that's what I outlined in the opening statement and that's gonna be her position, that he intentionally kept her out of the loop in any conversation about business, any kind of business, drugs or anything else. That it wasn't women's business. And that was part of his machismo, his macho approach to woman. So it's highly relevant.

THE COURT: Okay. Let me -- Mr. Vitier, are you trying to respond?

MR. VITIER: Yes, Your Honor.

THE COURT: Okay. You can come to the lectern, you respond, but then I want to turn back to Mr. Preston on the one point I made about why her DNA might be on the firearm.

But I want to hear from Mr. Vitier first so that the government can respond to both defendants.

MR. VITIER: Yes, Your Honor. Again, going back to whether Ms. Pinuela had knowledge that the firearm or the drugs are in there, none of the domestic abuse or the coercion or anything like that would have gone to any of that.

And secondly --

THE COURT: What about the firearm DNA?

MR. VITIER: We heard from the DNA analyst how it could be transferred. They could have touched -- I got it clearly from cross that either one of them could have touched the other one and then touched the gun. She could just say what he wants her to say, she's seen him with a firearm in the past and there's every reason in the world why his DNA would be mixed with hers. They're in a relationship, they were holding hands, and then he grabbed his gun. She doesn't have to testify about over a year of abuse and all this other stuff that wouldn't clear 403 that's completely prejudicial and irrelevant in order to get there.

I agree with the government that it has nothing to do -- a duress or coercion defense wasn't raised in a timely manner to bring it up now. It's almost trying to sneak in a duress defense and say this is why she would have possessed the firearm at one point or another. It's gonna confuse the jury into thinking -- into thinking that -- it's gonna confuse the issue -- the jury as to what is the issue, which is did she knowingly possess that firearm in a drug trafficking, you know, count or not. And whether she entered the conspiracy because he had some hold over her with making her use personal use drugs, which haven't been charged.

THE COURT: Okay. Can I hear from the government

again?

MR. PRESTON: As the Court is aware, limiting a defendant's ability to present a defense is something that is reviewable by the Eleventh Circuit. And I submit to the Court that my arguments didn't fully take into account the issue that Mr. Lange raised before the Court in which the Court has this additional question about, and that is the defense that Ms. Pinuela intends to assert in regard to how her DNA got on that particular gun.

I don't believe Mr. Vitier's other explanation is something that has to be forced upon Ms. Pinuela and I submit to the Court that Mr. Lange's argument carries some weight in regard to the DNA question in this case. How far he should be permitted to go in regard to a year's worth of domestic abuse is something the Court can -- can determine.

THE COURT: Yeah, it becomes a 403 balancing.

MR. PRESTON: Yes, Your Honor. But in this instance, I have to concede that I wouldn't want to take away a -- what's being proposed as a truthful defense in this case by suggesting that there's an alternative to how the DNA got on the gun.

THE COURT: Okay. I'm ready to rule on this.

There were multiple things mentioned in opening. There were no contemporaneous objections made during opening. I understand the motion in limine raised now by

the government ahead of Ms. Pinuela's testimony and I think there's merit to some and I think others Mr. Lange has a reason to put on a defense for his client and it's not unfairly prejudicial to Mr. Torres.

With regards to the DNA on the firearm, Mr. Lange, you may talk about or elicit, if you think this is testimony that is truthful from your client, why her DNA might be on the firearm, besides the government's theory, which is she possessed it that day.

With regards to personal use in terms of what Mr. Torres might have encouraged her to take or gave her for personal use or got her addicted, the coercion aspect, this case has never been litigated. You just told me at the witness -- the podium -- the lectern, excuse me, that you're not raising a duress defense or a coercion defense, correct?

MR. LANGE: I'm raising a defense that explains why she would have -- there would have been drugs -- personal amount of drugs in the -- in that car and why she would have had drugs in her system, small amounts of drugs in her system, as a result of him creating a coercive environment to take personal use drugs during their relationship. It directly relates to the admission of any personal use.

THE COURT: Okay. Yes, I understand. But I don't think that's directly relevant to the charges that have been

brought. Her DNA being on a firearm for which she is facing liability by the federal government, that's directly relevant, why her DNA might be located on the firearm. Why she's taking personal use is not directly relevant, and to the extent it is, it opens this Pandora's box of a year's worth, which you alluded to in opening, of abuse by Mr. Torres against Ms. Pinuela.

That's what I think -- although you have a right to put on your defense, Mr. Torres also has a right to not have unfairly prejudicial information put before the jury when I do think it's somewhat confusing if you propose putting on evidence that spans the length that you alluded to in your opening.

MR. LANGE: But it explains the history of -- why she was beaten down, mentally, physically, spiritually, by Torres during the course of those months prior to March 8th.

THE COURT: How is that relevant if you're not arguing a duress defense to her participation in this conspiracy? It's not.

MR. LANGE: That he would never have allowed her to participate as a woman in any drug trafficking or drug conspiracy involvement that he had just because of his attitude toward women. Women were there for sex, they weren't there for business. And that's her testimony and that's the flow of what happened during those months before.

She was beaten down mentally, physically, spiritually, and that is critical to why she couldn't have been a co-conspirator with him, because he would never have allowed it. He would never have allowed it, based upon how he treated her during the course of those months. It's highly relevant.

Any anyway, none of it's gonna be an enormous feature of this, but it is important for the jury to understand there is some history here. I'm not gonna beat -- I'm not gonna go through the whole almost 12 months of prior involvement, but I think it's relevant to talk about that -- you've already said it may be relevant regarding the firearm and how regardless of the theory of how the public defender might want to have DNA on firearms, she says it's because of the -- his abuse with a gun to her and her responding by picking it up and putting her finger on that trigger, which has DNA on it ultimately, and pointing it -- pointing it at the co-defendant to try to say don't threaten me, don't threaten my child. So that's that.

But the rest of it is his humiliation, if you want, of her, his overbearance on her during those months. He would never have brought her into a drug trafficking deal, he would feed her drugs, he would give her drugs for personal use, because he thought that was a way to keep -- by providing that, that was a way of keeping control over

her. But a drug trafficking case with machine -- with a machine gun and -- and all that fentanyl and coke, he would never have brought a woman into that. Never. That's gonna be her explanation in explaining her relationship with her (sic).

So I think it's highly relevant and, you know, she does have a right to put on, as the prosecutor was very fair in that -- his conclusory comments, it's very critical to allow a defendant to put a good-faith defense on in full unless they can establish real prejudice on a particular point. And they're not establishing their prejudice. You may -- you as a hearer might say, well, I don't believe that DNA story about the -- how the DNA got on the gun --

THE COURT: No, I didn't say that at all, I said you're allowed to put on the evidence.

MR. LANGE: Well, that should apply to the drugs also, because a lot of -- a lot of our theory of the defense is because of his macho attitude toward women, he would never have brought her into a conspiracy like this. A little drugs are okay, you know, drugs with sex are okay, but not drug trafficking with big money, whether it's coke or fentanyl. And -- and certainly not his involvement with his Glock machine gun. That's his thing. He would never have brought her into this. At least that's gonna be the implication from her testimony, fairly brief testimony, I

would say.

THE COURT: So you're offering the evidence of the prior abuse not for propensity argument, but for what?

MR. LANGE: I'm sorry, one more time, Judge?

THE COURT: You're offering -- you're going to elicit on the stand prior incidents of abuse.

MR. LANGE: Just a history, a brief history of their relationship that includes abuse and overbearance.

THE COURT: Okay. So we're in 404(b) land, prior bad acts. You can't be elicited for propensity, because there would be no propensity to even offer that's relevant here, because he's not being accused of an assault or something of the like. What purpose are you using to offer it, if it's not for propensity?

MR. LANGE: Well, it's intrinsic evidence, it's not even 404(b), it's not extrinsic, it's intrinsic. It's part -- it's part -- it's part of the -- it's part of her presentation -- it's part of her theory or --

THE COURT: It's not intrinsic unless you're admitting that she's guilty, which you're not.

MR. LANGE: No, no, no, it's intrinsic. I'm not admitting any guilt, I'm just admitting these acts -- these acts happened for a particular reason during course of the year, which led to the finale on March 8th, which makes it ludicrous that she would have been involved in that

trafficking. We have to explain from her explanation. If the jury accepts it, that's their decision. But it's a reasonable explanation as to why she -- that he would never have brought her into this particular drug trafficking operation. He just wouldn't have done it.

So, you know, the jury can conclude otherwise, but I just think it's fair -- it's unfair to take away one of the legs of her defense, the --

THE COURT: Okay. I think I have your case.

MR. LANGE: The coercion --

THE COURT: I have your case.

Does the government withdraw its motion or does it stand by part of its motion and does it ask for a curative instruction in the alternative?

MR. PRESTON: I withdraw the motion to the extent, Your Honor, that if I make relevancy objections it may cause the Court to have to make independent determinations as the testimony progresses in this case. But as I've indicated, I don't want to be putting the Court or myself in a position where we have to address this at a later date because the defendant has been limited in a defense. But once we cross the boundaries of relevancy, I will be making objections.

THE COURT: Sorry, so 404(b) objections?

MR. PRESTON: Yes, Your Honor -- no, not 404(b), 403 objections.

THE COURT: I don't know if you want -- I'm sorry, I just want to make sure. With regards to the prior -- with regards to the prior use of feeding her drugs or the beatings or the length of -- what becomes unfairly prejudicial?

I see some merit to the idea that he -- if the defense is -- this person doesn't believe women should be involved in drug conspiracies and I am proving that through the way he treats me as a woman, I think that's the defense, I sigh some merit to that being a defense. Certainly relevant, right, in that it tends to make it less likely that they conspired together.

