**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CASE NO. 8:22-cr-363-KKM-JSS
March 8, 2024
Tampa, Florida
10:01 a.m. - 4:27 p.m.

ELIAS XAVIER ROSARIO TORRES,
VERONICA ESTEFANIA RODRIGUEZ PINUELA,

Defendants.
________________________________/

**TRANSCRIPT OF TRIAL - VOLUME 4**
BEFORE THE HONORABLE KATHRYN K. MIZELLE
UNITED STATES DISTRICT JUDGE

Proceedings reported and transcribed by computer-aided transcription.

**APPEARANCES:**

For the Government:
JEFFREY CHANG, ESQ.
JAMES PRESTON, ESQ.
Assistant U.S. Attorneys
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
813/274-6000

For the Defendant, Elias Xavier Rosario Torres:
RAUDEL VITIER, ESQ.
HOWARD JAMES WILLIAMS, ESQ.
Federal Public Defenders
400 North Tampa Street, Suite 2700
Tampa, Florida 33602
813/228-2715

For the Defendant, Veronica Estefania Rodriguez Pinuela:
KEN LANGE, ESQ.
Law Offices of Ken Lange
12550 Biscayne Blvd., Suite 207
North Miami Beach, Florida 33181
305/892-0030

Interpreters:
Gabriela Loncar
Jesse Leonor

Court Reporter:
Howard W. Jones, RDR, RMR, FCRR
801 N. Florida Avenue, Suite 15A
Tampa, Florida 33602
813/301-5024

* * * * * * * * * *

# I N D E X

| | PAGE |
|---|---|
| FINAL INSTRUCTIONS TO THE JURY By The Court: | 6 |
| CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES BY MR. CHANG: | 24 |
| CLOSING ARGUMENT ON BEHALF OF DEFENDANT TORRES BY MR. VITIER: | 38 |
| CLOSING ARGUMENT ON BEHALF OF DEFENDANT PINUELA BY MR. LANGE: | 67 |
| REBUTTAL ARGUMENT ON BEHALF OF THE UNITED STATES BY MR. PRESTON: | 94 |
| INSTRUCTIONS TO THE JURY BY THE COURT: | 103 |
| VERDICT: | 112 |
| CERTIFICATE OF COURT REPORTER: | 123 |

* * * * * * * * * *

**P R O C E E D I N G S**

(Court called to order and the following proceedings were had outside the presence of the jury.)

THE COURT: Okay, ladies and gentlemen. We're resuming for the last day of trial.

It's my understanding there are no objections to the final jury instructions; is that correct?

MR. CHANG: Nothing from the United States, Your Honor.

MR. WILLIAMS: That is correct, Your Honor.

MR. LANGE: That's correct, Judge.

THE COURT: Okay. Then I am ready to call the jury in. I will read all of the instructions except that last page which I'll do after counsel gives their closing arguments.

Are there any other issues I need to take up before we call the jury in?

MR. WILLIAMS: Yeah, I just wanted to note on the way in a juror attempted to hold the elevator for me. I didn't say anything to the jury, just like no, thank you. I didn't say no, thank you, but just stopped. And so they were coming in through security, they were on the elevator and attempted to hold it for me and I said no, thank you.

THE COURT: I see no problem with that. As long as the elevators are working, it's a good day in this

building.

MR. CHANG: Just on a side note, Your Honor, I stepped outside to look for my agent this morning, a juror walked by, she said hi. I didn't realize, I said hi, and that's it. There was not other interaction.

THE COURT: As long as we're friendly and don't talk to them, it's fine.

Are there any demonstratives being used in closing?

MR. CHANG: I will be using a PowerPoint slide, Your Honor.

THE COURT: Any anticipated objections to that?

MR. CHANG: Everything in it is already in evidence. I don't anticipate any objection.

THE COURT: Okay. What about defense counsel?

MR. VITIER: Not from me, Your Honor.

MR. LANGE: No objection, Judge.

THE COURT: And no demonstrative? That's what I was asking, sorry. Defense isn't using demonstratives?

Okay. Forty minutes, allocate as you see fit, Mr. Chang.

Please bring the jury in.

MR. PRESTON: Your Honor, for the court's information, Mr. Chang and I will be sharing closing today.

THE COURT: Are you doing rebuttal?

MR. PRESTON: Yes, ma'am.

THE COURT: Okay. That's fine.

Members of the public, it's my preference that individuals not come in and out of the courtroom during my instructions or during any of the counsel's closing argument so that the jury can have full attention on who is presenting. So if you need to leave, leave now. Jury returned to the courtroom.

(The jury was returned to the courtroom, after which the following proceedings were had in open court.)

THE COURT: Good morning. Can you hear me?

(Jurors respond affirmatively.)

THE COURT: Ladies and gentlemen, we have come to the close of trial. It's my obligation now to instruct you. These are lengthy, these instructions. In large part, I'm a visual learner, so I have a law clerk project them onto the screen. You can follow along while I read. There will also be copy of all the jury instructions for each of you back in the jury deliberation room, so you don't need to take notes copious notes, just pay attention.

When I'm done I'm gonna turn to counsel to give their closing arguments and then I'll explain at the very end how the verdict form needs to be completed and then I will send you back to retire.

Members of the jury, it's my duty to instruct you

on the rules of law that you must use in deciding this case. After I've completed these instructions, you will go to the jury room and begin your discussions, what we call deliberations.

You must decide whether the government has proved the specific facts necessary to find the defendants guilty beyond a reasonable doubt.

Your decision must be based only on the evidence presented during the trial. You must not be influenced in any way by either sympathy for or prejudice against the defendants or the government. You must follow the law as I explain it, even if you do not agree with the law, and you must follow all of my instructions as a whole. You must not single out or disregard any of the Court's instructions on the law.

The indictment or formal charges against the defendants isn't evidence of guilt. The law presumes every defendant is innocent.

The defendants do not have to prove their innocence or produce any evidence at all. A defendant does not have to testify and, if a defendant chooses not to testify, you cannot consider that in any way while making your decision. The government must prove guilt beyond a reasonable doubt. If it fails to do so, you must find the defendants not guilty.

The government's burden of proof is heavy, but it doesn't have to prove a defendant's guilt beyond all possible doubt. The government's proof only has to exclude any reasonable doubt concerning the defendants' guilt.

A reasonable doubt is a real doubt based on your reason and common sense after you've carefully and impartially considered all the evidence in the case.

Proof beyond a reasonable doubt is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs.

If you are convinced the defendants have been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decisions about the facts.

Your own recollection and interpretation of the

evidence is what matters. In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

Direct evidence is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

Circumstantial evidence is proof of a chain of facts or circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say and how important that testimony was. In making that decision, you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions:

Did the witness impress you as one who was telling the truth?

Did the witness have any particular reason not to tell the truth?

Did the witness have a personal interest in the outcome of the case?

Did the witness seem to have a good memory?

Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

Did the witness appear to understand the questions clearly and answer them directly?

Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact and ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave in this trial.

But keep in mind that a simple mistake doesn't mean a person wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or an unimportant detail.

A defendant has a right not to testify. But since

Defendant Veronica Estefania Rodriguez Pinuela did testify, you should decide whether you believe Defendant Pinuela's testimony in the same way as that of any other witness.

If the government offers evidence that a defendant made a statement or admission to someone after being arrested or detained, you must consider that evidence with caution and great care. You must decide for yourself whether the defendant made the statement and, if so, how much weight to give to it. To make these decisions, you must consider all the evidence about the statement, including the circumstances under which it was made.

Any such statement is not evidence about any other defendant.

When technical -- I'm sorry. When scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

The indictment charges three separate crimes called counts against Defendant Veronica Estefania Rodriguez Pinuela and four separate crimes against Defendant Elias Xavier Rosario Torres.

Each count has a number. You'll be given a copy of the indictment to refer to during your deliberations.

Count One charges that the defendants knowingly and willfully conspired to possess with the intent to distribute 500 kilo -- I'm sorry, distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl.

Counts Two, Three, and Four charge the defendants committed what are called substantive offenses.

Specifically, Count Two charges that the defendants knowingly and intentionally possessed with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl.

Count Three charges that the defendants knowingly possessed a firearm, specifically a machine gun, in furtherance of a drug trafficking crime as alleged in Counts One and Two.

And Count Four charges that Defendant Elias Xavier Rosario Torres, knowing that he had been previously convicted in any court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting interstate commerce a firearm and ammunition, to wit: Glock 23 pistol and 19 rounds of ammunition contained

therein.

I will explain the law governing those substantive offenses in a moment. But first note that the defendants are not charged in Count One with committing a substantive offense. They are charged with conspiring to commit that offense.

I will also give you specific instructions on conspiracy.

Each count of the indictment charges a separate crime against one or more of the defendants. You must consider each crime and the evidence relating to it separately. And you must consider the case of each defendant separately and individually. If you find a defendant guilty of one crime, that must not affect your verdict for any other crime or any other defendant.

I caution you that each defendant is on trial only for the specific crimes charged in the indictment. You're here to determine from the evidence in this case whether each defendant is guilty or not guilty of those specific crimes.

You must never consider punishment in any way to decide whether a defendant is guilty. If you find a defendant guilty, the punishment is for the Judge alone to decide later.

Where a statute specifies multiple alternative

ways in which an offense may be committed, the indictment may allege the multiple ways in the conjunctive, that is by using the word and. If only one of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction, so long as you agree unanimously as to that alternative.

You'll see that the indictment charges that a crime was committed on or about a certain date. The government doesn't have to prove that the crime occurred on an exact date, the government only has to prove beyond a reasonable doubt that the crime was committed on a date reasonably close to the date alleged.

The word knowingly means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

The word willfully means that the act was committed voluntarily and purposely with the intent to do something the law forbids, that is with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids, before you can find that the person acted willfully, the person need not be aware of the specific law or rule that his or her conduct may be violating.

Count One, Controlled Substances, Conspiracy:

It's a separate federal crime for anyone to

conspire to knowingly possess with intent to distribute or import a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl.

Title 21, United States Code, Section 841(a)(1), makes it a crime for anyone to knowingly possess a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl with intent to distribute it.

A conspiracy is an agreement by two or more persons to commit an unlawful act. In other words, it is a kind of partnership for criminal purposes.

Every member of the conspiracy becomes the agent or partner of every other member.

The government does not have to prove that all of the people named in the indictment were members of the plan or that those who were members made any kind of formal agreement. The heart of a conspiracy is the making of the unlawful plan itself. So the government does not have to prove that the conspirators succeeded in carrying out the plan.

Each defendant can be found guilty only if all the following facts are proved beyond a reasonable doubt:

One, two or more people in some way agreed to try to accomplish a shared and unlawful plan the object of which

was to possess with the intent to distribute a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl; and,

Two, the defendant knew the unlawful purpose of the plan and willfully joined in it.

A person may be a conspirator even without knowing all the details of the unlawful plan or the names and identities of all the other alleged conspirators. If a defendant played only a minor part in the plan, but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion, that's sufficient for you to find that defendant guilty.

But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof of a conspiracy.

Also, a person who doesn't know about a conspiracy, but happens to act in a way that advances some purpose of one doesn't automatically became a conspirator.

The defendants are charged with possessing and intending to distribute at least 500 grams of a mixture or substance containing a detectable amount of cocaine. But you may find any defendant guilty of the crime, even if the amount of the controlled substance for which he or she

should have held responsible, is less than 500 grams of cocaine.

So if you find any defendant guilty, you must also determine whether the government has proved beyond a reasonable doubt the weight of the mixture or substance containing a detectable amount of cocaine that the defendant possessed and specify the amount on the verdict form.

And you must also determine whether the government has proved beyond a reasonable doubt that the substance containing a detectable amount of fentanyl.

The law recognizes several kinds of possession. A person may have actual possession, constructive possession, sole possession, or joint possession.

Actual possession of a thing occurs if a person knowingly has direct physical control of it.

Constructive possession of a thing occurs if a person doesn't have actual possession of it, but has both the power and the intention to take control over it later.

Sole possession of a thing occurs if a person is the only one to possess it.

Joint possession of a thing occurs if two or more people share possession of it.

The term possession includes actual, constructive, sole, and joint possession.

Count Two, Controlled Substances, Possession with

Intent to Distribute:

It's a federal crime for anyone to possess a controlled substance with intent to distribute it.

Both cocaine and fentanyl are a controlled substance.

Each defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

One, the defendant knowingly possessed a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl; and,

Two, the defendant intended to distribute the mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl.

The defendant knowingly possessed the controlled substance if the defendant knew he or she possessed a substance listed on the Federal Schedules of Controlled Substances, even if the defendant did not know the identity of the substance or the defendant knew the identity of the substance he or she possessed, even if the defendant did not know the substance was listed on the Federal Schedules of Controlled Substances.

To intend to distribute is to plan to deliver

possession of a controlled substance to someone else, even if nothing of value is exchanged.

The defendants are charged with possessing and intending to distribute at least 500 grams of a mixture or substance containing a detectable amount of cocaine and a mixture or substance containing a detectable amount of fentanyl.

But you may find any defendant guilty of the crime, even if the amount of the cocaine for which he or she should be held responsible is less than 500 grams.

So if you find any defendant guilty, you must also determine whether the government has proved beyond a reasonable doubt the weight of the mixture or substance containing a detectable amount of cocaine that the defendant possessed and specify the amount on the verdict form.

And you must also determine whether the government has proved beyond a reasonable doubt that the substance contained a detectable amount of fentanyl.

Count Three, Possessing a Firearm in Furtherance of a Drug Trafficking Crime:

It's a separate federal crime to possess a firearm in furtherance of a drug trafficking crime.

Each defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

One, that the defendant committed the drug trafficking crime charged in Count One or Count Two of the indictment; and,

Two, that the defendant knowingly possessed a firearm in furtherance of that crime as charged in the indictment.

A firearm is any weapon designed to or readily convertible to expel a projectile by the action of an explosive. The term includes the frame or receiver of any such weapon or any firearm muffler or silencer.

To possess a firearm is to have direct physical control of the firearm or to have knowledge of the firearm's presence and the ability and intent to later exercise control over the firearm.

Possessing a firearm in furtherance of a crime means that the firearm helped, promoted, or advanced the crime in some way.

If you find the defendant guilty of possessing a firearm in furtherance of a drug trafficking crime, you will answer an additional question about the firearm: Whether the firearm was a machine gun.

The government has the burden of proof on this question and the standard, again, is proof beyond a reasonable doubt.

A machine gun is a weapon that shoots, is designed

to shoot, or can be readily restored to shoot multiple shots automatically without manual reloading using one sustained pull of the trigger or by a single pulling of the trigger. The term also includes any part or combination of parts used to assemble or convert another weapon into a machine gun.