So I'm just asking at what point, so we don't have a bazillion 403 objections in front of the jury and then we're at sidebar arguing all over again about this.

MR. PRESTON: I don't want to go through a situation where all the testimony is gonna be proffered again, Your Honor.

THE COURT: Neither do I.

MR. PRESTON: So it's difficult for me to say without hearing the question that's asked and --

THE COURT: Okay. Let me hear from --

MR. PRESTON: I don't anticipate a bazillion objections, but there may be a point in time where --

THE COURT: Where it just gets too egregious.

MR. PRESTON: Carried away.

THE COURT: Okay.

MR. LANGE: I'm gonna streamline it as much as I can, Judge. I am not gonna beat that horse a lot, I just want there to be sufficient enough factual basis for me -- for me to present my arguments in closing arguments to the jury.

THE COURT: Understood.

Mr. Vitier, let me hear from you and then let's please call the jury back.

MR. VITIER: Yes, Your Honor. From us it would be -- I'm afraid if there was gonna have to be -- it's a prior bad act that has nothing to do with it, it's being brought in for an impermissible purpose.

As far as -- unless Mr. Lange is saying Ms. Pinuela did this knowingly because she was beat down, it's irrelevant to say -- I mean, he's trying to stretch it to where he's saying she was so beat down that there's no way he would have allowed her -- I mean, allowed --

THE COURT: I think he might be -- I think the more precise way to be saying it is --

MR. VITIER: Unlikely that he have --

THE COURT: His --

MR. VITIER: -- allowed her to enter a conspiracy?

THE COURT: That she didn't participate in this

conspiracy, in part because there would be no one to agree with, because the person would never agree with a woman to participate in these kinds of ventures. I think that's what Mr. Lange is saying.

MR. LANGE: Yes.

THE COURT: You will get to cross-examine her.

MR. VITIER: Yes.

THE COURT: That's the risk, of course, of getting on the stand.

MR. VITIER: Yes, Your Honor, I understand. My -- but under 403, it's just gonna -- it's so prejudicial to the jury, because this is the first time we've ever heard of this theory.

THE COURT: Well, we heard about it in opening, but --

MR. VITIER: Right. That's what I mean. But I'm saying --

THE COURT: Do you have curative instruction you're asking me to give?

MR. VITIER: Yes.

THE COURT: What?

MR. VITIER: That none of this can be considered as to whether or not Mr. Torres entered into a conspiracy with somebody else, it's irrelevant --

THE COURT: No, that wouldn't be -- the

evidence -- the propensity -- 404(b) usually is about you can't consider former similar acts to prove that the person committed the act here. He's not offering it for that, because these similar acts aren't even relevant for -- no one's getting beat, and -- this is really just not part of the elements of the charges brought. So the curative instruction would need to be more tailored.

MR. VITIER: Right. But if I would have known that this was gonna happen, we would have voir dired the -- because who knows if -- we didn't voir dire the -- I mean, any of the jurors as to whether they have strong feelings about domestic violence. So now we don't know if one of the jurors is like here is this domestic violence and then under 403 it prejudices them. That's part of the problem.

So I don't know that curative instruction you could give to say, hey, ladies and gentlemen, we didn't talk about this before, but you can't consider the fact that he may have committed domestic violence as to whether he's guilty to these charges. That's why they're irrelevant. That's why it's irrelevant.

THE COURT: I don't think the relevance is the right argument. I think 403 is your right argument.

MR. VITIER: Right.

THE COURT: I think we've passed the factual predicate she has that it's obviously relevant. She's not

offering it for a propensity argument. I think we're at the fourth prong of that prior bad acts, which is 403 balancing.

In light of that, Mr. Lange, you will be permitted to inquire -- but listen carefully. You will be permitted to inquire as to their prior relationship. I do not want this to be prolonged. Your opening foreshadowed a very lengthy, extended discussion of their relationship. That will not be permitted.

MR. LANGE: Right.

THE COURT: Okay.

MR. LANGE: Right. I agree. I'll streamline it.

THE COURT: Focus on the aspect of your defense that you've proffered here, which is their relationship would be such that there would be no agreement, because it would be seen as business or something like that.

MR. LANGE: Correct.

THE COURT: Right. So I don't want five minutes of how many times did he beat you, where did he beat you, did you go to hospital, none of that.

MR. LANGE: I'll stay away from that, yeah. I agree.

THE COURT: Okay? You understand?

MR. LANGE: I do understand. I want to move that along.

THE COURT: I guess that's all we can do at this

point. Is there any other motion to be had?

MR. PRESTON: No. Thank you, Your Honor.

MR. VITIER: No, Your Honor.

THE COURT: Think about what curative, if any curative instruction, Mr. Vitier, you're going to be asking for at the end of this. I think you're the one who's most likely to have a need for one.

Call the jury in.

And, Mr. Lange, I'll just remind you whatever you ask on direct you're opening the door for on cross.

MR. LANGE: I'm with you. I'm with you.

THE COURT: There will be no invoking, if that makes sense. You should advise your client of that. If she takes the stand and you open the door, she has to respond on cross.

MR. LANGE: She knows that. She's gonna answer the questions, all of them. I've talked to her about that. Theirs, mine, everybody's.

THE COURT: Ms. Pinuela, you understand it's your right and only your right to testify. It's your decision. So you should confer with counsel, but at the end of the day only you can decide that. So if you choose to take the stand I will assume that's a knowing and voluntary decision. Do you understand me?

DEFENDANT PINUELA: Yes. That's right, Your

Honor.

THE COURT: And you've discussed this with counsel?

DEFENDANT PINUELA: Yes.

THE COURT: Do you have any questions for me?

DEFENDANT PINUELA: No, ma'am.

THE COURT: Okay.

(The jury was returned to the courtroom, after which the following proceedings were had in open court.)

THE COURT: Now that the government has rested, does Mr. Torres have a case in chief that he would like to offer?

MR. VITIER: Your Honor, at this time the defense moves Defense Exhibit 11 into evidence.

THE COURT: Okay. In light of our earlier discussions, Defense Exhibit 11 will be admitted.

Any additional evidence?

(Defendant Torres Exhibit No. 11 admitted into evidence.)

MR. VITIER: No, Your Honor. At this time Mr. Torres rests.

THE COURT: Okay. Mr. Lange, does Ms. Pinuela have a case in chief she would like to offer.

MR. LANGE: Yes, Judge, Veronica Pinuela is gonna take the stand and testify.

THE COURT: Okay. Ms. Pinuela, if you could come forward similar to how you've seen other witness throughout trial.

DEFENDANT PINUELA: (Complies.)

THE COURT: Before you give your testimony, I'm gonna need you to stand and raise your right hand, the Courtroom Deputy will swear you in, and then you'll take the witness stand.

(Witness sworn by the Deputy Clerk.)

DEFENDANT PINUELA: Yes, I swear.

THE DEPUTY CLERK: State your name and spell your first and last name for the record.

DEFENDANT PINUELA: Veronica Estephania Rodriguez Pinuela, V-e-r-o-n-i-c-a E-s-t-e-p-h-a-n-i-a R-o-d-r-i-g-u-e-z P-i-n-u-e-l-a.

THE DEPUTY CLERK: Thank you. You may be seated.

THE COURT: You may inquire when you're ready, Mr. Lange.

MR. LANGE: Yes. Thanks, Your Honor.

**DIRECT EXAMINATION**

**BY MR. LANGE:**

Q. Okay. Ms. Pinuela, I know we're doing this through an interpreter. Is this your preference, what you want to do? You have to say yes or no.

A. Yes, sir.

Q. Have you ever had an experience testifying in court before?
A. Never, sir.
Q. First time?
A. My first time.
Q. Just listen carefully, listen carefully to my questions and -- and if you don't understand something, you know, ask me to repeat it or clarify it. Same with the prosecutor's questions when they question you. Same with the co-defendant's questions. You know, just make sure your question -- your answer corresponds to their questions or my questions.
A. Perfect, Mr. Lange.
Q. Okay. Now, you're how old, Ms. Pinuela?
A. Twenty-three years old as of right now.
Q. Okay. Where are you living right now?
A. Tampa, Florida.
Q. And who do you live with?
A. I live with my mom, my siblings, and my daughter.
Q. Okay. When you say -- when you say siblings, what siblings are there in addition to your daughter?
A. I have two brothers, one whose name is Hennie (ph), who is 13 years -- no, I'm sorry, I'm mistaken. One is 17 and other one is 13 years old.
Q. Okay. And your daughter, what's her name?

A. Name of my daughter is Lua Sophia.
Q. And how old is Lua -- your daughter Lua right now?
A. Four years old.
Q. Okay. Going back to two years ago now to March 8th of 2022, how old was your daughter, Lua?
A. She was two years old.
Q. Okay. And back then, were you living with your mom and your siblings and Baby Lua in your mom's house the same as you are today?
A. Yes, Your Honor.
Q. Okay. Now, focusing -- focusing in on March 8th of 2022, the day we're all here about this week, can you tell the members of the jury how you began that day? How did the day begin for you, where were you and what did you begin to do that day?
A. Back then, Elias Rosario was my boyfriend. He left me at my mom's house. He took my car and I called him, because my uncle wanted to go shopping, but he would never let me go out without permission. So I had to -- so I had to call him and ask him if I could go and he said, no, to wait a moment.
Afterward he called me and told me that Anna, who was my friend Emilio's girlfriend, she is going to pick you up. Afterward Anna picked me up with her two-year-old daughter. And I also brought my daughter along with us shopping. And we went with my uncle to purchase the things that he wanted

to buy for his hair.