During a conspiracy, if a conspirator commits a crime to advance the conspiracy towards its goal, then in some cases a co-conspirator may be guilty of the crime even though the co-conspirator did not participate directly in the crime.

So regarding Counts Two and three, Defendants Elias Rosario Torres and Veronica Rodriguez Pinuela, if you have first found either of those defendants guilty of the crime of conspiracy as charged in Count One, you may also find that defendant guilty of any of the crimes charged in Counts Two or Three, even though the defendant did not personally participate in the crime. To do so you must find beyond a reasonable doubt:

One, during the conspiracy a conspirator committed the additional crime charged to further the conspiracy's purpose;

Two, the defendant was a knowing and willful member of the conspiracy when the crime was committed; and,

Three, it was reasonably foreseeable that a co-conspirator would commit the crime as a consequence of

the conspiracy.

Count Four, Possession of a Firearm or Ammunition by a Convicted Felon:

It's a federal crime for anyone who has been convicted of a felony offense to possess a firearm or ammunition in or affecting interstate or foreign commerce. The defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:

One, the defendant knowingly possessed a firearm or ammunition in or affecting interstate or foreign commerce;

Two, before possessing the firearm or ammunition, the defendant had been convicted of a felony, a crime punishable by imprisonment for more than one year; and,

Three, at the time the defendant possessed the firearm or ammunition, the defendant knew he had previously been convicted of a felony.

A firearm is any weapon designed to or readily convertible to expel a projectile by the action of an explosive. The term includes the frame or receiver of any such weapon or any firearm muffler or silencer.

Ammunition means ammunition or cartridge cases, primers, bullets, or propellant powder designed for use in any firearm.

The term interstate or foreign commerce includes

the movement of a firearm or ammunition from one state to another or between the United States and any foreign country. It is not necessary for the government to prove that the defendant knew the firearm or ammunition had moved from one state to another, only that the firearm or ammunition did in fact move from one state to another.

You've been permitted to take notes during the trial. Most of you, perhaps all of you, have taken advantage of that opportunity. You must use your notes only as a memory aid during deliberations. You must not give your notes priority over your independent recollection of the evidence and you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

Your verdict, whether guilty or not guilty, must be unanimous; in other words, you must all agree.

Your deliberations are secret and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your own opinion and

change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with. Remember that in a very real way you're the judges, judges of the facts. Your only interest is to seek the truth from the evidence in the case.

At this time I'm gonna ask the government to present its closing argument.

MR. CHANG: Yes, Your Honor, may it please the Court.

THE COURT: Yes. Oh, Mr. Chang, I'm sorry, I failed to swear in the interpreters at the beginning of this morning, although they have been sworn in this whole week. I would ask the Courtroom Deputy to do that at this time.

(Interpreters sworn by the Deputy Clerk.)

INTERPRETER LONCAR: I do. Gabriella Loncar, L-o-n-c-a-r.

INTERPRETER LEONOR: I do so help me God. Jesse Leonor, L-e-o-n-o-r.

THE COURT: I'm sorry, Mr. Chang. You may proceed.

MR. CHANG: Thank you, Your Honor.

Members of the jury, I told you at the beginning of this case that this case was about the defendants protecting their product. And you saw during the trial that

that product was over $25,000 worth of cocaine and fentanyl. Now, they protected it using a machine gun, two loaded magazines ready to go, over a hundred rounds of ammunition.

So you've already received all the law that's applicable in this case, but I want to kind of walk you through it to show you exactly how each element was proven beyond a reasonable doubt like I told you we would do at the beginning of this trial.

Now, Count One is, as you heard, a conspiracy count. It's a separate offense from the underlying substantive offense and it's just an agreement between two or more persons to commit the crime. That agreement doesn't have to be a verbal handshake, hey, let's go deal drugs agreement. It can be proven through the circumstances surrounding the case.

And a conspiracy has two elements, as you've heard:

That two or more people agreed to accomplish -- to try and accomplish a shared plan. That two or more people tried to accomplish a shared plan.

I want to focus on the word share, because the defendants in this case, they had everything together. They went -- they drove together, they shared a car together, they went to the store together, the store where Tampa Police knew to be a place where narcotics -- it was a

hotspot for narcotics activity, for drug dealing. They went to the store together and they met together with other people inside of that vehicle. Everything they did in this case was together. They both claimed that the bags belonged to each other, belonged to themselves, and both their DNA was on the gun inside the bag.

She told you multiple times during her testimony that the defendant was her -- the co-defendant was her partner.

We also have to prove that the defendant knew of the unlawful purpose of the plan and joined in it. So I take that one defendant at a time.

Ms. Pinuela, she certainly knew the purpose of that plan. She told you on direct examination yesterday that the reason she reacted the way she did to law enforcement was because she was scared, because she was under the influence of drugs, and that she was having a panic attack because she got stopped by the police.

But I want you to watch the video that I'm about to show you in a minute, because timing is everything. And this is something that defense counsel touched on in their opening statement, that timing is important. That's something I agree with. Watch the video I'm about to show you and think to yourself, is this someone who is nervous, who is scared because of the encounter with police, or is

this someone who is calm and may be even a little annoyed when she is initially stopped. But as soon as Sergeant Jenne grabs the bag -- or starts to grab the bag out of her vehicle, her demeanor completely changes. That's when she starts freaking out. She starts crying, saying, no, that's my bag, you can't take it. That's the moment that her demeanor changes, because timing is important.

(Video published.)

MR. CHANG: Emotions start as soon as they find that bag, not because she was having a panic attack because of the encounter with police, it's because she knows exactly what's inside that bag and she knows she's going to jail. So now that's why she reacts.

And then you'll see -- again, timing is important, because again, you'll see that she makes some statements to her uncle, don't say anything, you know, don't tell them anything. But her demeanor changes again, because of what's happened at this point.

Before that, Defendant Torres has taken responsibility for the bags. He says, that's all mine, nothing illegal is in that car, you're not gonna go to jail, everything in there is mine. So now she becomes calm again, almost indignant, telling the uncle, don't say anything, we're innocent, don't say anything.

He have says, what's going on Vero, don't tell

them anything, don't talk to them, don't tell them a thing.

Later on -- this is Exhibit -- the transcript in Exhibit 2, she says -- the uncle says, what's going on? We found a bunch of drugs in the car, we're gonna be taking him to jail. And she says, I don't know, don't ask me, I don't know anything, and you don't know anything either. Nobody knows anything. And again, she's calm, collected during this encounter, because she doesn't think she's gonna get in trouble at this point.

She knew exactly what the plan was and what was going on with that bag and she willfully joined in it.

Now, Mr. Torres, moving to him, he certainly knew what the deal was. Aside from the statements that he made saying that everything illegal was his and that, you know, let her go, aside from the DNA being on the gun inside the same bag as the drugs, his jail calls, the calls that were made the day after this incident occurred, describe the whole conspiracy for you.

And again with him, timing is everything. Timing is important. Because every single officer that testified throughout this trial said that they never searched those bags on scene, that they didn't even see the gun inside at the time until they searched it back at headquarters. They never pulled the drugs out. And this is important because of what he says, because of what the -- what Mr. Torres says

in his jail calls the day after this incident. Before he's gotten a chance to see the photographs, before he's gotten discovery in this case, he's able to describe exactly how those drugs are packaged.

The transcript from Exhibit 3 and the photograph in Exhibit 28. They talk about, well, that half that was going somewhere else, yeah, that one there, they caught you with half, right? And he says, no, they caught me -- they caught me with a whole one, but broken.

And that's consistent with the other evidence in this case, that's consistent with how those drugs are packaged. There's a half of a kilo -- when they talk about one, they're talking about two of them, there's a half a kilo of cocaine in one bag and the rest of it is broken up. A whole kilo, but broken, because again, just like defense counsel said, the timing is everything. He's never even had a chance to see these drugs, but he can describe them, exactly how they're packaged.

Again, a conspiracy, as you heard, can be between both known conspirators, known conspirators such as the two defendants conspired together, but it can also be between the defendants and unknown conspirators.

These drugs didn't -- it's not reasonable to believe that these drugs were -- that they manufactured these drugs. They had to have gotten the drugs from

somewhere and someone. And it doesn't matter who got the drugs, who got drugs from that person, if they're all a member of this -- if they're all in a conspiracy together, both Ms. Pinuela and Mr. Torres are in a conspiracy with that unknown person.

Now, going back to his jail calls for a moment, this will kind of describe the conspiracy for you.

They put 400 grams on you. Yes, I know. But the one at the house, the kilo of cocaine at the house, that was supposed to be for you Fernand. And the other one, who is that for? That was for Juanito. Unknown co-conspirator.

What am I gonna do, pay him for one, that's it? Oh, did you go to my house? Yeah, I took all of that out. Yeah, that half, that half a kilogram. Defendant says, no, there's almost a whole one in there too. No, someone must have snitched you out. Oh, Fern, you think so, you think someone snitched? Yeah, absolutely.

Then talk about the facts of the traffic stop, how the cops why all over as soon as, you know, as if I was armed. And you knew what you were going to do? What does defendant say? Yeah, because I was going to buy something. Drugs?

Here's some more co-conspirators. Called Macho from Orlando, he has six and a half, six papers and a half, $6,500. That's from Exhibit 3, the transcript from the

first jail call, and Exhibit 4, the transcript from the second jail call. He talks about Macho again. And both of these calls are made on the same day back to back.

You already said you were gonna do a big deal with some people, right? Yeah, but I was gonna do that today. And it was for some other area, it was for Macho.

And even if Ms. Pinuela doesn't know this person, because she is a part of that conspiracy she's is a co-conspirator with that person as well, that unknown person.

So we've proven Count One to you beyond a reasonable doubt and you're free to go back and review the evidence, everything that you've seen so far. You'll have all of that to go back with you to deliberate.

Count Two is a substantive crime of possession, the cocaine and the fentanyl, with the intent to distribute. And you heard about what possession is, how it can be actual possession or it can be constructive possession. So it's like someone who rents an apartment, they leave that apartment, that apartment, it's still there, they're still in constructive possession of that apartment even though they left. That's the same concept here.

It can also be sole possession or joint possession. It's like if two people share an apartment together, both of them are in possession of that apartment,

so they're in joint possession of it.

Possession is a different concept than ownership. And in this case, when defense in opening statements, both defense counsel argued that the other person was in possession of the drugs. But both of those things can be true. And that's our position in this case, is that both defendants possessed the narcotics and possessed the firearm. It's not mutually exclusive, both of them can be in joint possession of the drugs, of the gun, because you heard that and you saw that both of them knew exactly what was in that bag.

And the second element of possession with intent is that they intended to distribute it. And we can tell from what Detective Alvarez said, just the amount itself of that cocaine was worth $25,000, how the fentanyl is about 160 separate doses. So just the amount of the drugs alone is enough to support the possession with the intent to distribute.

But that's not all that we have. We have the statements in the jail calls that Mr. Torres makes about distributing the drugs to unknown co-conspirators. We also have the paraphernalia that was found along with the drugs in the black Nike bag. Detective Alvarez told you how each of those items were used in the drug trade, how they were tools of the trade.

I'll show you Exhibits 31, 34, and 25. How the baggies over here in the top right corner, how those baggies are used for packaging drugs for distribution. How these little baggies in the bottom of the backpack are for smaller amounts and how these scales with the residue is used to show a buyer, hey, this is what you're getting, this is the weight that I'm selling you. And it's also used to weigh out the amount of drugs to make sure he knows that he's selling.

And the gloves and plastic bags and the spoon found in the same backpack as the fentanyl, because they don't want to touch it, they want to have some protection from the drugs, because these aren't drug addicts or drug users that we're talking about, these are drug dealers, distributors.

Now, Count Three charges the possession of a firearm in furtherance of a drug trafficking crime. We talked about how the defendants can both possess the same firearm, and there's two elements of this crime, that, one, they committed the drug trafficking crime in either Count One or Count Two.

So this is kind of like layers of an onion, you start out with Counts One and Two before you move on to Count Three. If we've proven either of those counts beyond a reasonable doubt, which I would submit that we've proven

both, then we started considering Count Three.

We talked about possession, how both defendants claimed ownership of the bag where the gun was found. And you also heard from Marcy Plaza who talked to you about DNA. And she admitted that it's not a perfect science, and we're not saying that it is. It provides very strong support that both defendants' DNA is on the firearm, 1.7 million times for Mr. Torres and 1.5 million times for Ms. Pinuela.

But this DNA is supported by the other evidence. It's just one piece of the puzzle. A big piece, but it's a piece of the puzzle. It's supported by the admissions. It's supported by where the bag was found, in the vehicle with both defendants. It's supported by all the other evidence in this case, by the target gazing, that Mr. Torres was looking at the bags as soon as he made contact with law enforcement that Sergeant Jenne told you about. That's all pieces of the puzzle to come together to show that both defendants were in joint possession of that firearm.

Element two is that the defendants possessed that firearm in furtherance of a drug trafficking crime. In furtherance can be helping or promoting that crime in some way.

They used that firearm to protect their product, to help them be able to finish the goal of distributing the drugs and to possess the drugs so that they don't get

robbed.

The cocaine isn't cheap. It's over -- the cocaine and fentanyl together, it's over $25,000. It's not like they can call the police if somebody tries to rob them, they have to protect themselves and protect their product.

Detective Alvarez told you how dealers in narcotics often carry guns for protection. This isn't -- this is a common behavior. He told you exactly what that gun was used for.

Think about the location of the gun, where it was found. Think about how it was right underneath the drugs in order to protect those drugs. Think about the condition that the gun was in, two loaded magazines, one in the gun ready to go. All these are factors that you can consider.

So after you found the defendant guilty of Count Three, then we'll move on to the next layer, right? We have to determine whether that machine gun -- that firearm was in fact a machine gun.

So I'll show you Exhibit 13, which is the gun and one of the magazines. And you heard from Officer Bleigh, who is an expert in firearms, he literally classifies these things for a living and he told you that this is machine gun. How this little trip right here makes this gun fire fully automatic. All you have to do is hold down the trigger and anything that's loaded in this magazine, it will

shoot until -- or until you let go.

And the definition of a machine gun includes anything that you can use, any component that makes another gun into a machine gun. So even just this clip, just this chip by itself that Officer Bleigh took out for you and showed to you, just that alone meets the definition of a machine gun under the law.

We don't just have that, we have the gun, we have the magazine, we have the ammunition. So we have proven that to you beyond a reasonable doubt. Multiple rounds with a single pull of the trigger. And you heard what Officer Bleigh said, 1200 rounds per minute, more fire power to make sure they protect their product.