Afterward, we went to the Burlington store to buy things for the little girls, like clothes and things like that. Afterwards I received a call from Elias stating that he wanted to go eat because it was the first time that he would have met my uncle.

And I told him, well, I'm going to drop the baby off, because we logically were going to Bahama Breeze and they serve alcohol there, and then I wouldn't be driving with my daughter.

And after that, we went to the -- to Anna's -- to drop Anna's daughter off. We dropped her daughter off and then we went to my mom's house and I dropped my daughter off there.

After that, we went to pick up Elias at his friend Jorge's, who back at that time was his best friend.

I called him to let him know that we were already downstairs, because we were in Anna's car. When I called him he told me to wait a moment, because I'm doing something. But tell Anna to come upstairs.

When Anna spent about ten minutes there, then she came back down with the keys to my car, being that Elias had my car that whole day.

When I waited for approximately 30 minutes, because Elias made me wait at the end of the parking lot. After

that, he came down with something in his arms. They were like two bags that he was hugging. I couldn't see what color they were, because truthfully it was very dark. But one of them was light colored and other one was dark.

He climbed into the car and I was talking to my uncle. And really I noticed that he placed something by his feet. But I did not ask him anything so that he wouldn't argue with me, being that he would argue with me over anything I would ask him.

After that we headed over to Bahama Breeze, but all of a sudden he received a phone call from someone named Eliar (ph).

When he takes the call, because he took it on speaker, Eliar tells him that they are going to meet at a gas station, because he's in the area. So I told him fine, let's stop at the gas station.

We arrived at the gas station before Eliar did.

MR. PRESTON: Objection, Your Honor, this is becoming a narrative as opposed to a question-and-answer --

THE COURT: Also afraid we're in hearsay land some with this phone call.

MR. PRESTON: As well --

MR. LANGE: I mean --

THE COURT: Ask questions, get responses.

MR. LANGE: Okay. I can continue.

THE COURT: No, no, don't continue. Ask a question, have her respond, and don't elicit hearsay statements.

MR. LANGE: Okay.

BY MR. LANGE:

Q. So I think we were at the point of Eliar -- of the co-defendant getting a call from Eliar. Is that Eliar Gonzalez?

A. Correct.

Q. And again, you didn't know what that call was about --

MR. PRESTON: Objection, leading.

THE COURT: Sustained. Sustained. Also do not ask her about the contents of a phone call to which would be hearsay and I know no valid hearsay exception for getting that in.

MR. LANGE: All right.

BY MR. LANGE:

Q. You were no the a part that phone call, you didn't participate in that call between the two --

MR. PRESTON: Objection, leading.

BY MR. LANGE:

Q. -- is that right?

THE COURT: Sustained. No leading questions.

MR. LANGE: All right.

BY MR. LANGE:

Q. Who else was on the call as far as you know besides Eliar Gonzalez and the co-defendant? Anybody else?
A. My uncle was there and Zamira, Eliar's wife.
Q. Okay. We haven't gotten to the gas station yet. I mean, just when the call came in, when the co-defendant got the call from Eliar Gonzalez to meet at the gas station. Did -- did anyone else participate in that call as far as you know?
A. No.
Q. Okay. So then after that phone call, where did you guys continue driving? Where did you stop?
A. We stopped at the gas station and we climbed out.
Q. Tell us exactly what happened at the gas station. What did you do and what did your uncle do if you saw what he did? And what did Eliar do -- I mean, what did the co-defendant do?
MR. LANGE: Compound questions.
BY MR. LANGE:
Q. If you understand the question --
THE COURT: Wait, wait. Mr. Lange, just you can repeat the questions, just break them up so we know which question she's answering.
BY MR. LANGE:
Q. What did you do once you got to the gas station?
A. When I noticed that Eliar's wife was in the car, I got

out of the car to go greet her.
Q. Okay. And how did you know Eliar Gonzalez's wife, who is sitting in the car?
A. Eliar's wife does nails. So really, I know her related to that.
Q. Did you notice what kind of car Eliar Gonzalez was driving when he came to the gas station.
A. A Mercedes Benz.
Q. Okay. Did you see where your uncle went, if anywhere, when you went over to talk to the woman that does nails?
A. My uncle got out of the car to smoke a cigarette and I told him, come here, I want to introduce you to someone, and I introduced him.
Q. You introduced him to the nail lady?
A. Zamira.
Q. Now, did you see -- did you see where the co-defendant went, if anywhere, when you're going over to talk to the nail lady, do you see what he was doing?
A. Are you referring to Eliar Gonzalez -- or Elias Rosario?
Q. Did you see what the co-defendant did with Eliar?
A. He went back to talk to Eliar behind the car.
Q. Did it appear to be a conversation with anyone else talking besides Eliar Gonzalez and the co-defendant?
A. No, it was only them two.

Q. Did you hear any part of this private conversation? Do you know what it was?
A. No. No, because I was speaking with Zamira and really I was very far -- very far from the car.
Q. Okay. So about how long did you spend at the gas station while he's talking to Eliar Gonzalez and you're talking to Zamira, the nail lady?
A. I would say between ten to 15 minutes.
Q. Okay. And then what's the next thing that happened when you left -- you left the gas station?
A. We went to Bahama Breeze, because Anna and Emilio were waiting for us at the parking lot.
Q. Okay. Now, when you say Anna and Emilio, is that the same Anna that came and gave you -- that took you and the girls shopping and took your uncle shopping?
A. Correct, sir.
Q. All right. And when you say Emilio, is that -- is that one of the -- one of the -- is that the boyfriend of Anna?
A. Correct.
Q. All right. And did this Emilio come down out of the apartment with --
MR. VITIER: Objection, leading.
THE COURT: Sustained.
BY MR. LANGE:
Q. -- the co-defendant? If you know. Did you see the two

of them together coming out of the apartment?

THE COURT: Sorry, Mr. Lange. Just rephrase it as not a leading question.

MR. LANGE: I'm sorry?

THE COURT: Rephrase the question, please.

MR. LANGE: Okay.

BY MR. LANGE:

Q. Were you able to see when -- when the co-defendant came out of the apartment, before you left -- before you left for Bahama Breeze, if he was by himself or with anybody else?

A. With Emilio. They both came down at the same time.

Q. Okay. Was that the same time when he was carrying the two bags that you couldn't identify?

A. That's correct, sir.

Q. And as far as you know, Emilio, what was his relationship to the co-defendant, if you know?

A. I really couldn't say, because I was never there when they were together.

Q. But were they together a lot or not? As far as you know.

A. Probably, yes, they would see each other about five times per week.

Q. Five times a week. All right. So after you leave the gas station, who's driving -- are you still in the same driving situation, you're driving and the co-defendant is in

the front passenger seat and the uncle is in the back seat, is that where everybody was?
A. Yes, correct, because Mr. Elias's leg was hurting and he asked me to drive.
Q. Okay. When you talk about this car we're talking about, is this the black SUV that we've heard about?
A. Yes, that's correct, the BMW.
Q. Okay. Now -- I'm sorry, BMW. Okay. And the black BMW, who paid for that -- as far as you know, who paid for that car?
A. Mr. Elias, because I was not working.
Q. And but the car, we had evidence that the car was actually in your name, yes?
A. The car was in my name, but he gave a down payment of $10,000.
Q. And did he -- did he -- did he say why he wanted the car in your name if he was paying for it?
A. Really, I don't know really. It could be because perhaps he didn't have credit or something like that, but I really don't know. Even the car that he had at the time was not in his own name, it was in the name of his ex-partner.
Q. Okay. So the -- did the co-defendant, as far as you know, use that black SUV a lot when you weren't using it?
A. Yes, he really did use it a lot.
Q. And did he use it -- did he happen to use it a lot when

you were not there?
A. Not really. In reality he would mistreat me and take the keys from me.
Q. He would mistreat you and take the keys. But what I'm saying is when he would mistreat you and take the keys, did you always go along with him or were you at home sometimes?
A. No, he would leave me locked up at the house.
Q. Okay. Now, when you say he -- he would leave you locked up in the house, did this -- did this happen quite a bit or just a few times or --
A. It wouldn't happen very frequently, only when he would not want me to go out, he would take the keys to the car.
Q. Okay. Would he do anything else physically to keep you at the house besides locking you up? Did he do anything else to you physically?
A. No, what he would do --
MR. PRESTON: Strike the term locking her up. The witness testified was taking the keys.
MR. LANGE: Right.
THE COURT: Strike that. Disregard that.
Mr. Lange, can you please ask the witness --
MR. LANGE: Yeah.
BY MR. LANGE:
Q. Did you testify that there were times when he would take the keys and lock you up, is that what you testified

to?

MR. PRESTON: Objection, leading.

THE COURT: It is leading.

BY MR. LANGE:

Q. What did you say --

THE COURT: Sustained.

BY MR. LANGE:

Q. What did you say about when he took the keys, what else would he do, if anything?

A. I really didn't want him to take the car, because I felt that he was into illegal things.

Q. You felt he was what?

A. That he was doing illegal things.

Q. Illegal things. All right. Now, when did you -- in relation to March 8th --

THE COURT: Mr. Lange, give them one moment.

MR. LANGE: I'm sorry.

BY MR. LANGE:

Q. In relation to our date March 8th, 2022, did -- approximately when did your relationship begin with the co-defendant?

A. I really hadn't been with him living in the same house for a long time, because he had a partner already. I would say after the 8th, about four months living with him full time.