Now, Count Four only applies to Mr. Torres and it's relatively straightforward. We already talked about how he was in possession of the gun, the statements, the circumstances, the DNA. And everything else has been stipulated to by myself and defense counsel.

Exhibit 44 is -- we haven't shown you this yet, but this is a stipulation of the parties, it was read to you by the Court, where he admits that he knew that he had been previously convicted of a felony prior to this offense, he has been convicted of a felony prior to the date of this offense, and that the firearm was manufactured outside the State of Florida and, thus, affected interstate commerce.

And you'll have a chance to look at this, see at the bottom how it's signed by the defendant, Mr. Rosario Torres, his counsel, and myself.

I want to briefly go over the verdict form with you.

Madam Clerk, can I use the projector, please?

I'd like to briefly go over this verdict form with you.

Count One is just one question, guilty or not guilty.

Count Two, I just want to make this distinction very quickly, that you're gonna have to decide the weight if you found that the defendant is guilty of Count Two. And this is the same thing that applies for Count Three. So even if you don't think -- these are separate things to consider, right? Even if you don't think that we've proven the fentanyl beyond a reasonable doubt, you still consider the cocaine separately. And you start from the top and go to the bottom. It's either 500 grams or more. If you don't think we met that burden, then you go to number two and number three and so forth.

Members of the jury, you have a job to do in this case. It's not to determine what the law is, it's not to consider what the punishment might be. Your job is simply to listen to the facts, take everything that we've given

you, and then apply it to the law and render a verdict.

We've proven that the defendants entered a conspiracy to deal drugs together, to distribute 500 grams or more of cocaine and fentanyl.

We've proven to you that they actually did possess that amount of drugs, the 500 grams of cocaine, the fentanyl, with intent to distribute it.

And we've proven to you that they possessed a firearm in order to help them commit that crime and that firearm was a machine gun.

And at the time, that Defendant Torres was a convicted felon.

That's why we're gonna ask you to return a verdict of guilty on all counts as to each defendant in the counts that they have been charged.

Thank you.

THE COURT: Okay. At this time, is Mr. Torres's counsel ready to provide a closing argument?

MR. VITIER: Yes, Your Honor. May it please Court.

THE COURT: Yes.

MR. VITIER: Ladies and gentlemen of the jury, I told you since opening Mr. Torres is not guilty. He didn't knowingly possess a firearm on March 8th, 2022, as a convicted felon. He didn't knowingly possess a firearm in

furtherance of a drug trafficking a crime. And he didn't knowingly enter into a conspiracy with Ms. Pinuela.

Now, I only have one opportunity to talk to you this morning. After me it's gonna be Ms. Pinuela's counsel and then the government again, so I'm gonna do my best to cover everything, because there's a lot that you need to consider in this case.

I'm gonna start with the stipulations that Mr. Chang just showed you, the government. We stipulated, which means I signed, Mr. Torres signed, and the government signed that Mr. Torres had been previously convicted of a crime punishable by over year. What does that mean? That that's one element that the government didn't have to prove. It wasn't an issue in this case. He was previously convicted of a felony.

We also stipulated, in other words, all three of us agreed, that the firearm found was entered -- it was one of the elements, entered commerce, which means it wasn't manufactured in Florida. We heard from the ATF agent, Mr. Bleigh, an expert in weapons who is actually certified in Glocks, they are all manufactured in Austria. Not an issue in this case where the firearm came from. It doesn't mean that Mr. Torres had any personal knowledge about the gun, it just means we weren't contesting it and that's something they don't have to prove.

So neither of the two stipulations were at issue in this case. And we all agreed during jury selection we wouldn't even consider the fact that Mr. Torres was a convicted felon as to whether or not he was guilty of these crimes.

So in essence, we agreed that your verdict was gonna come from an objective evaluation of the evidence presented in this courtroom and the evidence that you will see that goes back with you when you deliberate.

Now, as I said from the beginning, the issues in this case is whether he knowingly possessed that firearm and whether they proved that he knowingly joined a conspiracy and whether the government is gonna be able to prove beyond a reasonable doubt those crimes against him with the evidence. So let's talk about the actual evidence in this case.

The government began by calling Officer Maceo. You heard that he was surveilling a gas station with Sousa. You heard that he watched Ms. Pinuela pull into that gas station and Mr. Torres, Ms. Pinuela, and her uncle get out of the car. They met with two individuals from a Mercedes. At that time he saw what he understood from his training and experience that Mr. Torres had a blunt on the back of his ear. That's it. That's how they encountered these two individuals and the uncle.

There was no tip that Ms. Pinuela was gonna have drugs or guns in her car, there was no confidential informant they were working with, there was no active investigation against either one of them. Nothing. It was just two officers watching a gas station and saw something, followed a car, and then pulled her over for a traffic infraction.

Now, the government and I are in agreement as far as timing means everything. You see when they walk up Maceo is wearing the body cam, so most of the interaction with Mr. Torres is through Maceo's body cam. When he walks up to Mr. Torres, he's smoking -- actively smoking marijuana. He takes it out of his hand on video.

Now, the demeanor, I asked you guys in opening -- I'm sorry, ladies and gentlemen -- to pay attention to the demeanor. Torres is calm. What's the problem? You're smoking marijuana in a car. Oh, my bad. Even when they're taking him out of the car, he's like, why you gotta tie me up, man. Come on, man, don't do this. Cool as can be, doesn't resist, isn't freaking out, never lunges for the bags, and never makes statements at that time about the bags. That's why timing is so important, he just got out of the car and he walked away.

Now, during that interaction what's important is that you pay attention to what's going on, because it's a

hectic scene. Sousa's on the driver's side yelling, Jenne is also yelling, he's watching both of them, and they're asking Torres a lot of questions, where is your identification, where is your marijuana card, do you have a marijuana card? Yeah, yeah. Do you have any firearms? No. No, sir. And during that time you see that Torres is looking up, they have flashlights in his face, he's looking at Pinuela, he's like, where's my wallet, you-all need my ID, he's looking down, he's looking up, he's looking everywhere. Everything you would expect from somebody that just got rushed up on by police unexpectedly while you're smoking a blunt.

And when you hear Maceo asking him the most basic question, Torres is having a tough time answering them. When he's getting him out of the car, he's like, I have surgery in my knee. What knee? Huh? What knee. Huh? What knee? Huh? Oh, the right one. As you listen and you watch that body cam back, he can barely answer some of the most basic questions. Maceo has to repeat himself over and over again because Torres is high. He wasn't driving, he was in the passenger's side, he's going to the Bahama Breeze to eat, he didn't know any of this was going down.

And by the way, timing is important. When you watch that body cam, Pinuela and Torres both tell the police he doesn't have a wallet on him, because we just picked him

up. We just got him. We just picked him up. So Torres had just gotten into that car. And you can see from the video it's in military time, but don't quote me on this, but you'll see by yourself it's somewhere between 10:12 to 10:26 that they're at the gas station and then the body cam video starts at 10:40. So they're at the gas station about 12 to 15 minutes and then they're at the gas station -- I'm sorry, then they're at the Bahama Breeze getting pulled over at 10:40. So if he'd just gotten picked up, use the math yourself, he's been in the car for about 30 minutes. Doesn't have a wallet on him, doesn't have his keys on him, doesn't have a phone on him, doesn't have anything. Nothing on him.

Now, a few minutes later you see Maceo's walking Torres away. And what's valuable about his body cam is you see which way they're facing. He's facing his vehicle and that's where he's escorting Torres when he goes, yo, man, they don't have anything to do with them, let them go, everything is mine. Maceo specifically says, I don't know what you're talking about. I don't know what's in the vehicle, so I don't know that's yours.

This whole time they have told Torres, and you hear it on video, we're taking you out of the car to detain you to see if you have a marijuana card. Nobody has mentioned a gun, nobody has mentioned narcotics, nobody said

anything about the bags. At this point he hasn't said a thing about the bags. He's saying, hey, man, you know, just let her go. His primary concern is let her go, they don't have anything to do with it. Why? When they got out over and they're saying we're taking you out of the car for smoking weed, he turns and says, she doesn't smoke and he's not even from here, he's on vacation.

So he thinks all of this is because they pulled him out of the car for smoking a blunt, because that's all they told him. The officer tells him on video and you can see it for yourself, we're getting you out of the car. He's over somewhere else when they're talking about everything else with Pinuela.

Now, you watched a second video from Maceo's body cam. I believe it's the second exhibit from -- don't quote me on that, but the second video from Maceo, it shows Sergeant Jenne lifting the flap of that pink bag and showing him what's inside. And Maceo leans over it so he can videotape the cocaine that's in it.

So now you have two officers on the scene, Jenne that was looking for a firearm, and Maceo, both of them look into the bag, neither one of them see a firearm. So up to now nobody's even mentioned a firearm, nobody's even seen one. That was pretty much it for Maceo.

As far as the government's presentation, then they

call Sousa. She came in and told you she was positioned at the driver's side, which we see her on her video camera and she was mostly focused on Ms. Pinuela.

Now, she told you that when she got there Ms. Pinuela and her uncle that was sitting in the back seemed extremely nervous. Her testimony was they were shaking, couldn't keep still, their voices were trembling, they were talking fast. She asked -- Pinuela asked Sousa several times, can I just get out of the car, can I just get out of the car? She's doing everything she can to distance herself from those bags. It's obvious.

She saw Torres get removed from the car and at that point you saw that pink bag and another bag sitting on the floorboard. She saw when Jenne opened door and she saw Pinuela lunging at the bags. And you see her on video going, hey, hey, hey, maintain your hands on the steering wheel, don't reach for anything. And as you just saw on the video, Pinuela's complete demeanor changed. That's mine, why you take my stuff, this is my car, right? Grabbing things. No, no, no, I'm not gonna do that. And she tries to force herself out of the car, Sousa has to jam the door back, like, yo, calm down, you're gonna get a charge you don't want to get.

She testified, Ms. Sousa did, Officer Sousa, that she kept becoming belligerent even when she was getting her

out of the car, which you saw for yourself. She was resisting. She doesn't want to listen and, luckily for her, Sousa was extremely patient with her and did everything she did to calm her down. She started crying, she had an obvious reaction.

But then, on cross-examination -- I'm sorry, during the government's case in chief when they were talking to her, to Ms. Sousa, she talks about a statement that comes way later. Again, that's why you've gotta see timing is important. It's almost at the very end of Sousa's body cam video when Torres is in the back of a patrol car -- and you can see the timing for yourself, because like I said, it starts at 10:40. Now it's around 11:00-something p.m. or so, check the times for yourself. But it is a hundred percent clear they're taking Torres to jail.

It's at that time and that time only that Torres mentions the bags. And Sousa is like, what are you talking about? And he's like, come on, man, if you're going to take me, if you're for real gonna take me, just -- you know what you can charge me with, just let her go. Sousa doesn't believe him. Listen to it for yourself, read the transcript. She goes, are you really trying to tell me that that little pink backpack is yours? And he goes -- generally states, what side of the car did you find it on? Sousa still doesn't believe him. She's like, yeah, but she

can't drive with those things at her feet. And he goes, come on, man, just let her go, nothing in the car is hers, that's -- nothing in the car that's illegal is hers.

We already know that's not true, because in the matching pink wallet she had cocaine and ecstasy and in her purse she had other drugs and in the pink backpack she had her oxycodone. So we know that's not true. But we'll get to why would Torres say that in a moment.

Sousa asks him, what's yours in the car? Is this yours, is that yours, is this cellphone yours, or whatever. He's like, no, man, all the personal property in the car is hers. Because that's true, everything in the car is Pinuela's, it's her car.

But the most important thing about that conversation, that exchange that I just told you about, is Sousa didn't know that there was a gun in the bag either. At the very end of it -- that's why I asked her during her testimony, the very end of it she's walking away and a different officer up and goes, hey, did you see the zero with all the 39? And she testified zero means gun and 39 means narcotics. And she said, no, I never looked in the bag. So when she's having that conversation with Torres, she doesn't even know that there's a gun in the bag. And she never -- I asked her, did anybody bother to ask Torres what was in the bag? If he's willingly talking to the

police, why didn't they just say, well, what's in there, Torres? If it's yours, that's in there? If you don't believe what the bag is his, right? But they never did that.

Now, I asked Sousa about Pinuela's uncle who was in the car with them. She interviewed him. She knew he was in the car. She seen him at the gas station. She knew he's riding with them. She knows he's in the car and he's acting nervous. Sousa also overheard Pinuela telling her uncle, don't say anything to law enforcement, don't talk to anybody.

Sousa also told the uncle, we found large narcotics, a large amount of narcotics in the vehicle. He turns to his niece and goes, what? She says, yeah. But you know what? I don't know anything, neither do you, we're all innocent.

Now, you heard that after interviewing the uncle officers never searched his phone, they just released it to him. They never asked for a warrant, they never processed him for anything, they didn't process him for latents, they didn't take his DNA. They give him back his phone and he was released at the scene, no further investigation into the uncle.

Now, the government is making a big deal about the fact that Pinuela and Torres are in the car with the guns

and the drugs. Well, so is the uncle. So there's got to be more proof than they're just around the bags. And you heard from Pinuela, she was with her uncle way longer than she was with Torres in that car.

And speaking about Pinuela, I asked Officer Sousa specifically about when she talked to her. I asked him did you have an opportunity to talk to Pinuela away from Torres? And I reminded her, Torres was talking to you in the back of the car handcuffed, right? Yes. And Pinuela's all the way over there, you saw her on your body cam? She was like, yeah, she was away from him for multiple times. She made multiple statements to you, correct? Yeah.

Then when I asked her, did Torres ever say anything about abusing her or pointing a gun at her or any other of Pinuela's details of the story, that Torres put the bags in the car or some mysterious Elian Gonzalez or whoever she mentioned. Her reaction on the stand was genuine, she was like, what? No. I was like, is that the first time you hear that? And she's like, yeah. Remember, this investigation is going on for two years, an officer that's at the scene investigating this whole case, first time she's ever heard anything of that.

After Sousa they called Sergeant Jenne. He was the commanding officer. He didn't have body cam that night, but he was relying heavily on Maceo's body cam footage,

because as he testified to you, he was shoulder to shoulder with him. Maceo is here at the driver door, he's in the back, and he's covering both Torres and the uncle. And he's looking back and he's talking about what he can see.

He said much of what Sousa said. He was just opening the door, so he cannot have a barrier between him and those two bags. So he opens the passenger door and as soon as he does, Pinuela lunges for them. He testified Torres never -- he didn't hear Torres make any statements at all and he never saw Torres make any movements towards the bags or lean towards the bags or say anything about the bags. But he did say he saw Pinuela reaching for the bags, which is what prompted him to take them out. He said he was already suspicious about the bags because they were looking at them, because Torres was looking at them, but he was like, it was Pinuela's action of reaching for them that made me, with my training and experience, remove the bags out of the car, put them on the hood.