Q. And at the beginning, how did the relationship seem to be going from your point of view? How was he?
A. Well, when I was his lover, he treated me very well. But then hell broke out when he would -- it all started when I started living with him. He would beat me a lot, he would throw the phone in my face when I would receive a message, and it became a living hell.
MR. VITIER: Objection, Your Honor, 403.
MR. LANGE: To be --
THE COURT: Overruled at this time, based on earlier rulings.
BY MR. LANGE:
Q. Did there come a time when you saw him with any kind of a gun in the house?
A. Yes. Yes.
Q. Tell us about what you saw.
A. Yes, that's correct he was always armed.
Q. What did you see?
A. He would always leave the pistol on the table or in the bathroom. That's what I would see.
Q. Okay. And did there come a time when any -- any arguments you had with him became violent?
MR. VITIER: Objection, Your Honor, leading.
THE COURT: It's on the line. Overruled right now.

Mr. Lange, are you gonna go back and ask what firearm you're referring to?

MR. LANGE: Right. We're getting to that.

THE COURT: Okay.

BY MR. LANGE:

Q. I'm sorry, did there come a time when you -- when the -- the argument -- the arguments that you had with him became violent?

A. Yes, always. All arguments became violent.

Q. And did you ever see him become violent with a firearm with you, with a gun?

A. Yes, correct, he even went so far as to call my mom because he was going to kill me.

Q. He would say he was gonna kill you?

A. Yes, and he told my mom to go pick me up, if not, he would kill me.

Q. And did you see him actually do anything with the firearm regarding you, in terms -- anything at all?

A. What he would do to me always was hold the gun up to my head and call people and FaceTime so that they would see me.

Q. He would put you on FaceTime so that you would -- so they could see you with a gun pointed at your head?

A. Yes, he would call my friends from high school and tell them, look, don't write her anymore, don't get in touch with her anymore, and he would hold the firearm even when it

was -- with my -- the baby's father, my daughter's father.
Q. And would you ever have your baby, Lua, there at the times when he had the firearm to your head?
MR. VITIER: Your Honor, same objection.
THE COURT: Wait one second.
MR. VITIER: Same objection, it's 403.
THE COURT: For this question, I will sustain it. Don't provide the translation for that.
And the jury shall disregard that last question.
MR. LANGE: Okay.
THE COURT: Mr. Lange, can you move to the kind of firearm?
MR. LANGE: I'm sorry.
THE COURT: Make this relevant by talking about what firearm you're --
MR. LANGE: Well, we're gonna get to that. I'm gonna get to that, Judge.
BY MR. LANGE:
Q. Do you know if the firearm he was pointing at your head was the Glock in this case or anything --
MR. VITIER: Objection, Your Honor, leading.
THE COURT: Sustained.
Ms. Rodriguez, what kind of firearm are you referring to?
THE WITNESS: It was really a Glock.

MR. LANGE: All right.

BY MR. LANGE:

Q. Now, did there come a time during this period when he was doing this to you with the Glock that you -- that you ever picked the Glock up yourself?

A. Yes, Your Honor. Once, when he would beat me, a friend of his that they would call Crusty, Crusty told him to calm down and he put the gun on the --

MR. VITIER: Objection, Your Honor, hearsay.

THE COURT: Sustained. Don't say what someone else told you, just say what he did and then what you did.

BY MR. LANGE:

Q. Right. What did you see him do, if anything, with the -- when he was -- when he was beating and strangling you, did he do anything with the Glock?

A. Can you please repeat question?

MR. VITIER: Your Honor, I object to the form of the question, counsel is testifying.

THE COURT: Okay. Yes, Mr. Lange, you cannot testify on direct.

BY MR. LANGE:

Q. Did --

THE COURT: Sustained.

BY MR. LANGE:

Q. Did there come a time where you ever picked the Glock

up in response to what he was doing to you? Did you ever touch the Glock yourself?
A. Yes, I picked it up to defend myself, because he was pointing at -- he had been pointing it at me and left it on the table.
Q. And when you picked it up, what did you do with it? Did you do anything with it or just hold it or point it or what did you do?
A. I just held it, if I was -- as if I were going to shoot it. But I didn't do anything. I was just holding it, because I was waiting for my mom to pick me up, because he had told her that he was going to kill me, pick me up.
Q. Was that the only time you picked the Glock up in response to him or did -- was it -- was it other times also?
A. No, once when I was his lover, he was taking -- showering or fixing himself up and he told me to pass the gun to him.
Q. So you pick up the gun and pass it to him, the Glock?
A. Yes.
Q. Okay.
A. Yes, that's correct.
Q. Now, at any time when you were with him, did he ever discuss business with you, his business? Any conversation at all, not what he might have said, but did he ever begin to discuss anything about business?

A. No, sir, he was always with his brother, Fernando Rosario and his father, Elias Rosario, and they would always lock themselves in the room to talk business.
Q. Okay. Separate from you, would you ever be brought into any business discussions with the co-defendant and these guys? Were you ever part of any of his business discussions?
A. No, sir, I couldn't talk in any of the meetings or in -- at all, because he would get upset.
Q. He would get upset that you -- why, that you would try to participate or why? Why would he get upset, if you know?
A. Because if I would comment -- if I would make a comment, he would say don't make any comments, you have nothing to say here.
Q. You have nothing to do with what?
A. I'm referring to family meetings. He really wouldn't allow me to be there when the men were gathered.
Q. So the men -- the men were doing their talking and he kept you out of it; is that right?
A. That's correct.
Q. Okay. Did there come a time when -- during this whole period where he began speaking to you about you using small amounts of drugs?
A. Can you repeat the question?
Q. Did there come a time during this whole period of time

when the co-defendant began trying to get you to use small amounts of drugs, to use it for personal use?
A. Yes.
Q. And what was that? Can you explain that, what happened there?
A. He would give me cocaine and then, perco, and then he would give me this pink powder, I don't know what the name is.
Q. Did you want -- did you want to take any of these initially?
A. In the beginning, I would say no, but then he would constantly tell me try it, and then I did and I became an addict.
Q. You became addicted to the personal use drugs?
A. Yes.
Q. Did you want to become addicted to the personal use drugs?
A. No.
Q. And was he continuing to give you personal use drugs?
A. Yes.
Q. All right. Why did you -- before we get back -- before we get back to leaving the gas station and going -- and going to the Bahama Breeze, why did you stay with this guy?
A. I'm sorry, could you ask the question again?
Q. Yeah. We had left off -- we have left off in the gas

station, you guys heading for the Bahama Breeze restaurant for dinner. But before I get back to that, why did you stay with him, given the abuse and all this stuff with the gun and the drugs? Why did you stay with him?

A. Because his family would threaten my family that we had to move from Tampa.

Q. His family would threaten your family that you had to move from Tampa?

MR. PRESTON: Objection, echoing.

THE COURT: Sustained. Sustained.

MR. LANGE: Okay.

BY MR. LANGE:

Q. Is there any other reason that you stayed with the guy? I mean, he did all of what you just testified to. Why would you stay with someone like that? Tell the jury.

MR. PRESTON: Objection, asked and answered.

THE COURT: You may answer one more time. Overruled.

BY MR. LANGE:

Q. Tell the jury why did you stayed with the guy. Why would you stay with him?

THE COURT: We have the question.

THE WITNESS: Well, because I really trust -- I trusted him truly. I was very -- I was very much addicted to drugs, but I did love him. I loved him, that's --

BY MR. LANGE:

Q. You loved him in addition to the addiction?

A. Yes, that's correct.

Q. All right. Now, getting back to when you left the gas station in your car to go to the Bahama Breeze, did you -- did you see where Eliar Gonzalez and Zamira, his girlfriend, went in the Mercedes? Did they go in the same direction you went or a different direction?

A. I didn't really notice.

Q. There came a time when you guys got to the Bahama Breeze parking lot to go to dinner, right? Yes?

MR. PRESTON: Objection, leading.

THE COURT: Yes. Sustained. Rephrase.

BY MR. LANGE:

Q. After you left the gas station, where did you go? Where did you drive to?

A. We drove to Bahama Breeze.

Q. And why were you going to the Bahama Breeze?

A. Because my uncle had just arrived from Atlanta and Elias wanted to meet him.

Q. Okay. Now, at that point, what happened? Tell the jury what -- what you remember occurring with the police once you were parked in the parking lot of the Bahama Breeze.