He talked about target gazing. He said it was an unconscious reaction to look in the direction of something illicit. So during cross I was saying, well, it could be anything, right? It could be drugs, it could be anything that you don't want officers to see? He's like, absolutely. But because of your training and experience, you're worried about weapons? And he's like, absolutely. Drugs can't hurt

me, so all I'm thinking about is, is there a gun that can hurt me or one of my officers. But he admitted that target gazing could be anything that you subconsciously don't want them to look -- that you don't want somebody to find you with. He said, if it's grocery bags, obviously, you're not gonna be target gazing, was his example.

Now, again, when you go back and look at the video for yourself, he said he went back and he -- Sergeant Jenne says he went back and counted on Maceo's body cam ten or 11 target gazings. But see it for yourself. He's looking at his -- Pinuela, his then-girlfriend, he's like where's my wallet, I need my wallet, I need my marijuana card. He's answering all the questions. He looks down, he looks to the sides. And you can see for yourself, because as the officer said, what they're looking at is what the camera is capturing. So you're the witness of what it is that the officers are looking at at that time.

And you can see where Sergeant Jenne is looking, because you can see his flashlight going back and forth. He's the only other officer on the passenger side of the vehicle, so you can see what he's looking at.

I then asked him about the items that were processed in evidence. He couldn't really recall much. I asked him who was the one that submitted what items, because I wanted to ask him about the items that were processed. He

didn't really remember. He was like, I don't know, we have -- he generally explained that in the evidence room it's kind of like a collaborative effort, like there's no one person specified that's supposed to process the items. He took a guess at who would have processed for latents and he said Taylor Kline. But we heard from Taylor Kline right after him, all Taylor Kline did was get buccal swabs from one of the defendants. So we heard later on it was Kendra Harrell that actually processed it and we will talk about that in a moment.

But I asked him about the -- as the commanding officer, why was the uncle let go? I asked him why no one searched his phone, and he said, I don't know, I just feel like we didn't have any cause to. And you heard her uncle is 44 years old, on vacation, who has been to Miami, Atlanta, and now Tampa. He isn't even from here, from another country. He was in a car with a 24-year-old and his 22-year-old niece and a bag with almost a kilogram of cocaine and fentanyl and all the -- like the government just said, $30,000 worth of drugs or more. And there was no cause to even process him or see if he was connected. I mean, look at the phone, see if there's any texts, that he was somehow involved with his niece in this drug conspiracy. But, no, he felt like there was no cause to investigate the uncle and he let him go, or he allowed the other officers to

let him go.

So besides Officer Horvat, who just came in and testified that he checked Ms. Pinuela's console and there was a full box of ammo, .40-caliber, and three loose bullets and a bag -- I'm sorry, a container of Mentos containing marijuana. That was pretty much his only involvement.

So at that point, all the officers on the scene that interviewed the witnesses, that submitted the evidence in this case, were done testifying. At that point, there was no testimony and no evidence provided to you to prove that beyond a reasonable doubt Mr. Torres knew there was a firearm in the car or that he willfully joined the conspiracy. Nothing. Nothing of that testimony and that evidence we just talked about proves beyond a reasonable doubt that he had anything to do with the conspiracy or that he was carrying a firearm in furtherance of a drug trafficking crime or that he knowingly possessed that firearm.

So at the end of the first day of testimony and the beginning of the second day, we started getting into the forensics of this case. So let's talk about that.

Besides I think it was Jamie Walker and Taylor Kline that just talked about they took buccal swabs from -- in other words, they tried to obtain DNA from both the defendants.

The only other person that testified about collecting the evidence was Kendra Harrell. She was the crime scene technician. She testified on that stand that the only item of evidence that was tested for DNA was the firearm. That's it. They didn't tested anything else for DNA.

You heard she lifted latent prints from several items, the cocaine bags, gun, the magazine, the bullets, she submitted, I believe she said, 13 prints on five cards. We went through the whole how you lift the latent print and everything else.

But the bigger point is there were no fingerprints to anything that came back to Mr. Torres. I asked her if these -- if those latents were processed, she's like, I'm not sure, but I don't think they were of comparison value.

The point is, if they were and they would have matched Torres, you would have heard about it. So they weren't.

I even went over many of the items that weren't processed. The government just showed you all these paraphernalia and everything that goes along with it, like he showed you the sandwich bags with -- the box of sandwich bags, he was like, was that processed? No. The Mentos container, was that processed? No. Did you -- well, I just said the only thing that was swabbed for DNA was the -- was

the firearm. And you heard from the FBI lab expert that you can do both. You can test for latents and DNA on different items, whether they're textured or smooth. Actually, Ms. Harrell said the same thing.

Now, she told you that she could have taken DNA samples from other items, but she wasn't requested to. Most importantly, she and Ms. Plaza, the FBI laboratory expert, told you that is it possible to take DNA samples from clothing. For example, in a rape kit or in anything else, you can do it from clothing, you can do it from other materials. That wasn't done in this case? She said, no.

Now, we turn to Ms. Plaza. Like I said, she testified that you can take DNA from smooth and textured surfaces, you can extract DNA from cloth, and she mentioned what was submitted to her. So I specifically asked her, there was item three, four, and five. Item three were from the front sight and the muzzle, I believe. And then item five was from the rear sight. And I asked her, had you -- could you have processed them separately? She said, yes, I could have. I tried to walk her through why, if I touched the front of the gun or the back of the gun, and if you recall, she's like, yeah, but I combined them. Not saying that there's anything nefarious about that, but the point is they could have specified if they wanted to what part of the gun had this DNA mixture in it. And then most importantly,

item four came from the grip and the trigger.

Now, item three, which is now the combined three and five, came back to at least two people, but the grip and the trigger, which is where you hold the firearm, came back to three people. We had an exchange there. It was like first it was two, then it was three, and she explained, yes, because of the heights and the balance and peaks of the alleles and the STR what I'm looking for, because she explained 99 percent of all our DNA is the same. She looks at that one percent. So when I looked at those heights and I looked at the balance and peaks of these alleles, I knew there had to be at least three people. Three people on the gun.

You also heard from her the possible ways that the mixtures could have gotten on the firearm. She talked about the inherent limitations to DNA evidence. Looking at it, all she can say is there's a mixture and it includes these two people.

She explained to you how primary and secondary transfers happen. She also conceded that there's no way of telling how long that DNA has been there. I walked her through an entire hypothetical. If me and her are holding hands, I touch something, put it in my briefcase and it sits in my briefcase for a week or two or a month, that mixture would still be there. Somebody came along and put something

else in my briefcase, as long as it didn't disturb the other item, or even if it did, that mixture might still me there. There's no way of telling for sure. She can't say scientifically one way or another. So as an analyst, she can't tell you how long the DNA has been there or how it got there.

Now, importantly, I asked her did she receive a summary of this case along with the DNA requests for the gun? She said, yes. She reviewed it on the stand and I asked her, how many people were you told were in that vehicle? She looked at it. Two. She knew that -- she heard that there were two people in the car, she never heard about the third person. She never knew the uncle was in the car.

And when I asked her if she was ever submitted a third buccal swab, not from Torres, not from Pinuela, in this case, she said, no, only from Torres and Pinuela. So in other words, the only two people she could have tested against the firearm were these two. She never received a third.

So even after hearing from the forensic experts in this case, there was still no physical evidence or testimony that Torres knew that the gun was in the backpack or he entered into a conspiracy. The FBI laboratory expert explained to you exactly how Torres's DNA could have ended

up in a mixture that was on that firearm without ever having touched it. She said it under oath from that very seat.

So at that point, that's pretty much the government's case. That's what was presented here in this courtroom. So what's left is what about the statements? What about the statements that were made?

You just saw some of the jail calls that were recorded and the transcripts. You heard from the government's cross of Ms. Pinuela that that in six months of 2022 Torres had made over 1200 phone calls to just Pinuela alone. So you can imagine in that time how many phone calls were made and recorded. Of all those calls, two were presented to you. Just two.

And I asked you in opening to pay particular attention to who is saying what. And it's not Torres that's saying, oh, it must have been a confidential informant, I must have gotten snitched on, it's must have been this, it's Ferdinand (ph). He's the one telling him, Torres is seen -- when you go back and look at the whole transcript, Torres is seen multiple times saying, no, no, the police told me they came up us on because of a blunt. Remember, he's a 22-year-old that's in jail. And he's like, that's not true, the cops told me that they saw me smoking a blunt.

What's very interesting, when you go back and look at those transcripts is Ferdinand says, nope, they were

watching you since the gas station. The gas station? According to Veronica's uncle. So Ferdinand is talking about this case and getting false information from who? Veronica's uncle of all people. He's on the transcript twice. So I ask you, look for the source of the misinformation, take that into consideration, and listen to who is saying what.

And there is talk about weights. But the government said to you, oh, at that time they don't have discovery, this, that, and the other. I submit to you he's booked, he's in jail, he knows what the charges against him are. Common sense tells you if you're in jail, they're not gonna just put you in jail and not tell you what it is, you're gonna see what your charges are. 400 grams is pretty specific. That comes from -- they put that on you, means they're not saying that the cops planted that on you, they're saying, yo, they charged you with about 400 grams. He says, huh-uh, a whole one broken up. That's what he's talking about.

The rest of it, you have to take it into its own context and you have to pay attention to what the Judge said -- I'm sorry, to one of the instructions that you just heard. If the government offers evidence that a defendant made a statement or admission to someone after being arrested or detained, you must consider that evidence with

caution and great care. You must decide for yourself whether it's the defendant that made the statement and, if so, how much weight to give it.

To make those decisions you have to consider all the evidence. And I say that to tell you this: We know from all of the evidence that came through here and the people who were involved in this investigation for over two years there was never a confidential informant, nobody snitched on anybody, there was no -- so whoever is giving him this information is misleading him. He's telling him something that we know is not true.

So at that point the government rested. That was all the evidence that they had to prove beyond a reasonable doubt that Mr. Torres knew there was a gun in the car and that he knew that -- what Pinuela had in her backpacks. Now I submit to you, after two years of jail calls and all the 1200 calls to Pinuela and everything else, what you didn't hear is Torres and Ferdinand saying, hey, man, you had a machine gun in the car or what about the fentanyl? If the government's theory is he's talking so openly about cocaine, which I submit when you go back and look at that in its context, all Torres is wanting is let's get Pinuela out of jail, how are we gonna get a bond, can we get her an attorney from Orlando, he costs $30,000, well, this guy owes me 6,500. There's a lot of talk about money, bonds, and

they're going back to the charges and everything else. Read it for yourself. But understand that you have to take it in its context. He's in jail, doesn't know how he got there, he's trying to make sense of the situation, he's getting misleading information from the outside. He can't control what they're telling him.

And you heard from Ms. Pinuela that Mr. Torres and his dad and his brother bought vehicles at auctions and sold them. That's the money. That's the money that they're talking about that somebody in Orlando owes him or wherever it is. To just look at this and take small snippets out of context and say, oh, that must be drug money they're talking about is going much further than what the evidence proves.

Now, at that point the government rested. I submitted into evidence Ms. Pinuela's drug tests, so you can see it for yourself. And counsel for Ms. Pinuela called her to testify. She said a story that nobody had heard before. You saw Sousa's reaction when I mentioned it. She told a story of abuse and alleged violence that there was absolutely no evidence of. She had two years to come forward with any evidence about what was happening. And to be honest with you, they're very serious allegations that shouldn't be put forth and there was absolutely nothing and it was so incredible that I can't believe it was even put forth in front of you that -- that Torres had called three

of her high school friends on FaceTime pointing a gun at her and none of them reported it to the police. And that he also called the father of her baby on FaceTime pointing a gun at her and he didn't report it. Which I submit to you, that alone let's you know it's a lie. There's no father on earth, whether you're with the mother or not, that's gonna let that happen without calling the police. Especially if you're on FaceTime, right? He can just call 911, he's not worried about Torres shooting him at that point, right? I mean, just common sense, that didn't happen.

Same thing about what she said that Torres -- one of the craziest things she said is that Torres pointed a gun at her daughter and that she never reported it. That Torres called her mother and told her, I'm gonna kill your daughter, and that never got reported. I submit to you there's not a mom on earth that wouldn't trigger their instinct and when they get away from the person would call the police. Especially when he's in jail and she isn't. And she had two years to do it. Never filed for an injunction, never got a police report. But she had an excuse for everything. I was like, what about pictures, why didn't you show -- oh, I had pictures, but he smashed my phone, something she didn't mention on direct, oh, I just remembered. Okay. Well, in this day and age, there's no backup to those pictures, why wouldn't you, you have family,

right? He's locking you at home and he's calling you, so you must have your cell phone when he's gone. If you use common sense, why didn't you text those picture to your family, why didn't you send them to somebody else? She hasn't changed her number in these last two years, why didn't she backup her phone. I mean, it's -- the point is none of it was believable.

THE COURT: Mr. Vitier, two minutes remaining.

MR. VITIER: I'm sorry?

THE COURT: You have two minutes remaining.

MR. VITIER: Okay.

So for that particular testimony, I just ask that you review the credibility of witnesses. Number one, did the witness seem to have a good memory. When I was asking her about why she panicked about the bag or whatever, first it was the drugs, but when I walked her through all those drugs, she was like, okay, never mind, it's not the drugs, because I had the cocaine yesterday, I had a pill in the morning, and all I did was smoke weed that day. Oh, no, it was my anxiety, that's why I freaked out, I thought that bag had my kid's clothes and diapers in it and that's why I freaked out whether Jenne took it.

Same thing with the car. The car was Torres's when it was incriminating, but when it came down to explain why she reacted that way, she said, oh, no, it's my car. I

asked her who it was registered to. She's like, well, he bought it from the dealer. I'm like, that's not the question, who registered it? Oh, I went and registered it under my name. I didn't want -- I didn't want the brand new BMW.

So whether or not she had a good memory during the cross and -- the cross of the government and of myself, for the first time ever she had to ask, she was stalling, hey, can you repeat that, can you repeat that, something that didn't happen during her direct.

Number two, did the witness impress upon you one who was telling the truth? That was clearly not true.

And three, did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case?

Now, you heard from Ms. Pinuela herself allegedly she didn't want to report stuff to the police, because she was here on asylum, she wasn't here legally, and she knew that she was subject to deportation and immigration issues after prison if she got busted with these -- with this gun and those charges. So she had every reason in the world to lie to you.