A. I parked -- I backed in to park. And everything really

happened so fast and many police arrived and I got very nervous, because I had never been in the presence of police before.
Q. Okay. So when you say you got very nervous, what does that mean? How did you -- how did you seem nervous?
A. I got --
Q. What did you do?
A. I got kind of exited when the police -- in a negative fashion when the police approached me.
Q. Right. But what did you do? Did you cry, did you scream, did you yell, were you -- stay quiet? What did you do when the police were approaching you?
A. Right then and there, there were many emotions at the same time. I yelled, I cried, I asked to get out of the car, I felt suffocated. But I came to believe that that must have been the effects of the drugs that I had in my body at that time.
Q. Okay. So you said you were feeling suffocated, you asked to get out of the car?
A. Yes.
Q. And did they let you out right away?
A. No, I was told to wait a moment.
Q. Okay. But you said it could have been the effects of the personal amount of drugs that you took. Do you remember what kind of drugs you took personally before you got to

Bahama Breeze, before that night?
A. Yes. Yeah, I just took the perco and --
Q. The what?
A. Perco, marijuana. Oxycodone.
Q. Oxycodone? And why did you take oxycodone, was that a drug that you liked or just because he gave it to you?
A. I truly didn't like it, but it was what my partner took and he would give me one to have a good time.
Q. And when you say he, was it the co-defendant that gave you the oxy?
A. Yes, because he had an accident about a year ago and he broke his legs, so he became addicted there to oxycodone.
Q. Was he taking the oxy for the -- to relieve his pain from the accident? Was he taking oxycodone every day as far as you know?
A. Yes, Your Honor.
Q. Okay. So we heard -- we heard testimony about an officer coming in and reaching -- well, first of all, before we get to that, was -- was the co-defendant smoking any kind of marijuana as far as you could see?
A. Yes, he was smoking a marijuana blunt.
Q. All right. When -- we had testimony that the officers took him out after they found him with the marijuana cigarette.
Do you recall the testimony when the officer, Sergeant

Jenne at the time, was opening the door to pull -- pull those two bags out from where -- where he was sitting, by his feet? Do you recall that testimony?
A. Yes, I remember the testimony that he was yelling, that's not hers, that's not hers, that all has to do with me.
Q. You recall the co-defendant on his own yelling this has nothing to do with her?
MR. PRESTON: Leading.
THE COURT: Sustained.
BY MR. LANGE:
Q. Do you recall what the co-defendant was yelling?
A. Yes.
Q. What?
A. He was yelling that's -- all of that is mine, don't touch her, she has nothing to do with that.
Q. Okay. Now, there's some testimony, and we saw the video, that when Sergeant Jenne was coming in to pull those two bags out from where the co-defendant was sitting that you made a movement, some kind of arm movement or body movement, while you're sitting in the driver seat, some kind of movement toward Sergeant Jenne or --
MR. PRESTON: Objection, form of the question.
BY MR. LANGE:
Q. Do you remember that?

THE COURT: Wait, wait. Mr. Lange, these are leading questions.

BY MR. LANGE:

Q. Do you remember when Sergeant Jenne was coming in to pull those two bags out from where the co-defendant had been sitting --

MR. VITIER: Your Honor, it's still leading.

THE COURT: Yes, sustained.

BY MR. LANGE:

Q. Do you remember making any movement toward those bags while they were still in the -- on that side of the car in the front, make any kind of physical movement toward the bags?

A. Yes, because the pink bag is mine. I had it at the house where I lived with Elias, but I really didn't know what was inside the bag.

Q. That was my next question. You said the pink bag was yours. How did you know -- what made you -- when you looked down and saw a pink bag, how do you know that was your bag?

A. Because I would use it to go to my mom's house, to Elias' houses.

Q. And what did you do with the bag?

A. I would use that to carry clothes for my little girl or pampers or things like that.

Q. And would you ever leave that bag over where Elias

stayed, with her pampers and your personal belongings, the pink bag?
A. Yes.
Q. So you recognize -- recognize that pink bag is yours. Did you know anything about the contents of what was -- what he had in that pink bag, anything?
A. No, I didn't know anything about what was in the bag.
Q. Now, what about the black bag, did you recognize the black bag that was there also next to the pink bag by his feet?
A. That bag, Elias would always carry that bag, but he never really told me what he carried inside that bag.
Q. Okay. So you recognize the black bag as Elias's, but you didn't have any idea what he had in there?
MR. PRESTON: Objection, leading.
THE COURT: Sustained.
BY MR. LANGE:
Q. Did you have any idea what there was in that black bag that Elias carried?
A. No, sir.
Q. All right. Were you involved in any way in the fentanyl that was found in those bags, any way were you involved?
A. No, sir, never.
Q. Were you involved in any way with the cocaine that was

found in those bags, any way?
A. No.
Q. Were you involved with the Glock firearm that was found in those bags in any way?
A. No, never.
Q. Were you involved in any way in whatever plan he had trafficking of those drugs in that bag, were you involved in any way?
A. Never.
Q. Any way meaning to talk to him in advance about it --
MR. PRESTON: Objection, leading.
BY MR. LANGE:
Q. -- talk to anybody else --
THE COURT: Wait. Sustained.
BY MR. LANGE:
Q. In any way, did you have any conversation with him at any time about that -- that stuff in the pink and the black bags?
A. No, he would never talk to me about that.
MR. LANGE: Could I just have a second, Judge, please?
THE COURT: Yes.
MR. LANGE: Do you mind. Thank you.
I have nothing further. You may inquire.
THE COURT: Mr. Preston, if the government has any

cross.

And then I'll turn to Mr. Torres to see if he has any.

**CROSS-EXAMINATION**

**BY MR. PRESTON:**

Q. Good afternoon, Ms. Pinuela.

A. Good afternoon, sir.

Q. Ms. Pinuela, your counsel was just talking to you about the pink bag.

MR. PRESTON: May I approach, Your Honor?

THE COURT: Yes.

BY MR. PRESTON:

Q. Government No. 10 is the pink bag that we're talking about, correct?

A. Yes, Your Honor.

Q. Judge Mizelle is Your Honor.

A. I'm sorry. This is my first time at this.

Q. And it was that pink bag that you were reaching for when Officer Jenne was at the passenger side of your vehicle on March 8th of 2022, correct?

A. Yes, because I really thought it had my things inside of it.

Q. And it did, didn't it?

A. That's not right.

Q. In the video that was played in this case from the body

worn camera, you're seated in the driver's side of the vehicle, correct?
A. Correct, sir.
Q. And it wasn't until Officer Jenne was at the passenger side door, when he reopened the door that had closed after Mr. Torres's removal, it wasn't until after he reopened the door that your focus went to the bags, correct?
A. Would you repeat that question, please?
Q. It was not until after Officer Jenne, Sergeant Jenne at the time, opened -- reopened the car door and stood in the doorway that you paid attention to those bags, correct?
A. Yeah, I really had not ever seen them until he opened the door and wanted to grab them.
Q. And it became a very hot topic of your concern when you saw Officer Jenne's attention on those bags, correct?
A. Would you repeat the question, please?
Q. I'll rephrase the question.
It became very important to you, those bags became very important to you, at the point in time that you realized that Sergeant Jenne was focused on those bags, correct?
A. No, sir. And in reality I believe that's an action that anyone would take when someone is attempting to take something. And that bag really is mine, but I thought it had something else in it and that's the reason for my reaction.

Q. When Officer Sousa said to you you're in a traffic stop, you have to wait. Your response was, seriously? Correct?
A. Yes, correct.
Q. Officer Sousa confirmed that and said, that's correct. Do you remember that?
A. Yes, I remember that vaguely.
Q. And then you reached for the bags, correct?
A. I don't know if it was exactly at that moment, because I was speaking with Officer Sousa, and then the other officer came and opened. So I don't remember if it was exactly at that time of the conversation.
Q. You started to reach for the bags and Sergeant Jenne said whoa, whoa, whoa. Correct?
A. Yes.
Q. Officer Sousa then told you you have to keep your hands on the steering wheel, correct?
A. Yes, she told me that.
Q. And Sergeant Jenne had to tell you again, don't reach, please. Correct?
A. I believe so.
Q. And you were belligerent, you said, but that's mine. Correct?
A. In reality -- I'll repeat it again. It's my bag, but not what was in the bag, sir.

Q. My question was, you just then responded, but that's mine. Correct?
A. Yes, that's correct.
Q. And then you became even more agitated, correct?
A. Yes -- yes, sir, but really I was under the effects of many drugs.
Q. Well, let's just talk about that for a moment. You've indicated that you were under the influence of marijuana?
A. Uh-huh.
Q. And oxycodone, correct?
A. Uh-huh.
Q. And there was oxycodone in that pink bag as well, correct?
A. Uh-huh.
Q. Were you going for your drugs at that point in time, the oxycodone?
A. No, sir. In reality I'll say again what I already told Mr. Ken, the one who would use the oxycodone was Mr. Elias and he would only give me one single time. I had my own drugs in my wallet.
Q. So your vices included the marijuana that you tested -- that you said you were using, the oxycodone that you said you were using, the cocaine that was in your wallet, cigarettes. Any other vices?
A. No, I do not smoke cigarettes, sir.

Q. So the Virginia Slims pack that was in the pink purse belonged to someone other than you too, correct?
A. I really don't know.
Q. All right. So let's get back to the 8th and the car stop. Why did you take my, unintelligible, no, no, no, that's mine, no, that's my car, why are you take my shit, because that's my car, right? So why you take my home. No, no, I'm not going to do that.
That's all you, correct?
A. Yes, sir, I said it under the effects of drugs, surely so.
Q. So under the effects of drugs, you were so concerned about diapers and your children's clothing that you were fighting with police officers over what they were taking out of the car. Is that what you're telling this jury?
A. No, sir, in reality I was troubled by the fact that someone came into my car, which is my property, which is my car, and would take my things without my permission. So I got worried.
Q. Police officers, correct?
A. How so?
Q. These were police officers that were at your car, correct?
A. Really, yes, of course.
Q. And after those bags hit the hood of the car, that's

when you turned on the waterworks, the tears, correct?
A. What do you mean the waterworks, the tears.
Q. You started crying when you saw those bags put on the hood of your car, correct?
A. I was already crying.
Q. You're saying you were crying when you were telling these police officers they couldn't take, in your words, your shit?
A. Oh, no, no, I wasn't really crying at that moment. I was crying because I was having a panic attack and I told Officer Sousa that I need to get out of the car, because I couldn't breathe.
Q. And after you were out of the car and in handcuffs, you told your uncle, don't tell them anything, don't talk to them, don't say anything, don't say anything. Correct?
A. Yes, sir, I did that.
Q. Because you did not want your uncle to talk about the drug dealing that you were involved in, correct?
A. No, it really wasn't that, I was afraid because of my immigration situation. And his as well, because he had just recently arrived in this country and did not know what was in the car.
Q. You talked with Mr. Lange about being threatened with a firearm, correct?
A. That's correct.