She also told you that as a matter of habit Mr. Torres carried that Glock. But the night in question when he's transporting $30,000 worth of stuff, the gun isn't

on him. The police searched him, he had nothing on him. If you're protecting a product that the government said he would have had the firearm on him, but it wasn't there, it was in the bag. Why? Because Pinuela was carrying the bag. That's why the gun was in that bag.

Now, the law tells us that we have to look at the evidence objectively and remove all bias, remove gender, remove everything else, and just look at the facts of the case. Typically that's hard to do as human beings, but in this case it would be really, really easy. All you've got to do is flip the roles. If you would have heard it was Torres in his vehicle, registered to him, with his uncle riding around with those two bags, if he had a box of ammo in his console, if he had sandwich bags in his door, cellophane in the trunk to wrap up this stuff, he has got fentanyl in it.

When Pinuela is removed out of the car, it's him who jumps for the bags, it's him that says give me my shit, you can't come in my car and get my stuff. If it was him and all the evidence pointed to him as much as it does to Ms. Pinuela and you had to decide, well, she said all this stuff in the car that's illegal is hers, it must be hers, you wouldn't hesitate. You would know that it was all Torres's. So in this case the facts is no different, no different. It's hers.

You heard from the three officers from the Violence Squad that --

I'm about to wrap it up, Your Honor. I'm sorry.

-- that they have all done hundreds and thousands of cases and they've investigated women and men for guns and drugs. So the fact that she's been charged with drug trafficking and a firearm in furtherance of that should not enter into the equation.

So in short, the government fell short of their burden to prove beyond a reasonable doubt the charges against Mr. Torres, not because of anything they did, but because of the lack of investigation in this case and the lack of forensics in this case.

You heard that the most important piece of evidence in this case, that pink bag, could have been tested for DNA, and it never happened. You heard that they never processed the uncle. So as you sit here right now, you don't know if the uncle is the third person on the grip of that firearm. And you never will.

So I leave you with two things: In the jury instructions, in conspiracy, it says simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof of a conspiracy. Also, a person who doesn't know about the conspiracy, but happens to act in a way that

advances some purpose of one does not automatically become a conspirator.

The other ones all have the element of knowingly. They had to prove that he knew the firearm was in the car and that he knowingly carried the firearm in furtherance of the drug conspiracy.

And lastly, I leave you with the burden that they could not meet. Reasonable doubt is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs.

And the evidence in this case just doesn't amount to that much against Mr. Torres, which is why you need to find him not guilty.

Thank you.

THE COURT: Is Ms. Pinuela ready to offer a closing argument?

MR. LANGE: I'm sorry, we're proceeding, Judge?

THE COURT: Yes. Are you ready for your closing argument?

MR. LANGE: Yes, I am. Thank you.

Jury members, good morning. The only question of any importance left for you regarding Ms. Pinuela is after hearing all of what the government gave you, all of what the prosecutor gave you, and all of what Ms. Pinuela gave you in her sworn testimony late yesterday and, hopefully, all of

what I'm going to say to you in closing argument will have some effect to help focus on the real issue in the case.

The only question left regarding Ms. Pinuela is has the government proved by the end of the case that she is guilty beyond and to the exclusion of every reasonable doubt that she was this machine gun possessing, cocaine and fentanyl trafficking person?

So to begin this, it's -- and it gets back to the issue of reasonable doubt. Reasonable doubt is proof of such a convincing character, the prosecutor's burden a hundred percent of the time. Ms. Pinuela has no burden to prove anything. A hundred percent of the burden falls on the prosecutor. It's a very heavy burden. Beyond and to the exclusion of every reasonable doubt is proof of such a convincing character that you would rely on it without hesitation in deciding the most important of your own personal affairs.

Now, just in your own personal life -- it's a very well written legal definition of reasonable doubt, beyond a reasonable doubt. Think in your own personal affairs, what's the most important issue that you might have with your children, yourself, your husband, your significant other, your church, whatever the most important issue is, your parents, would you, based on what the prosecutor has given you, based on considering all of what Ms. Pinuela gave

you and, hopefully, based upon what I'm gonna chat with you about, would you without hesitation rely on what's presented to prove beyond a reasonable doubt that there is no reasonable doubt that she is a machine gun possessing, drug trafficker of fentanyl and cocaine? The stuff in those black and pink bags from the co-defendant, the co-defendant's black and pink bags that he put in that vehicle with the machine gun and the fentanyl trafficking quantity and the cocaine trafficking quantity.

We are not talking about personal. These comments about, well, her drug addiction and personal drugs around the car. That's not what this is about. This -- this is a drug trafficking case involving very specific stuff that horrible trafficking kilo of cocaine, the cocaine amount, that horrible trafficking fentanyl amount, and that horrible machine gun in those bags.

Beyond every reasonable doubt, are you convinced, are you made sure from all of what you've heard in this case that she is guilty, because -- because if there is a -- if there is a reasonable doubt that you have, just as if you had analyzed it in your own personal issues, whatever the most important issue in your life is, would you without hesitation make that most personal decision based upon the stuff that was present here in terms of finding -- finding her guilty? I would suggest you would not make your most

important personal decision based upon, without hesitation, like without hesitation, not -- based upon what's been presented here regarding trying to make Ms. Pinuela this machine gun carrying -- machine gun possessing drug trafficker.

So it's all about reasonable doubt. The law says if you have one reasonable doubt on this issue of whether she is this machine gun possessing drug trafficker of cocaine and fentanyl, the Judge says if you have -- the law says if you have one reasonable doubt you must give that benefit of that doubt to Ms. Pinuela, because the doubt is reasonable. That's the reason they've got a hundred percent of the burden of proof from beginning to end and they have to exclude every reasonable doubt in this case. They can't leave a reasonable doubt hanging, because if they do that, even a single reasonable doubt hanging that's not resolved by you guys, the law demands that if -- even with a single reasonable doubt you must give her the benefit of the doubt and find her not guilty for -- because the doubt is reasonable. All right.

Now, I happened to have counted ten reasonable doubts as we go through the case. We're going go through now exactly what happened in the case. Your count may be different than mine. You only need one reasonable doubt. And I know you're gonna have one. I'm suggesting I counted

ten, you may count one or more. It doesn't really matter what I count, but I want to go through it to suggest to you where the reasonable doubts lie that they have answer, that they have to exclude. See, they can't just leave a reasonable doubt hanging, they've got to disprove that reasonable doubt. Make it unreasonable. In any event, let's begin.

My first reasonable -- my first -- my first mention of a reasonable doubt exists with -- well, he's now Lieutenant Jenne. He was Sergeant Jenne who was head of the Violent Crime Task Force here that oversaw the case back two years ago. And you remember -- you remember now Lieutenant Jenne, you remember Lieutenant Jenne, very professional, very honest appearing, very thorough, very well educated in his job, very well trained in his job. This is the target gazing, what I'm calling the target gazing, what he called the target gazing case.

Target gazing, he studied the -- the criminal science of the mind and the psychology of criminals when they're hiding things like guns, like machine guns, or things like trafficking amounts of cocaine and fentanyl in bags. And they begin -- and they have those -- those bags around and they begin to target gaze. They begin to stare at these bags. And from his training and experience, which was -- which was -- which is I thought was amazing, to tell

you the truth in terms of his preparation on all this, he could really almost be qualified as a police expert in target gazing.

He said that he saw -- when those -- pink and black bags were between the co-defendant's legs as he's sitting in the front passenger seat of the black SUV, after the vehicle is stopped by the police, he's looking from outside. Now, Officer Maceo is by the rear -- rear window talking to the co-defendant about the -- smoking the joint. But Sergeant Jenne was right behind him looking -- looking in to see. The first thing he's focusing on is possible violence. Could be drugs also, but he's concerned with firearms and safety for his officers and himself. And he started this target gazing down at these bags that were right tucked between the co-defendant's legs on the floorboard. And he's counted up to 11 different target gazes that this co-defendant made at that bag. Down, up, down, up, down, up, while he's sitting there during the process of Maceo trying to get information about the -- about the smoking the marijuana. He's focused on those bags, 11 times Lieutenant Jenne said he saw him target gazed. He was convinced, convinced as an expert in this kind of police science, that these bags contain something, likely a firearm, certainly -- certainly drugs, but likely a firearm. That was just his experience, training, and he

knew to target -- what the target gazing meant. Innocent people don't target gaze at bags in a car 11 times.

He said there's a difference between people that have a lawful gun in the car or have maybe some prescription drugs in the car, their behavior is much different than a criminal like a co-defendant who is target gazing down at his cocaine, his fentanyl, his machine gun in those bags.

And the other -- the interesting thing and why I'm making this my number one reasonable doubt at this point is he also -- he doesn't miss a thing, Lieutenant Jenne. He also -- because remember, I asked him, I said, did you happen to notice -- I know you were focused, obviously, mostly on the co-defendant, but did you happen to also pay attention to my client, the driver? He said, oh, yeah, I did. I said, did you see any target gazing at all from her? He said, no. Jenne would not have said that, remember he was a prosecutor witness, he wasn't my witness. This guy is the straightest arrow that you can find. He was just telling it right down the middle. Did you -- did you look to see if my client target gazed? Yes, I looked. Did she target gaze? No. That tells you a lot in terms of who the criminal is regarding the stuff in those two bags on the floorboard. Reasonable doubt. Ken Lange's reasonable doubt number one.

My number two reasonable doubt is the

co-defendants, once the car was -- the car was stopped by the police in the Bahama Breeze parking lot, the co-defendant is, of course, talking about the smoking the joint and all that. And they get him out of the car and he begins to spontaneously -- this is not -- this is not some police interrogation where he needs to be concerned that he may be pressured into making statements. This is not something that he thought of later on after he had time to manufacture a story. This is -- these are spontaneous statements that he made. Nobody questioned him, nobody -- there was into pressure, he just was getting out supposedly for this illegal smoking of a marijuana cigarette. And he starts -- he starts volunteering spontaneously volunteering the fact that Ms. Pinuela is guilty of none of this. Whatever it was in the car, all the stuff is illegal in that car is his. None of that was hers. Don't arrest her. It's all mine.

And once they pull those -- his bags out, the pink and the black bag and they find the machine gun and the trafficking amount of cocaine and the trafficking amount of fentanyl, they put the bag -- Sergeant -- at that time Sergeant Jenne puts the bags on the hood of the black SUV. As Officer Maceo is walking -- walking out the co-defendant, he looks right at those bags sitting on top of the hood of the black SUV. And then he continues making his statements,

all that stuff is mine, looking right at those bags that had the -- the machine gun and the coke trafficking amount and fentanyl traffic amount, all that stuff is mine. Now he's saying all this spontaneously, no one is making him say this, no one is forcing him, no one is threatening him. And that's why I think it should be considered to be important and believable, because it's the -- when a person is spontaneously making statements without anybody forcing them and threatening them or they don't have time to conjure up some kind of a story, that's the most honest information you are gonna get out of somebody.

What he's blurted out, all this that he -- he did it a bunch of times on the scene with the officers, not just once, about she has no fault, she -- all the stuff is mine in the car, it's all illegal, it's all mine. Everything is mine. Including the stuff that was in the pink and black bags, including the machine gun, including the trafficking amount of cocaine and fentanyl.

This is the most believable spontaneous statements in the world. Every spontaneous statement he made was -- was bad for him. Certainly what he was saying was bad for him, and yet he was making it, because it may be -- it may be the one time in his life where he has done a decent -- he has a done a decent thing. And that decent thing is telling the truth about -- about who was responsible for that poison

that he had in those bags and the machine gun he had in those bags, that would -- he would get credit from me. As Ms. Pinuela's lawyer, he gets no credit from me for anything else, but he gets credit for me --

MR. VITIER: Your Honor, objection.

THE COURT: What's the basis? Is there any basis to the objection?

MR. VITIER: Yes, Your Honor, it's nothing that's in evidence.

THE COURT: Overruled.

You may continue.

MR. LANGE: He's gonna -- you know, none of this is helping him, and yet he's saying very clearly that all of it relates to him. And it makes it very powerful and it's my number two reasonable doubt as to why Ms. Pinuela is not beyond and to the exclusion of every reasonable doubt guilty of being this machine gun possessing drug trafficker of the coke and the fentanyl in the pink and black bags.

Now, moving along to the next phase of this is the time before -- before March 8th, the date of the traffic offense and all that stuff. Going back over the months where Ms. Pinuela first met the co-defendant and they start off having -- as you know, having a good relationship. She was falling for the guy. He seemed like a good guy, seemed like a good fellow. And she ended up toward the end of that

prior year moving in with him. And as she told you, that's when hell started. Hell began once -- once she moved in with him, because he became totally different, like Dr. Jekyll and Mr. Hyde, like -- like you're one personality and then you're another person -- a different personality. He became aggressive. He became -- he -- brutal, he beat her, he choked her, he -- he held a gun, the Glock, this Glock to her head, which he always carried. When she had her baby, her two-year-old at that point, her baby, Lua, with her. You know, she would be carrying the baby, he would still have the gun to her head. You know, and it became a point where at some point during all this -- all this, she, when he had laid down the gun -- I mean, he was -- he would lock her -- he would lock her in her room, he wouldn't discuss -- he wouldn't let her ask any questions about what was going on, his male friends would come over, he's a very macho guy. He didn't include her in any of his conversations about business. He just treated her like -- like a -- like he felt a woman should be treated, which is just for sex, not for anything else. She's good for one thing --

MR. VITIER: Your Honor, again --

THE COURT: Sustained. No basis in evidence for that statement. The jury will disregard it.

MR. LANGE: Well, Ms. Pinuela was abused by this

guy seriously and, as a result of that, during one of these times -- after one of these times when he put the gun to her head when she was holding her baby, he put the gun down, she picks the gun up, puts her finger on the trigger, holds it at him and says, I'm gonna shoot you, kill you. She felt so threatened by her and that the baby was threatened that she held it on him. And there were other times when she would have picked the gun up and passed the gun to him when he was coming out of the shower or other times in the house.

So obviously, her DNA is on the gun. But it's not on the gun because of her involvement in any of this drug trafficking with the coke and the -- and the fentanyl, it's because it is his machine gun and she couldn't -- should she have picked up the gun and pointed it at him? Probably not the smartest thing to do, but she was responding to the constant abuse she was getting from this guy. And that's how her DNA got on the gun. That's my reasonable doubt number three.