Q. And to repeat or rephrase part of your testimony, it concerned you being shown by Defendant Torres on FaceTime to your friends with a gun to your face, is that correct?
A. Could you repeated that, please?
Q. Did you not testify to this grand jury that Mr. Torres, Defendant Torres, used FaceTime to communicate with your friends showing him holding a gun to your face?
A. Yes, that's correct.
Q. So on social media, he showed your friends that he was threatening you with a firearm, correct?
A. Yes, that's correct.
Q. How many times did that occur?
A. With three different people.
Q. And how many of those three people, your friends, out of concern for your safety called the police to say that you were being threatened with a firearm?
A. None.
Q. Exactly. How many times did you call the police to tell them that you were being threatened with a firearm?
A. Never. I really was afraid that he would kill me before I would be able to call the police.
Q. How many times did your mother or your relatives, who you say were aware of the dangers that you were in, how many times did they call the police?
A. Never, because my mom was also threatened by him and my

entire family was threatened by him.
Q. So with all these threats, with all this danger for your safety, when the Defendant Torres, on March 8th of 2022, is found in possession, where you're both found in possession, but when drugs are discovered on the scene, he's in handicuffs, you recognize he's going to jail, you still didn't tell the police what was happening to you in regards to the safety story that you've told this jury for the first time this week?
A. I don't understand. If you could repeat, please?
Q. On March 8th of 2022, when Defendant Torres was in handcuffs and going to jail, because you knew that the police had discovered a machine gun and drugs in your car, you still didn't tell them that you had been in fear for your life being associated with Mr. Torres, did you?
A. I'll say it again, in reality I was under the effect of drugs and did I not want to talk to any police officer, because I had never spoken with any police officer. So in reality I felt that they, instead of helping me, might want to attack me.
Q. Okay. Did you feel that you were now -- after you were arrested and released on bond and your co-defendant was not released on bond, did you feel that you were now safe from his threats?
A. No. I really had to install cameras all throughout my

house, because I would see strange cars pass by all the time.
Q. So you still were afraid of him; is that correct?
A. To today's date I'm afraid of him, of him and his family.
Q. What's your phone number?
A. (813)476-6844.
Q. On March 8th of 2022, your phone number was (813)474-6484, correct?
A. Correct.
Q. When did you change that number?
A. Never change my phone number.
Q. I'm sorry, I misunderstood the number that you gave us on the answer. So you still have that same phone number?
A. Yes, that's correct.
Q. Using that phone number while this dangerous person in your life was in jail, using that phone number, you communicated with him regularly; did you not?
A. That's right. And this happened after the threats made to my family, and since they were afraid, I wanted them to see as if I were being friendly towards them.
Q. Could you describe for the jury how friendly you wanted that to be in the number of contacts that you had with the Defendant Torres?
A. Well, he would really call me, Mr. Elias would call me

three times a day, and he would argue with me if I didn't answer and ask me what I was doing and that he was gonna send his friends to see what I was doing.
Q.   Would you disagree with a number between April 25th of 2022 and October 28th of 2022, approximately six months after -- a period of six months after this March incident, would you disagree with the number of 1200 contacts between yourself and the Defendant Torres?
A.   Yes, correct.  I don't know the perfect number, but, yes.  And when I was arrested by the FBI, that I turned myself in voluntarily.  And the last call that I received from Mr. Elias, as a matter of fact, was on the December 31st threatening me that I was going to suffer the same as him and -- can I use foul language?
Q.   Please translate.
A.   Okay.  He told me that I was a slut, that I was no good, and that I was no one without him.
Q.   While he was in jail, did Defendant Torres provide you any financial support or have anyone else give you money?
A.   Yes, Your Honor, he would monthly give me money.
Q.   And his monthly source of income was very important to you, correct?
A.   No, it really wasn't important, but the thing is the car that we had had to be paid monthly and it was literally $1200 and I didn't have that money.

Q. You cared about a car that wasn't even yours?
A. No, I really didn't care about the car, but they wanted me to stay with the car. I don't know why. Really after we split up, I turned the car in, because I could not pay for that car.
Q. Because you're unemployed, correct?
A. That's correct.
Q. The last gainful employment that you had was in 2020, correct?
A. Yes.
Q. The last gainful employment that Elias Torres had was in 2020, correct?
A. In reality that wasn't really an employment, he got that fake paperwork to be able to get the car.
Q. My question was your co-defendant in this case, Elias Torres, during your relationship he was unemployed, correct?
A. Well, really he would tell me that he worked with cars, that his dad, that they were into finding cars. I don't really know where, I think at auctions, and then they would sell them more expensively.
Q. He had no gainful employment during your relationship, did he?
A. That's what he really told me.
Q. But what you knew from the business was that the drug sales that you participated in with him helped finance your

unemployment style of living, correct?
A. Sorry, sir, but that's not so. I did not know anything about the selling of drugs.
Q. Didn't you already tell the jury that you believed he was involved in illegal activity?
A. That's correct, but I did not know what it was about. He would never talk to me about that.
Q. Is this the Glock firearm that you've been talking about?
A. Yes, that is Elias Rosario's firearm.
Q. And you believe he carried it all the time?
A. All the time, he would never leave it.
Q. Where did he carry it?
A. He always had it in his pocket.
Q. He carried this firearm in his pocket?
A. Yes, he always had it in his pocket.
Q. With this extended magazine as well, correct?
A. I really don't remember, but perhaps, yes.
Q. Which pocket?
A. The reality, his pants pockets.
MR. PRESTON: No further questions at this time, Your Honor. Thank you.
THE COURT: Mr. Vitier, do you have questions for this witness?
MR. VITIER: Yes, Your Honor, I do.

**CROSS-EXAMINATION**

**BY MR. VITIER:**

Q. Ms. Pinuela, I want to start with -- Good afternoon, by the way.

A. Good afternoon.

Q. I want to start with the car you didn't care much about, the BMW. That was registered under your name, correct?

A. Yes, it was in my name, sir. Elias got it in my name because he couldn't register it to his, he made a 10,000 down payment.

Q. Okay. So Mr. Torres -- you're saying Mr. Torres went and registered the car under your name?

A. We went together to the dealership. He knew somebody at the dealership who was waiting for us.

Q. That's not what I'm talking about. When you registered the vehicle to be under your name, to get the tag, you're saying he did that?

A. No, I did all that at the dealership.

Q. And when he bought the car under your name, did you have a gun at your head at that time?

A. No, of course not.

Q. So you did that voluntarily?

A. Pardon?

Q. So you did that willingly?

A. Yes.
Q. Okay. And you were talking about his other vehicle at the time, on March 8th, 2022, Mr. Torres had his own vehicle; did he not?
A. His vehicle that was not in his name, it was in the name of his ex-partner.
Q. So he had his own vehicle?
A. Yes, but at that time it was -- had broken down and he would always use mine.
Q. That's one thing I want to clarify for the jury. At one part you said it's my car, then you said it's actually his car, and now you're saying it's your car. Which one is it?
A. Well, I -- I repeat once again, the car was in my name, but I didn't use it. He used it more than I did.
Q. So why did you just testify when the government was asking you that you were so upset that somebody went in your car to get your stuff?
A. Because legally it is my car, sir.
Q. Okay. And you -- your reaction to them taking your pink bag was because you were under the influence of drugs?
A. Yes, I -- you could say, yes, I did, but I was concerned that my things were there, so --
Q. But you were so intox -- go ahead. I'm sorry.
A. That was the reason.

Q. Okay. But you were so intoxicated that you didn't know how to react to police, but you were able to drive around with your uncle for hours?
A. Can you please repeat the question?
Q. Yes. When police were trying to talk to you, you didn't know how to react and you had a panic attack because of the drugs?
A. Yes.
Q. Okay. But you didn't have -- you weren't intoxicated when you were driving around for hours with your uncle?
A. I really wasn't driving around for hours with my uncle. Anna, as I repeat, picked us up at my mother's house.
Q. So Anna took you and your uncle to get your uncle a driver's license?
A. Driver's license for who?
Q. For Jimenez Rodriguez?
A. No, sir, it wasn't that day.
Q. So it wasn't on March 8th?
A. That wasn't the day. I didn't go with my uncle.
Q. Okay. So if your uncle said that, then your uncle is lying?
A. My uncle really didn't say that. He said that we had gone to buy something for his hair.
Q. Is your testimony here that your uncle -- you did not pick up your uncle, just you and your uncle, around 5:00 or

6:00 p.m.?
A. No, I wasn't -- no, I didn't go with him. I was already with him, I was with him and Anna and the girls, because we were shopping.
Q. Okay. So at what time?
A. I would say from about 2:00 p.m. to about -- until about 7:00 p.m., until I received the call from Elias that we were going to go out to eat.
Q. Okay. And before you went to go pick up Torres to go to dinner, you dropped everybody else off?
A. No, sir, Anna was -- I didn't have Elias's car. Anna went, we dropped off her daughter and then we dropped off my daughter and Anna stayed with me and we left in Anna's car to pick up Elias.
Q. Okay. So if your uncle told the police that he was in your car with you alone for hours, he was lying?
A. No, sir, he didn't say that, Your Honor. I was literally with Anna and my uncle in the car and it wasn't in my car.
Q. I'm not asking you if he said it. I said if he said it, he was lying?
MR. PRESTON: Objection.
THE COURT: Sustained.
MR. VITIER: I'll move on.
THE COURT: The jury disregard that line of

questioning.