Reasonable doubt number four is in the same context, when she was living with him. You know, they talk about, well, he's -- she joined the co-defendant as a conspirator and an accomplice to all this. Listen, she testified that he was a very macho guy, he only talked to men, he didn't do any business, he told her not to ask about his business, he would never do business with a women. So

what do you think the odds are of him bringing into a very serious cocaine case with trafficking amounts of cocaine, trafficking amounts of fentanyl, a machine gun, why would he bring a woman into this when he refused to even speak or deal with her? And plus, he was beating on her anyway. This is not the kind of person you're gonna bring into a serious drug trafficking conspiracy as a partner. That's reasonable doubt number four.

Then he begins to -- then he begins to give her drugs, feed her drugs, small quantities of various drugs, to keep her under control. She wasn't doing drugs before. She didn't want to do drugs, but she was kind of in love with this guy. Even with all the beating, abuse, I'm asking her, how can you stay with this guy? That's a natural question, but she just felt that -- you know, she was hanging in there even with all the abuse and the disrespect.

But then he started feeding her drugs and she didn't want to do it at first, but then she did. And he got her hooked on various small quantities of various drugs. That has zero to do, even though they tried to make it, oh, this is an issue, this is not an issue. The issue is in the black and the pink bags, the quantity of -- of the traffic -- drug trafficking quantity of coke and fentanyl and the machine gun, that's the issue. Those are the three things that are the only issue in this case. All this other

stuff is smoke and mirrors that they're trying to -- somebody back there is trying to -- is trying to raise as an issue?

MR. VITIER: Your Honor, objection.

THE COURT: What's the objection?

MR. VITIER: Can we approach?

MR. LANGE: I'll move on, Judge.

THE COURT: Yeah, overruled. But move on Mr. Lange.

MR. LANGE: All right.

So keeping her under control with these drugs, what are the odds of him then bringing her into any drug trafficking conspiracy as a partner that he would have, this particular drug trafficking conspiracy. He would never use somebody that he's keeping -- he's keeping control over by feeding her small amounts of drug. You have to have somebody that's clear minded as a partner in a drug trafficking operation of this quantity. You're not talking about moving small amounts of drugs or possessing small amounts of drugs. You're talking about moving a lot of coke, a lot of fentanyl with a machine gun. The only person -- kind of person you're bringing in is another guy who -- who this guy, the co-defendant, feels is gonna be reliable. And it's not gonna be a woman he's feeding drugs -- personal use drugs to -- to get her hooked on drugs

so he can dominate her and control her. That's the next reasonable doubt.

Then the business about the car, the black SUV. Whose car is it? Well, he knows -- it's on the video, he gets out of the -- when he first gets out of the car with Officer Maceo, he says, this is my car. Okay. But we know from Ms. Pinuela that even though the car was in her name, you know, he put -- for whatever his reasons were, whether he was a convicted felon or for some other reason, he wanted to put the car in her name. But he -- he was constantly using it, constantly driving it, and obviously, it was a drug wagon for him. It was his drug wagon. It was a place where he dealt things in terms of drugs. He was using that as his drug -- as part of his drug operation. All right? Next reasonable doubt. That would be my next reasonable doubt.

So we get now to the actual March 8th date and exactly what happened on March 8. Ms. Pinuela's uncle had come down from Atlanta to visit and stay with her mom in town here for a few days. On that particular day, March 8th, Ms. Pinuela -- the uncle wanted to do a little shopping and Ms. Pinuela said, okay, I'll take you shopping. And she tried to call -- or she did call the co-defendant, saying, I'm gonna take my uncle shopping with the baby, Baby Lua, two-year-old Lua. No, no, you can't do that, I'm gonna

send over Anna. Now, Anna is a friend -- is not particularly her friend, but she's the girlfriend of one of his boys, a guy by the name of Emilio. And that name becomes important later in the case.

And he said, no, no, Anna will come over, she's got a two-year-old like yours and she'll come over and she'll take you and Lua and your uncle shopping. So they all go shopping for several hours. They come back, the co-defendant calls and says, okay, you're back, I want to take your uncle out for dinner, you and your uncle out for dinner at the restaurant. So she says, okay.

And, now, Anna was also gonna go with her boyfriend, Emilio, in a separate car and meet them at the restaurant and they were all gonna have dinner together at the Bahama Breeze.

So Anna -- Anna drops off her baby at home, Ms. Pinuela drops off hers with her mother, and Anna -- Anna comes and takes the uncle and Ms. Pinuela to meet the co-defendant to take them out to dinner. But they don't meet at the co-defendant's house, they meet at another guy's house by the name of Vargas, Jorge Vargas, who is another one of these male pals of the co-defendant.

And Anna goes -- pulls up in front of the house, of Vargas's house, she goes -- she let's Emilio know that they're there. He says, come on up. Because she has to get

the keys for the black SUV, because the co-defendant had the black SUV there.

So she gets the keys and she brings it down. Now, there was still stuff in the shopping day that the uncle and Ms. Pinuela had. And so they had to transfer some of the shopping stuff that was -- that they bought -- she bought for her baby, Lua, and whatever he bought, transfer that into the black SUV.

So Anna comes down with a key, gives Ms. Pinuela the key, Ms. Pinuela and the uncle transfer his stuff and her stuff, the baby stuff's that was left in the car, in Anna's car, into the black SUV. And they're waiting for the co-defendant to come down so they can go to dinner at the Bahama Breeze.

The co-defendant comes down with who, Emilio. They walk out of the house together, out of Vargas's house with Emilio, Anna's boyfriend who took them shopping. Anna took them shopping. Emilio is walking out of the house with the co-defendant and the co-defendant is carrying two bags. Now, it's dark, so Ms. Pinuela can see that he's carrying two bags. And he's carrying it sort of tucked under one arm or the other, kind of lurched -- kind of bent over a little bit to hide the bags, stuff them kind of under an armpit. But she can definitely recognize two bags, a dark colored one and a light colored one. That's all she could see with

the light out there. So the co-defendant -- so Emilio gets in his car, gets in Anna's car, and they're driving off to go independently to the Bahama Breeze and meet them over there.

And this is my -- this is my next -- this is my next point in terms of a critical point. Where the co-defendant brings these two bags out. Even though we can't identify them, they're light or black bags, we know those are the bags that contained the Glock and the quantities of coke and fentanyl, the trafficking quantities. Because he goes into the front passenger seat and he puts them down between his legs. The uncle gets in the backseat and my client gets behind the wheel of the black SUV and they begin to drive off toward the Bahama Breeze. That's my next reasonable doubt.

Very shortly after leaving the Vargas's house, there's a call that comes in on the phone for the co-defendant, and it's with somebody, we don't know what it was, nobody knows what the conversation was, other than they wanted to meet at this gas station, convenience store, that was close to Vargas's house. This is between the co-defendant and the guy that called.

Both vehicles pull up into the parking lot of this open gas station, convenience store. And we have a silver Mercedes, white Mercedes, I'm not sure of the exact color,

but a Mercedes pulling in also. And we know that because of the timing of the call, the guy on the other end of that call that the co-defendant got was the driver of that Mercedes.

So the driver of the Mercedes gets out and my client recognizes -- Ms. Pinuela recognizes him as a guy named Elian Gonzalez, another one of the pals, guy -- guy buddies of the co-defendant.

And Elian Gonzalez has gotten out of his Mercedes, had gotten off to the side with the co-defendant, they were having a private conversation. And Ms. Pinuela and her uncle got out of the black SUV and walked over to the Mercedes, because Ms. Pinuela recognized the girl in the front seat is the girl by the name of Zamira, who does nails, including her nails. So they have a chat. They sit outside the car chatting with her while Zamira sat in the car. And this private conversation was out of hearing between Elian Gonzalez and the co-defendant. But obviously it was connected to the bags. And that's my next reasonable doubt.

Think about the timing. Everyone is talking about the timing, the timing. Well, talk about timing that really matters. The co-defendant walks out with Emilio with two bags out of Vargas's house. He puts then in the front -- the front passenger seat, he starts -- they start to drive

to the Bahama Breeze, and just after leaving that -- Vargas's house a call comes in from this guy, Gonzalez, Elian Gonzalez, and they decide to meet right at that point. And then they go off and have this private conversation. You would have to be, you know, deaf, dumb, and blind not to see the connection between the bags that the co-defendant had, which we now know were full of trafficking amounts of cocaine, trafficking amounts of fentanyl, and a machine gun. There had to be -- obviously there was a significant connection with the way the timing happened between what he brought those bags and put them in the car to when he gets the call from Elian Gonzalez and they get out and have this private meeting and then Gonzalez drives off in his Mercedes with the nail girlfriend, Zamira.

Now that's my reasonable doubt next, because -- because obviously, my client, Ms. Pinuela, is not involved in any of this private conversation between the co-defendant and -- who brought the bags into the car from -- from Vargas's house and at the gas station when he's having the private meet-up just minutes after leaving Vargas's house having this private meet-up with in Elian Gonzalez. And that meet-up, we weren't listening to that meet up, we weren't privy to it, but you've got to know from using your common sense, which is always the benchmark in a trial like this, common sense, sound judgment, basic horse sense in

figuring out what makes sense and what is nonsense. This is, obviously, these two guys getting together to plan something to do in moving the coke and moving the fentanyl, some kind of trafficking the next step. Why else would he all of a sudden get a call coming out with the two bags and a very short, few blocks, away from Vargas's house get this call and they have this little meet-up, private meet-up, and he leaves in his Mercedes? That's my reasonable doubt, the next reasonable doubt, because my client had nothing to do with that. She had zero to do, she's talking to the nail girl. She's off on this side, she's not involved in any of that.

Okay. Now, the next -- so then they -- after Elian Gonzalez leaves in the Mercedes, my client -- my client, the co-defendant, and the uncle leave to go to the Bahama Breeze. And they get to the Bahama Breeze parking lot and they're in the Bahama Breeze parking lot and the police descend on them, because the co-defendant was smoking the joint. And then we get to Officer Maceo, after talking to him, pulling him out of the passenger side. Now, we know the bags that he put on the floorboard are still there in the floorboard. And we know from then Sergeant Jenne's testimony about the bags and the 11 target gazes and all that. He's watching behind Maceo's shoulder, looking down on the passenger side to see all this target gazing coming

from the co-defendant. And no target gazing coming from my client in the driver's side.

And then once Maceo pulls out the co-defendant, that's when he starts making all these statements, multiple statements about everything is illegal and -- here in this car is mine, nothing is illegal to her, she has no involvement, she has no -- she's doing nothing illegitimate, it's all mine. That's when he's making all these spontaneous statements.

Now, then Sergeant Jenne, of course, has seen all these -- these target gazes, these 11 target gazes from the co-defendant of the bags and he goes down -- and he goes into -- as he should have, because he knows from his training and experience there's got to be probably a firearm in there, or at least drugs, probably both. And he goes down to pull these two bags that the co-defendant put between his legs on his side of the front when he left Vargas's house, Sergeant Jenne goes to pull them out and my client does reach over, because she recognizes the pink bag. The pink bag was hers she had when she was dating the co-defendant, had left that pink bag over at the house as an overnight bag with some diapers from Baby Lua and her own overnight stuff when she would state over. This was before she actually moved in with the co-defendant. But she recognized that as her bag.

All right. That's my next reasonable doubt. Kind of lost count, but you get the point. That's my next reasonable doubt, because -- because when she is reaching over, she's not reaching over because, oh, my God, he's gonna find my cocaine, they're gonna find my fentanyl, he's gonna find my machine gun. That's not why she's reaching out, she's upset. First of all, she's saying, listen, we're coming -- she tries to tell the police, my uncle and I are coming here to have dinner. He's in from out of town on vacation, we came here to dine, to have dinner at the Bahama Breeze. Okay. But when she watches over -- so obviously, she's upset, because she hasn't done anything at all. The only -- only guy that had done anything at that point was the co-defendant smoking the joint.

So she couldn't figure out what the heck was going on. And then she reaches for the bag, but it's her bag. That's what -- she had been very upset. Now, we know that she was upset, not because she was upset that he was grabbing her bag, but because she -- because she had been fed drugs, small quantities of drugs over a period of time from the co-defendant. She was -- she was -- you know, she was, you know, hooked on -- hooked on the drugs. And some of those drugs, one of the drugs was this oxycodone. And she told you -- I don't know much about oxycodone, but apparently it can cause anger, angry outbursts. And of

course, he was also -- the co-defendant was also taking oxycodone at the same time he gave her the oxycodone, because he was taking oxycodone for -- he had had surgery on both legs and he was taking it to ease his pain. That's where the oxycodone came from.

THE COURT: Mr. Lange, five-minute warning.

MR. LANGE: All right. Thank you, Judge.

So that's -- so that's my next reasonable doubt, that she grabbed the bag not because she knew there was contraband, but because, you know, it was her bag. And also, because of the drugs, she was probably more aggressive than she should have been. No doubt about it. Because she was not completely in her right mind because of all that drug feeding that he had been doing for over a long period of time for her.

And so they get -- and then this business about getting out of the vehicle and saying something to the uncle about, well, don't say anything. She already told you that she's applied for -- for a per permanent visa, and she's here -- she's here illegally, she's applying for a visa, she was there. And her first thought was in her state of mind that she was -- that she had because of the drugs and because of the excitement of the whole thing, she said something about don't say anything. But that had to do with don't say anything because it may affect -- because he was

applying for asylum also and she was applying for asylum and she figured anything that could be said could be used in an asylum hearing against she or the uncle. That's the reason for that. That's the next reasonable doubt.

So I didn't count them, I thought I had ten, maybe not ten, maybe nine. I don't know how many reasonable doubts. But you only need one reasonable doubt to -- and the law demands that you give her the benefit of that doubt, because the doubt is reasonable. And remember, this is a focused case. In those bags, the cocaine trafficking quantity, the fentanyl trafficking quantity, the machine gun. Is she guilty of that stiff beyond and to the exclusion of every reasonable doubt? Have they proven with hard, sure, believable evidence, understanding her testimony that she gave you at length yesterday and this closing argument which I hope was somewhat helpful, that the answer would be a resounding no, she's not guilty of any of this. Not Count One, not Count Two, not Count Three. She was not involved with the co-defendant's machine gun, she was not involved with the co-defendant's trafficking amount of cocaine or trafficking amount of fentanyl, she was not guilty of any of that. That was him. That was the macho man, he was one that did it, not her.

Now you could say, okay, she took -- she got hooked on personal use drugs. That's not what we're here

on. That's not what we're here for. And that shouldn't be part of this decision. The decision is cut and dry. Have they proven beyond every single reasonable doubt that she is this machine gun possessing cocaine and fentanyl trafficker? It's either yes or no.

And we're gonna be waiting, Ms. Pinuela and I are gonna be waiting patiently. You guys have to do whatever due diligence you do in deciding your verdict. I know your verdict is gonna speak the truth as to Ms. Pinuela. You know, I -- you know I hope the truth is not guilty, because she's not guilty. But that's your decision. You have to make that decision. Okay? I'm simply -- she has been dealing -- she and her family have been dealing with this for the last two years with this case, she needs to be set free. The hostage needs to be set free. And she's the hostage and you're the only people that can set her free.