BY MR. VITIER:

Q. So your uncle came for vacation?

A. Yes.

Q. And you mentioned that he's not from here?

A. No, he wasn't living here. He was living in Spain for 21 years, then he moved to Atlanta. He was going to start a business. And then from Atlanta, he moved here, because we are -- to see us, because we're his only family.

Q. Okay. But my point is, you mentioned that you were worried about immigration consequences for yourself and him.

A. Yes, because by then my uncle had already submitted his paperwork seeking political asylum, because it's something that all of us Venezuelans have to do.

Q. So in other words, you are also under political asylum?

THE INTERPRETER: I'm sorry, Counsel, would you repeat that?

BY MR. VITIER:

Q. So in other words, you too are under political asylum or have petitioned for it?

A. Yes, I have -- I submitted a request, but I don't have asylum yet.

Q. So you know and you've been informed that if you get convicted of this crime, you're subject to not just prison, but also deportation?

A. Yes, but fortunately, I am innocent.

Q. Now, you told the jury Mr. Torres used to take the keys away from you, right?

A. Yes, that's correct. He would beat me and take the keys from me.

Q. Okay. And of all these times that you beat you, you never took a photograph of any of the injuries?

A. Okay. Yes, I -- I did have photos, but when he smashed my phone I lost all the information.

Q. That was a fact you forgot during direct, that you had photos and you had evidence, but he smashed it?

A. What --

Q. When your attorney was asking you about the abuse, you forgot to mention that you had photographed all this abuse, but he smashed your phone conveniently?

A. But he didn't ask me about photos.

Q. When you -- let's start on March 8th, 2022. You didn't report it to the officers at the scene, you're saying, because you were under the influence?

A. Can you please repeat?

Q. You're saying you didn't say anything to the officers about him forcing you to do things with firearms, because you were under the influence of drugs?

A. That's correct, I was under the effects of drugs that day.

Q. So we go back to you and your uncle are driving around doing drugs together before you pick him up?
A. No, sir, I repeat once again. I was with Anna, her daughter, and my daughter.
Q. Okay. So you were getting high with Anna, your daughter, and their daughter?
A. No, in reality it was when -- well, I have smoked marijuana since I was 17. And that day Elias gave me a pill in the morning and I took it.
Q. And at what point did you do the cocaine?
A. The day before.
Q. Did you have a gun to your head when you did the cocaine?
A. No, because I was already addicted, so I didn't need to have a gun to my head. I was already addicted to it.
Q. So which -- if Torres gave you a picture in the morning -- a pill, I'm sorry, and the cocaine was from the day before, what were you on that had you so high that you had an anxiety attack and you didn't know how to deal with officers?
A. I really don't know. I suffer from anxiety.
Q. So now you're telling the jury that it was because of anxiety that you didn't know how to answer the questions and reacted to the bag, not drugs?
A. Would you please -- can you please repeat?

Q. So now you're telling the jury that it's because of your severe anxiety that you didn't know how to react to the bag and the officers, not drugs?
A. No, it was the drugs and anxiety that hit me at the same time.
Q. Okay. But if the cocaine was from yesterday and the pill was from this morning, what drugs are you talking about?
A. Okay. So if you really don't know this, I'm going to explain it to you. So the oxycodone pills make people become aggressive when the effects are already gone, and that's what happened to me at that time.
Q. And you're saying having one -- your testimony is that you only got the pill once. So you're saying --
A. That one that day. The day before we went out partying and I can say I had -- I took four pills.
Q. Okay. But when your attorney asked you the question of how many hydrocodones you would get from Mr. Torres, you literally said only one; did you not?
A. No, I didn't say only once, I said that he would give me pills to have a good time.
Q. But you said he would only give you one pill; did you not?
A. Sometimes, but if we would go out or something, we really would do more drugs.

Q. Okay. Now I'm gonna move on to the firearm.
A. Okay.
Q. To explain how your DNA may have gotten on that gun, you mentioned that sometimes while Mr. Torres was getting showered he would ask you to hand him the firearm?
A. Yes, that's correct.
Q. While he's showering?
A. No, when he would get out of showering.
Q. Was there a particular reason that he couldn't walk over and pick up the gun, that he needed you to hand it to him?
A. Well, in reality he was always in a rush, so to be -- to hurry up more, he would tell me, oh, get me the gun that's in the room.
Q. Now, you stated to the jury that Mr. Torres always had this Glock on him.
A. Yes, that's correct, he always had it.
Q. And the prosecutor demonstrated it to you and you identified that particular weapon and magazine.
A. Yes, that's correct, that was his weapon.
Q. And he asked you specifically what pocket.
A. I can't really say what pocket.
Q. No, I'm saying the government already asked you that.
A. Yes, in his pants pockets.
Q. But you're saying that he put a Glock with a 29

extended magazine, you could see what it looks like in the picture, that he was fitting that in his pocket everywhere he went?

A. Well, I repeat once again, I didn't see the extended magazine that you just showed me, but, yes, he would put his gun in his pocket.

Q. So you would see him carry an empty gun without a magazine, so it could fit?

A. Well, it did have a magazine, but you couldn't see the bottom part of it. But it wasn't really the long magazine, because I would have noticed.

Q. Now, going to the -- where you said that the two bags came from. You said you happened to see Torres -- Mr. Torres coming down the stairs with two bags, but he had them hugged where you couldn't see what they were.

A. Yes, that's correct, he had -- he had them and if you can see Mr. Torres, if you can notice that he's a really big person. So he had them like this. It was something light and something dark and he was holding it like this. And I couldn't really say what they were, because at that time it was dark and there was not a lot of light.

Q. So he had that whole bag basically under one arm?

A. Yes, that's correct, both bags.

Q. With a gun and cocaine in it?

A. That I don't know, because at that time I did not know

what was inside the bags.
Q. And so your testimony is when he got in the passenger side of the car, you still didn't see your bag?
A. Well, I repeat once again, he's a big person and if he puts the bags there where he is, next to his legs, you can't really see what he has at his feet.
Q. Okay. The big person got out of the car at the gas station, right?
A. And I got out of the car with him too. I got out first and then he did.
Q. So at no point until Bahama Breeze did you see these bags?
A. No, I saw them when we got to Bahama Breeze, that the officer wanted to get them.
Q. So that's was my question. The first time you ever saw them was at Bahama Breeze?
A. It wasn't the first time, I repeat once again, as I said before, I saw them when he put them in the car.
Q. Right, but you just said that you didn't know it was your pink bag?
A. No, I didn't know it was my pink bag, but it was a light colored bag and dark colored bag.
Q. So the first time you realized it was your bag is when Sergeant Jenne had them in his hands?
A. Yes, that's correct.

Q. And you thought at that time Sergeant Jenne was taking a bag full of diapers and stuff like that?
A. Yes, because -- of course, because I always leave that bag in my car and since he had the car all day, I don't really know what he could have done with that bag.
Q. So you made a couple of statements on the scene to your uncle.
A. Yes.
Q. Not just the one the government mentioned, but there's another part where Officer Sousa tells your uncle, we found a large amount of narcotics in the car. And your uncle looks at you and goes, Que? And you said, yeah, but don't ask me anything, I don't know anything and neither do you?
A. Yes, I did, but I don't know, it was just that Officer Sousa had already told me that they had found something in the car.
Q. As we sit here today, we're almost two years from the day that you were arrested with the bags, right?
A. Yes.
Q. In those two years you've had all the opportunity in the world to gather as much evidence as you wanted to prove these allegations against Mr. Torres?
A. I'm sorry, I did not understand.
Q. You're saying that you had witnesses on FaceTime that saw you with a gun to your face?

A. Yes.
Q. That your mother has witnessed that he called her saying he was gonna kill you and several other threats?
A. Yes, that's correct.
Q. But there's no police reports to substantiate any of it?
A. That's correct, what you're saying.
Q. No threatening -- you haven't changed your phone number, right?
A. No.
Q. No threatening texts from Mr. Torres to you or your family?
A. Yes, I have.
Q. You do? Have you provided those to the government and to your attorney?
A. Yes, I -- not to the prosecutor, but to my attorney, yes. And I even have messages from Elias's mother and -- and the -- Elias's cousin, who are there, back there.
Q. Did you present those to the police?
A. I didn't present those to the police, but my attorney has them.
Q. Did you file an injunction against Mr. Torres?
A. No, I never filed for an injunction.
Q. And you gave a list of witnesses to your attorney of people who can corroborate --

A. Could you repeat, please.

Q. And you're saying you gave a list of the witnesses that can come in and testify that these threats happened on FaceTime?

A. No, what I said was -- well, with the FaceTime I don't have witnesses for anything, because until today's date my friend no longer speak -- talk to me.

Q. Okay.

A. And regarding the threatening messages, I do have those, but I don't believe that his family is going to testify against him.

Q. Have you presented it to an officer to ask if it's something they could pursue?

A. No, really it's something I gave to my attorney.

Q. But you know your attorney can't charge anybody with a case, right?

A. But one would suppose that my attorney would counsel me as to what's the best thing I could do, true?

Q. True. You mentioned that there were these secret business meetings at first where you were excluded from?

A. Yes, that's correct.

Q. And then you recharacterize it as it's family reunions?

A. No, what I was referring to is that at family gatherings they would speak as men and the women would not be -- it was supposed that the women would not speak.