So thank you for your attention.

THE COURT: Okay. Given that we've been going for almost two and a half hours, we're gonna take a brief ten-minute break before I turn to the government for their rebuttal case and going over the verdict forms.

Because Mr. Vitier went over four minutes, I permitted Mr. Lange to go over four minutes. So government, you have four minutes additional remaining. That means I have 22 minutes on my count for rebuttal.

Ladies and gentlemen, we're gonna be in recess until 12:35. At that time we'll come back and finish closings, jury instructions, and then I'll send you back to lunch. I've ordered lunch for you, so you don't need to leave the building, you'll have that provided.

(The jury exited the courtroom, after which the following proceedings were had in open court.)

THE COURT: Members of the public, I said this before. When we return I don't want people coming in and out during any counsels' closing. So if you need to stay out, that's fine, but either be in or out by 12:35 until the conclusion of the trial.

We're in recess.

(A noon recess was taken, after which the following proceedings continued in open court.)

THE COURT: Anything before we call the jury in?

MR. LANGE: No, nothing, Judge.

THE COURT: Can you go get the jury, please.

COURT SECURITY OFFICER: Yes, ma'am.

THE COURT: Thank you.

MR. VITIER: Super quick, we forgot to renew the JOA at the close of all the evidence, I just wanted to make sure it's clear for the record.

THE COURT: Yes, I would deny it based on the same reasons as before, there's sufficient evidence for this to

be a jury determination.

(The jury was returned to the courtroom, after which the following proceedings were had in open court.)

THE COURT: At this time I'll turn to the government for rebuttal argument, and then I will go over the verdict forms with the jury.

MR. PRESTON: Members of the jury, it is said on closing arguments when the facts are against you, you argue the law. When the law is against you, you argue the facts. Well, when the law and the facts are both against you, you argue ten reasonable doubts. You argue my client didn't know. You just argue.

The United States has accepted its burden in this case to prove all the essential elements of each of the crimes charged in this case beyond a reasonable doubt.

To the extent my comments will address these ten reasonable doubts of Mr. Lange, so be it. If you need to resolve the other ones, the evidence in this case speaks volumes for the lack of reasonable doubt in this case.

Today is March 8th of 2024. It's the second anniversary of the arrest of the Defendants Torres and Pinuela. Two years. On March 8th of 2022, we saw some claims in the body-warn cameras of the officers, claims from each of the defendants in this case.

The Defendant Pinuela, to borrow her language, why

are you taking my, my, shit? She claimed the items that were in the floor of the car that then-Sergeant Jenne was taking from the car. Very agitated, very concerned, telling him to stop, telling him he couldn't do it. She claimed ownership on that date. On that same night, the defendant, Torres, claimed ownership of those items. Anything illegal is mine.

When did the relationship break down? Possibly around December of last year when that last phone call that Ms. Pinuela noted was her last jail call with the defendant; possibly. But somewhere it broke down, because what you're being presented today is the scarecrow from the Wizard of Oz pointing in opposite directions. Mr. Torres is pointing back, Ms. Pinuela is pointing forward. Wasn't mine, it was his, hers. Well, ladies and gentlemen, that's not the decision you have to make, was it either/or, because the evidence in this case has shown that it's both.

A late night dinner at Bahama Breeze, approximately 11:00 p.m., when she has two-year-old at home. Tuesday night or Wednesday night, forget which, middle of the week, they pull into the parking lot of Bahama Breeze. We've heard that evidence. The police converge on the vehicle. A lot of police. We have the seizure, we have the arrest. And then what we have is potentially two of the unluckiest people in the world, because what was seized from

that vehicle was this pink purse, which contained these drugs, approximately a kilogram of cocaine, 25 to $30,000 worth, fentanyl, approximately 160 street doses. Valuable stuff.

And what else do we find with those drugs underneath? A machine gun with a speed of discharge approximating 1200 rounds per minute. The 29-bullet clip in that particular firearm would be clean in about a second. Not target practice. Designed specifically to inflict injury or death on a human being. Possessed with this poison in order to protect it. For whatever deal was going down, reaching into that bag it get drugs out, if it was going to be a ripoff, the defendants were well protected at that point in time.

I want to talk about Ms. Pinuela first. On the second anniversary of her arrest. She took the stand in this case with two years to rehearse the tale that she told. And, ladies and gentlemen, I do not mock domestic abuse. It's a serious issue. Serious issue in society today. Always has been. But it shouldn't be bandied about as a false defense in a criminal trial and that's what you have here. And I'll discuss with you why you can consider it as a false defense in a moment.

Ms. Pinuela came and she was ready to present you with that entire story without even being questioned, she

just start rattling it off. Two years. Two years to have that story put together. But it's rife with inconsistencies with what the reality of this whole situation was. She had her answer to everything. When her DNA was 1.5 million times more likely to be on that gun than other contributors, she came up with this story, because I picked it up to threaten my boyfriend after he threatened me with that same gun. This person who has put her life in danger time and time again, according to her testimony, and she points a gun at him, threatens to kill him, and yet he's back with the gun in his pocket right after that. Does that cover your common sense? No, it makes no sense. But it was an answer she had to give, because she knew that she had handled that firearm, that her DNA was on the gun. So she came up with an excuse for it, an excuse to plug into the other holes.

Her partner threatened her, partner, Mr. Torres, threatened her time and time again, abused her. He threatened her on social media with her friends, her daughter's father, her mother, threatened her, threatened family members, and yet nobody in a situation where this person, this defendant, has had a gun pointed at her on social media, nobody has ever reported this to the police.

The first time anybody heard about this was you when she took -- well, during the opening statement, which fell a little short of what was presented to you, but what

Mr. Lange told you wasn't evidence anyhow. But the first time you heard about it was during opening statements. First time anybody heard about. Why? Because it didn't happen. It's just used to fill in the gaps, to try to cover the evidence that Ms. Pinuela is a drug dealer, in partnership with Co-defendant Torres. That's why her DNA is on the gun which is covered, under the drugs that are in her purse. That's why she got so upset, so upset when Detective -- when Detective Sergeant Jenne went to remove those items from the car.

And what was her answer to that? Why did her composure change from acting like what's happening to you can't take my stuff? Because she knew there were drugs in there, she knew there was a gun in there and so she just explodes. You can't do that. No, no, you can't do that.

And what was her excuse for that kind of behavior? Well, now we switch it over to, I took an oxycodone that morning. He gave me one pill that morning. And I used cocaine the day before. So that's why I was acting that way. An answer to everything. But not a reasonable answer.

Again, all these people who were witnesses in some respect to this alleged abuse, we didn't hear from one single person during the course of this trial. I asked her about that. Where are these friends who witnessed a FaceTime, a live encounter, where you had a gun to your

head? Why didn't they called the police? Where are they today? We're not friends anymore. Does that make sense? No. Another convenient excuse to try to cover the holes.

After March 8th of 2022, Co-defendant Torres is in jail. He's in handcuffs on -- behind his back, in handcuffs on the night of March 8th of 2022 at the scene. The defendant knows, Defendant Pinuela knows that Defendant Torres is in handcuffs. And does she tell the police that's not my stuff? He's been abusive to me, thank goodness you've got him in custody, you have saved my life, or anything of that nature? No. She turns and says to her uncle, don't say anything, we don't know anything. Translate, keep quiet, cover it up.

Now, we know from the jail call that the uncle said something and we also see the conspiracy loop being connected. All right? No, the uncle is not here, he was merely present that night, the police let him go. But what did he do the very next day? He reports to Fernand what happened and Fernand reports to Defendant Torres. We heard that in the jail call. We didn't need to play thousands of jail calls in this case. That one jail call sums it up.

Now, I'm getting to Defendant Torres a little bit here. In that jail call, which took place the very next day, March 9th of 2022, we hear Fernand, last name unknown, discussing the incident with the defendant, Torres. You've

heard it. There's a discussion about other people. I mean, talk about conspiracy. They talk about Usef (ph), Gordo, Giuseppe (ph), Macho, The Kid. Fernand's upset, there were too many cops there, they were there waiting for you, somebody had to have snitched. And then they try to figure it out. Well, why would somebody be concerned about a snitch, an informant? Why would they believe that somebody sent the police there to be at the Bahama Breeze waiting for this 10:40 p.m. encounter in the parking lot? Why would someone believe that? Even if the police didn't have that tip, why would they believe that there was a snitch that put the police on them if they weren't involved in illegal activity? There is no other reason.

So Fernand and the defendant, Torres, start discussing the incident at the Bahama Breeze and the people who may be upset about the loss of the kilogram of cocaine. And you need to collect money for bond, to pay back the drug debts. During that conversation there's a discussion with this Fernand, last name unknown, and the defendant, Torres, tells him Usef isn't going to avoid you, he owes 34 and a half. $34,500. What's the value of a kilogram of cocaine? What's the upcharge when it gets sold from its $30,000 purchase price to someone else? You can use your common sense in answering that question.

More importantly, Fernand says, they caught you

with a whole one? And Defendant Torres says, uh-huh, but broken. And Mr. Vitier comes up and tells you he had no knowledge of what was in the bag?

And that wasn't even all of it. Because further on in that conversation he discussed what was at the house and whether Fernand got the stuff in the kitchen. They try to figure out who the informant was and how the police know that they were going to go from the gas station to Bahama Breeze. Well, we know it was good police work. We know that there was surveillance being conducted in a high-crime area, that detective Maceo had the binoculars and he saw that one nugget that allowed them to follow the defendant, Torres, and the defendant, Pinuela, to the Bahama Breeze to execute that traffic stop. Whether or not it was a hunch, it paid off, because the activities and actions prompted a further search of the vehicle and secured this poison and that weapon of destruction. And they tried to figure out, they being Fernand and Defendant Torres why the police were at that location.

We have some more inconsistencies. Defendant Pinuela tells you this tale of violence and abuse that she's now been removed from. But then we hear that she's on the phone with him about ten times a day while he's in jail. What -- we also heard that she's getting money from him. Now, he's in jail. Where is that money coming from? Well,

he has his friends on the outside, drugs are being still moved. That money is coming to her. One of her primary concerns was not losing the BMW SUV. I recall the car payment that she mentioned being $1100 a month. That's a pretty sizable debt that she's collecting and paying from Defendant Torres while he's sitting in jail. Is that consistent with somebody who should be thankful that the hell, as she called it, she was going through is over? Common sense suggests no.

Still taking money from him. Still talking to him. And when questioned about it on cross-examination, he would get mad at me if I didn't take the calls. He's in jail. Your life is better. It's not better if you don't have that cash coming in, though. If you don't get to drive that BMW SUV that you're paying $1100 a month for.

Let's go back to the scene. When she's grabbing for the bag, we talked about that as well. That was you, wasn't it? Yes. But I took drugs, a pill that morning, cocaine the day before, so I wasn't acting in my right mind. The video does not bear that out. We don't see a person in that video who is deluded and under the influence of drugs to the extent that she's not acting voluntarily, knowing what she's doing. She's very deliberate, acting cool, exploding when she realizes that stuff is going down when those bags are being removed, crying when she realizes that

they have been removed, cools down when she thinks that her boyfriend just took responsibility, and even cooler when she tells her uncle, don't say anything.

THE COURT: Mr. Preston, two minutes.

MR. PRESTON: Yes, ma'am.

Ladies and gentlemen, on behalf of the United States, I want to thank you for the careful time and attention you've paid to this case. And with that said, the case is about to be yours. There are a number of things that no counsel here talked about that you get a chance to talk about if you need to in resolving this case. But again, I submit to you that the United States has proven beyond a reasonable doubt all of the elements of each crime charged against each of these defendants. And after your deliberations, you can return to this courtroom and you can face the defendants and you can tell them, Defendant Torres, Defendant Pinuela, each of you is guilty as charged. So say we all.

THE COURT: Okay. Ladies and gentlemen, I have just a few instructions remaining.

When you get to the jury room, choose one of your members to act as the foreperson. The foreperson will direct your deliberations and will speak for you in court.

Now, you've seen both of these projected on the overhead. I'm gonna go over them now with you.

There are two verdict forms that have been prepared for your convenience, a verdict form for each defendant. You need to complete them separately and return them separately.

The one verdict form for Ms. Pinuela has the three counts with your determinations listed that she's been charged with.

Count One of the indictment asks you about whether you find her guilty or not guilty of the conspiracy charge.

Count One has a secondary question to it as well. If you find her guilty of the offense charged in Count One, then you further need to determine the amount that the government has proved beyond a reasonable doubt as to the drug quantities. There's a box for cocaine if it was weighing over 500 grams or more, weighing less than 500 grams, or none. And then there's a question about fentanyl, whether there's a detectable amount or none. You need to indicate which if you find her guilty of Count One.

For Count Two the first question with regards to the possession with intent to distribute a controlled substance, you need to indicate whether you unanimously find her guilty or not guilty.

The second question is similar to that found in Count One. If you find her guilty as to Count Two, then you'll be asked the same question, to indicate whether the

amount of cocaine was 500 grams or more, less than 500 grams, or none. And then with fentanyl whether it was a detectable amount or none.

With regards to Count Three, this is possession of a firearm in furtherance of a drug trafficking crime. You first need to indicate your verdict as to guilty or not guilty.

If you find her guilty as to Count Three, then you further need to indicate whether you believe the firearm was proved beyond a reasonable doubt to be a machine gun, yes or no.

The foreperson then dates and signs the verdict.

Now, Mr. Torres's verdict form, which I said is a separate form, so you'll complete it separately. Count One, Two, and Three look similar, in that Count One first has you indicate whether Mr. Torres you find him unanimously guilty or not guilty.

You will be asked to indicate the same amount of drugs, cocaine, whether it weighed 500 grams or more, less than 500 grams, or none. Fentanyl whether there was a detectable amount or none. And that's only if you find him guilty of Count One.

Count Two, it's the exact same in terms of the layout. For the offense with possession of intent to distribute a controlled substance, you first indicate guilty

or not guilty.

If you find Mr. Torres guilty, then you'll be asked the same questions to complete, weighing 500 grams, less than 500 grams, or none of the cocaine. And then with regards to fentanyl, detectable amount or none.

With regard to Count Three for Mr. Torres, the possession of a firearm in furtherance of a drug trafficking crime, you indicate your verdict, guilty or not guilty.

If you find him guilty then you would be asked to indicate the same question about whether the firearm was a machine gun, yes or no.