And when I would go to his parents' house, he would have meetings with his brother, Fernando Rosario, and his father, Elias Rosario, in the room.

Q. And since you weren't in the room, you don't know what they were talking about?

A. No, I really did not know what they talked about.

Q. So they could have been talking about buying cars from auctions?

A. Yes, could be.

Q. Now, I have one last question for you, Ms. Pinuela. You're telling the jury that Mr. Torres always had this Glock on him, right?

A. Yes, correct.

Q. And the one night that he's gonna ride around with a kilo of cocaine is the one night he decides not to put it in his pocket, he's gonna put it in your bag?

A. Okay. I have come to think that perhaps it was out of respect to my uncle for him to not notice that he was carrying a weapon.

Q. How would your uncle see it if he has it in his pocket? Was your uncle gonna search him?

A. No, but you could really tell that he would have something heavy in his pockets.

Q. So out of respect for your uncle, he's not wearing a gun on him?

A. That's really what I think. I can't say that, yes, that's so, because that would be his thinking, not mine.
Q. If that were true, why would he bring a half a kilo or more than that and fentanyl and everything else in your car?
A. That I really don't know. You would have to ask him.
MR. VITIER: One moment, Your Honor.
I don't have any other questions, Your Honor.
MR. LANGE: No redirect, Judge.
THE COURT: Does the government wish any recross?
MR. PRESTON: No. Thank you, Your Honor.
THE COURT: Okay. Ms. Pinuela, you may return to counsel's table at this time.
Mr. Lange, do you have any --
MR. LANGE: The defense rests, Judge.
THE COURT: Okay. Is there a rebuttal case to be offered by the United States?
MR. PRESTON: The United States rests.
THE COURT: Is there any rebuttal case by Mr. Torres?
MR. VITIER: Yes, Your Honor. May we approach on the matter?
THE COURT: Yes.
MR. VITIER: Very briefly?
THE COURT: Yes.
(Sidebar.)

MR. VITIER: I'm sorry, it's been a long day.

THE COURT: So I know you had mentioned wanting to call in rebuttal Officer Sousa, but given what happened on cross, I'm not sure there's any a need for that.

MR. VITIER: As far as everything that she said that contradicts what the uncle said?

THE COURT: Okay. Well, first of all, the uncle has not testified in this trial. So that line of questioning I told them to disregard, because it's not relevant. And so who are you trying to call?

MR. VITIER: It would just be Sousa. I mean --

THE COURT: And precisely what are you going to elicit, an inconsistent statement, is that what you're trying to -- my point is given the transcripts and the cross, what else are you gonna get at that?

MR. VITIER: The jurors haven't heard -- sorry. The jurors haven't heard yet the timeline and what was said to Sousa about the fact that they were in the car all day, everything that is impeachable at this point. And I understand -- and I'm processing as I'm thinking about it. I wanted to bring this in as -- the problem is he's unavailable to me, can't call the uncle, because he's pleading the Fifth. So at this point he's an unavailable witness to me and we need his testimony to impeach hers. So I'm asking to use Sousa and --

THE COURT: I'm sorry, you're trying to -- you're trying to get his statements in through Sousa, whatever her name is?

MR. VITIER: Right, I don't know if you remember, earlier I was trying to get that information in, because what the uncle told Sousa led her investigation into not arresting him and letting him go, right? And I wanted to get that in. And you felt like there was no impermissible -- no permissible way for me to get that information in. And I wanted to call the uncle to get that information.

THE COURT: I understand why you want to call the uncle, but my point is that that seems to be implicating confrontation clause problems, right?

MR. VITIER: Right. Right. For Mr. Lange.

THE COURT: Right, for Ms. Pinuela. So without the ability to cross, I'm not sure how you can do that.

What's the government's position?

MR. PRESTON: And we have a number of hearsay problems with that sort of testimony.

THE COURT: Right, because you're literally introducing it for the truth of the matter, what he asserted. So we've got Sixth Amendment problems, we've got 803. I don't see any 803 exception that -- he's not alleged to be a conspirator, so it's not a statement that comes

under 801, so I don't see how it gets in. Is that the only basis for what calls -- so you rest too?

MR. VITIER: Yes, I will rest.

THE COURT: Is there any other --

MR. VITIER: No, Your Honor.

THE COURT: Okay. Then I'm gonna let the jury go home and we're gonna do jury instructions and then tomorrow morning we'll go into closing. Okay?

MR. VITIER: Okay.

(Sidebar concluded.)

THE COURT: Okay. Just to do on the record, Mr. Vitier, then, does Mr. Torres also rest? There's no rebuttal case, Mr. Vitier?

MR. VITIER: Yes, Your Honor.

THE COURT: Ladies and gentlemen, all parties have rested, which means the evidence has closed at this time. I'm going to go ahead and let you go home today. Thank you for your patience.

Tomorrow morning I'm going to give you instructions as to the law and I'm gonna turn to counsel and have them offer their closing arguments and then I'll send you back to begin deliberations.

There are some matters I need to take up with counsel before I instruct on the law. In light of that, I would ask that you come at 10:00 so you're not waiting

around for me. Come at 9:55, congregate in the jury deliberation room, and we'll begin at 10:00 a.m. tomorrow morning. Okay?

(The jury exited the courtroom, after which the following proceedings were had in open court.)

THE COURT: Okay. So with jury instructions, I think the only objection that was outstanding had to do with the Pinkerton instruction. I think there's more than ample basis here for this particular case to give that instruction related to Count Two and Three.

Are there any other objections? There are some tweaks I need to go through and make now that Ms. Pinuela testified, but Mr. Torres did not, from the joint proposed instructions, just the applicable ones based off of that testimony. But are there any other substantive objections?

I think I already mentioned, Mr. Chang, I added in fentanyl because that was admitted originally, but obviously, Count One includes cocaine and fentanyl.

MR. CHANG: I was just gonna bring that up. I noticed I left it out when I was going through the instructions too, so --

THE COURT: I've already edited that in my copy, but I need to clean up some of the stuff, like I said, about who testified and didn't testify. Are there any substantive objections?

What I propose I will do is I will leave a copy of the final instructions as I intend on giving them at counsels' table at 9:00 a.m. tomorrow. You can look at them, you can give me any objections before the jury comes in at 10:00 if there's any other wordsmithing or other objections to be had. But I don't actually a need for a charge conference at this hour.

MR. PRESTON: Well, since all the proposed jury instructions were filed jointly, Your Honor, I don't think we need a charge conference either. But I will point out to the Court that there were several options under B6 and B63 is probably most appropriate, because it deals with a defendant with no felony conviction testifying.

THE COURT: Yeah, that's what I meant by the cleanup. I'm not gonna give all of them, but that one seems applicable given Ms. Pinuela and not Mr. Torres.

Is that the only wrinkle? I don't want a long prolonged objection tomorrow morning that could have been lodged timely when the jury instructions were due.

I didn't see any, which I was happy for.

MR. VITIER: No, Your Honor, I don't have any. I want to remind the Court I haven't received a copy of -- a redacted copy of the indictment taking the prior out. I don't know if Your Honor has received one.

THE COURT: Prior and forfeiture.

MR. CHANG: I filed it this morning.

THE COURT: Yeah. I was gonna say I think I saw something this morning and it's now on the exhibit table, because all that stuff will go back. So you can take a look at it. But it should -- I don't think there's any issues with it.

I will defer to the two verdict forms. I know we talked about that before. If that's government preference, it's fine.

Mr. Lange, anything from you?

MR. LANGE: No, nothing, Judge. Thank you.

THE COURT: Okay. In that case, how long does counsel want for closing?

MR. LANGE: I'm suggesting the same half hour or approximately half an hour we had in opening.

THE COURT: Mr. Chang?

MR. CHANG: Forty minutes, Your Honor.

THE COURT: Okay. I'll give everyone 40. We're gonna give the government 40 and they just can reserve what they want for rebuttal.

MR. VITIER: So you're giving me 40?

THE COURT: Everyone will get 40. And government can give divide up the amount however they see fit with rebuttal.

We'll start at 10:00. It'll probably take me a

good 25 minutes to get through this amount. I'll do -- like I said, I instruct them first, I'll turn to Mr. Chang or Mr. Preston, whoever is doing closing, Mr. Torres's counsel, and then Mr. Lange for Ms. Pinuela, and then back to the government. That's the order that we'll proceed tomorrow morning.

Is there anything else I need to be aware of? I think counsel, Mr. Lange, if your client is found guilty, I think it's presumptive detention, isn't it?

MR. PRESTON: Mandatory.

THE COURT: Mandatory. Okay. So this isn't an issue. But Ms. Pinuela, if that were to occur, Mr. Lange I'm sure has advised you of that, just in terms of preparations. Because I imagine the jury could come back with a verdict tomorrow.

Do you understand what I'm saying.

MR. LANGE: Yes, Your Honor.

THE COURT: Okay. Anything else?

MR. VITIER: No.

MR. LANGE: Nothing else, Judge.

MR. CHANG: No, Your Honor.

THE COURT: Okay. Then I will see every -- I will leave those copies on your seats by 9:00 a.m. and I will see you at 10:00 or, if there's objections, let someone in the court know and I'll come out and rule on them ahead of time.

Okay?

MR. CHANG: Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Proceedings adjourned.)

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER TRANSCRIPT CERTIFICATE**

I, Howard W. Jones, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to *Section 753, Title 28, United States Code*, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 232 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.

/s Bill Jones
__________________________
Bill Jones, RDR, RMR, FCRR
Official Court Reporter
United States District Court
Middle District of Florida
Tampa Division
Date: 09-23-24