Now, Mr. Torres was charged with four counts, so his verdict form has the fourth count listed. That's to the offense of possession of a firearm by a convicted felon. You need to indicate your verdict, guilty or not guilty.

At the end it has the date and the foreperson signs that verdict form as well.

When you have reached a verdict, you can indicate this to the Court Security Officer and he will let me know and we'll come back to court.

Now, you'll take these verdict forms with you and the evidence will be sent back for your review as well.

When you have all agreed on the verdicts, your foreperson must fill it out, sign it, and carry it back in. And then I'll turn to that foreperson to indicate their

verdict -- your verdicts when you come back to court.

If you need to communicate with me at any time, please write down your message or question and give it to the Court Security Officer. The Court Security Officer will bring it to me and I'll respond as promptly as possible, either in writing or by talking to you back here in court.

But I caution you not to tell me how many jurors have voted one way or the other at the time if you do send me a note.

The last thing I need to go over before I ask you to begin your deliberations, two of you were selected to be alternates in this case. That's Ms. Patricia Dinninger and Ms. Desiree Lopez. At this time I will excuse you from remaining here at the court house. Make sure that the Courtroom Deputy has your contact information.

You are to remain under your oath as a juror. And what do I mean by that? Don't Google, don't research, don't talk about the case, just as you have been doing all week. Stay abiding by those parameters that you were instructed on the first day.

When the jury reaches a verdict and it's announced in court, I will have the Courtroom Deputy call you to let you know you've been released from those obligations. I ask that you maintain those promises you took as a juror until we have a verdict in case one of the other jurors falls ill

or there's some need to replace one of them.

So at this time, Ms. Dinninger and Ms. Lopez, thank you for your service, you are free to leave.

The other 12 of you, I'll ask you to now retire to the jury deliberation room. There's lunch there and you can let the Court Security Officer know once you've reached verdicts.

(The jury exited the courtroom, after which the following proceedings were had in open court.)

COURT SECURITY OFFICER: The jury is out of the courtroom.

THE COURT: Anything else that we need to bring up?

MR. LANGE: Nothing from Ms. Pinuela, Judge.

THE COURT: Does the Courtroom Deputy have everyone's contact information?

Mr. Lange, you said you didn't have a cell phone. How will the Courtroom Deputy --

MR. LANGE: I'll be here on the floor. I will not leave the floor.

THE COURT: Okay. I don't care if counsel leaves, you may leave as long as you're in close proximity and the Courtroom Deputy can get ahold of you if we have a verdict or otherwise need to reconvene.

Okay. We are in recess until I hear from the

jury.

(Defense counsel reviews evidence prior to being sent back to the jury.)

THE COURT: Okay. Ladies and gentlemen, I have been informed that they have a verdict. Anything I need to address before we call the jury in to receive it.

MR. LANGE: No, Your Honor.

MR. CHANG: No, Your Honor.

MR. VITIER: No, Your Honor.

THE COURT: Ladies and gentlemen of the public who are observing, whatever the verdict is, you need to maintain your composure. So there will be no outbursts and the like. If you are gonna have difficulty complying with that, you should go ahead and remove yourself from the courtroom at this time. Understood?

Please bring the jury in.

(The jury was returned to the courtroom, after which the following proceedings were had in open court.)

THE COURT: Okay. Ladies and gentlemen of the jury, I've been informed that you have reached a verdict.

Mr. Szuts, are you the foreperson?

JURY FOREPERSON: I am, Your Honor.

THE COURT: Can you pass forward the verdicts to the Court Security Officer.

(Verdict passed to the Court.)

THE COURT: Okay. Mr. Szuts, are these the unanimous verdicts of the jury?

JURY FOREPERSON: They are, Your Honor.

THE COURT: I'm gonna now publish the verdicts. What that means is I'm going to read them out loud.

Ladies and gentlemen of the jury, please pay close attention, because after I do this, one of the parties may ask for me to poll the jury and, if that's the case, then the Courtroom Deputy will ask each of you if this is in fact your verdict.

So I'm going to read the verdict as it relates to Mr. Torres first.

As to Count One, the offense of conspiracy to possess with intent to distribute and distribute a controlled substance, in violation of Title 21, United States Code, Section 846, 841(b)(1)(B) and 841(b)(1)(C), beginning on an unknown date, but no later than on or about March 8th, 202 2, we, the Jury, find the defendant, Elias Xavier Rosario Torres, guilty.

The second part of the question. We, the Jury, having found the defendant guilty of the offense charged in Count One, further find with respect to that count that he conspired to possess with intent to distribute the following controlled substances in the amount shown:

For cocaine, the box marked weighing 500 grams or

more is checked. For fentanyl the box marked a detectable amount is checked.

For Count Two, as to the offense of possession with the intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841(b)(1)(B), and 841(b)(1)(C), on or about March 8th, 2022, we, the Jury, find the defendant, Elias Torres, guilty.

With respect to the second question, we, the Jury, having found the defendant guilty of the offense charged in Count Two, further find with respect to that count that he possessed with intent to distribute the following controlled substance in the amount shown:

The box checked is weighing 500 grams or more for cocaine and the box checked for fentanyl is a detectable amount.

Count Three of the indictment. As to the offense of possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c), on or about March 8th, 2022, we, the Jury, find the defendant, Elias Torres, guilty.

We, the Jury, having found the defendant guilty of the offense charged in Count Three further find beyond a reasonable doubt that the firearm possessed in Count Three was a machine gun, and the box checked yes is marked.

With regards to Count Four of the indictment, as

to the offense of possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g), on or about March 8th, 2022, we, the Jury, find the defendant, Elias Torres, guilty.

So say we all, this 8th day of March, 2023 (sic), signed by the foreperson.

Now I'm going to read verdict as it relates to Pinuela.

With regard to Count One of the indictment, as to the offense of conspiracy to possess with intent to distribute and to distribute a controlled substance, in violation of Title 21, United States Code, Section 846, 841(b)(1)(B), and 841(b)(1)(C), beginning on an unknown date, but not later than or about March 8th, 2022, we, the Jury, find the defendant, Veronica Pinuela, not guilty.

As a natural result, nothing is checked with regards to question two for Count One.

As to Count Two of the indictment, as to the offense of possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(B) and 841(b)(1)(C), on or about March 8th, 2022, we, the Jury, find the defendant, Veronica Pinuela, guilty.

We, the Jury, having found the defendant guilty of the offense charged in Count Two further find with respect

to that count that she possessed with intent to distribute the following controlled substance in the amounts shown. For cocaine the box marked weighing 500 grams or more, for fentanyl, the box marked a detectable amount.

For Count Three of the indictment, as to the offense of possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 824(c), on or about March 8th, 2022, we, the Jury, find the defendant, Veronica Pinuela, guilty.

With respect to the second question, we, the Jury, having found the defendant guilty of the offense charged in Count Three further find beyond a reasonable doubt that the firearm possessed in Count Three was a machine gun. The box marked yes is checked.

So say we all this 8th day of March -- I see now the verdict forms say 2023. That's a scrivener's error, it should say 2024, March 8th, 2024. But they're both signed by the foreperson.

In light of that scrivener's error, that was my fault, I'm gonna return this to --

Mr. Szuts, if you could cross out and put the correct date here.

Yes, I sent both verdict forms back, the preform had March 2023 and it should say March 2024. So just for appellate purposes, I would like the date to be accurate.

You can initial by both of them, that's fine. Just where the date -- where it says 2024 -- 2023, just cross out and put the correct date.

Counsel, does anyone wish for the jury to be polled?

MR. WILLIAMS: Yes, Your Honor.

MR. LANGE: Yes, Your Honor.

THE COURT: Okay. Once I receive the verdict forms back, I'll ask the Courtroom Deputy to do that.

And for the record, the only edits made were to -- from 2023 to 2024, signed and dated by the foreperson.

Madam clerk, if you could please poll the jury at this time.

THE DEPUTY CLERK: Ms. Henderson, is this your verdict?

THE JUROR: Yes, it is.

THE DEPUTY CLERK: Ms. Henderson, is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Mr. Virelles, is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Ms. Davis, is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Mr. Szuts, is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Ms. Solanki, is this your verdict for Mr. Torres?

THE JUROR: Yes.

THE DEPUTY CLERK: Is this your verdict for Ms. Pinuela?

THE JUROR: It is.

THE DEPUTY CLERK: Ms. Turner, are you able to hear me okay, Ms. Turner?

Is this your true verdict for Ms. Pinuela?

THE JUROR: Yes.

THE DEPUTY CLERK: Is this your verdict for Mr. Torres?

THE JUROR: Yes.

THE DEPUTY CLERK: Ms. Fazakerley, is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Ms. Terrelonge, is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Ms. Garrett, is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Mr. Torres?

THE JUROR: Yes.

THE DEPUTY CLERK: Ms. Viergever, is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for

Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Ms. Samuel, is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Ms. Pinuela?

THE JUROR: Yes.

THE DEPUTY CLERK: Ms. Lewis, is this your verdict for Mr. Torres?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Is this your verdict for Ms. Pinuela?

THE JUROR: Yes, ma'am.

THE DEPUTY CLERK: Your Honor, the jury has been polled.

THE COURT: Thank you.

In light of that, I'll ask the Courtroom Deputy to go ahead and file and record the two verdicts on the docket.

Ladies and gentlemen, on behalf of the United States and the parties and the lawyers, I wish to thank you for your time and consideration in this case this week. I also wish to advise you of some very special privileges that you enjoy as jurors.

No juror can be required to talk about the

discussions that occurred in the jury room except by Court order.

For many centuries our society has relied upon juries for consideration of difficult cases. We have recognized that jury's deliberations, discussions, and votes should remain their private affair as long as they wish it to be.

Therefore, the law gives you a unique privilege not to speak about the jury's work. Specifically, you have no obligation to speak with the lawyers if they reach out to you, nor do you have an obligation to speak with anyone in the media or otherwise.

A request may come from those who are simply curious or from those who may wish to find fault with your decision. It will be up to you to decide whether to preserve your privacy and the sanctity of the verdict process and your fellow jurors.

Counsel, as a reminder, under Local Rule 5, you cannot communicate with the juror except for express permission granted from the Court.

Members of the jury, at this time you are dismissed and discharged from any further obligations in this case. I would like to personally thank you. If you would like to remain in the jury deliberation room, I will come by and answer any questions that I'm able to do so in

just a few moments. Thank you for your service.

(The jury exited the courtroom, after which the following proceedings were had in open court.)

THE COURT: Are there any motions to be taken up at this time?

MR. VITIER: No, Your Honor.

MR. LANGE: No, Judge.

MR. CHANG: No, Your Honor.

THE COURT: Okay. As I indicated I believe yesterday, Mr. Torres, you will remain in custody awaiting sentencing. I will set that date in the next day or so in time for the Probation Office to adequately prepare the Presentence Investigation Report.

Ms. Pinuela, you are hereby remanded to the custody of the U.S. Marshals to likewise await designation -- or, I'm sorry, to likewise await the sentencing date. I will place these probably back to back on the same date for counsels' benefit.

Yes, Mr. Lange?

MR. LANGE: I'm sorry, I was waiting until you were finished, Judge, I'm sorry.

THE COURT: If you'll give me one moment, I can give you the exact date. I had calculated it earlier this week, but I can't recall it at this moment.

Do we have it?

THE DEPUTY CLERK: June 10th.

THE COURT: June 10th. 10:00 and 11:00? Okay.

MR. LANGE: I'm sorry, Judge, I just wanted -- I know that we had some brief discussion about the possibility of revoking her pretrial release, but she has been on a bracelet and pretrial release successfully for 23 months. And since she was acquitted on one of the three counts, there's some good news in the bad news, and I'm wondering if Your Honor, she's on a bracelet --

THE COURT: You need to show my clear and convincing evidence that she's not a flight risk or a danger to others given the convictions, which were both serious, to Count Two and Three. I don't know if it's mandatory remand.

Does government have a position on that?

MR. CHANG: It is mandatory remand pursuant to Title 18, United States Code, Section 3143, because this is a drug crime. As far as the conviction in Count Two, her remand is mandatory pending sentencing.

THE COURT: Okay. That resolves it.

MR. LANGE: All right. Thank you, Judge.

THE COURT: I also think in light of -- even if it wasn't mandatory, in light of the severity of the potential penalties and now that there is a jury verdict convicting her of two of the offenses that remand is wholly appropriate here, which is why I tried to give a preview so that affairs

could be ordered accordingly ahead of today.

MR. LANGE: I just thought I would raise in light of the acquittal on one of the counts.

THE COURT: Okay. It's denied, the motion to stay out.

So both defendants will be remanded pending sentencing. Sentencing will be set for June 10th. It's a Monday at 10:00 a.m. for Mr. Torres, at 11:00 a.m. for Ms. Pinuela.

If counsel has any current conflicts. Let me know at this time, but I would need to schedule my June calendar early in the month.

Mr. Lange or Mr. Vitier, do you have any known conflicts with that date?

MR. VITIER: I'm looking, Your Honor.

MR. LANGE: Would there be any possibility of doing the sentencing on June 10th at 1:00 o'clock instead of 11:00. That would be very helpful for me with my schedule. Is that --

THE COURT: I don't have any objection to do -- I'm going to do them together, back to back.

Mr. Vitier, could we do 1:00 p.m. for your client, 2:00 p.m. for Ms. Pinuela?

MR. VITIER: Yes, Your Honor, that's fine.

MR. LANGE: That would be perfect for me, Judge.

THE COURT: I think that that should be fine. Yes, that should be fine.

Is that fine from the government's perspective?

MR. CHANG: Yes, Your Honor, no conflict.

THE COURT: Okay. If counsel expects more than an hour, I need to know ahead of time.

MR. VITIER: Yes, ma'am.

THE COURT: And if there's any reason to continue it, I need to know very soon.

MR. VITIER: Yes, Your Honor.

MR. LANGE: Yes, Your Honor.

THE COURT: Anything else before we are adjourned?

MR. LANGE: No nothing. Thank you, Judge.

MR. VITIER: No, Your Honor.

MR. CHANG: No, Your Honor.

THE COURT: Then we are adjourned.

(Proceedings adjourned.)

UNITED STATES DISTRICT COURT )
)
MIDDLE DISTRICT OF FLORIDA )

**REPORTER TRANSCRIPT CERTIFICATE**

I, Howard W. Jones, Official Court Reporter for the United States District Court, Middle District of Florida, certify, pursuant to *Section 753, Title 28, United States Code*, that the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 122 inclusive) and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of America.

/s Bill Jones

___________________________
Bill Jones, RDR, RMR, FCRR
Official Court Reporter
United States District Court
Middle District of Florida
Tampa Division
Date: 09-23-24